# Appeal No. 2025-1557

---

# United States Court of Appeals for the Federal Circuit

---

**EDWIN DAVID SCHINDLER,**

*Plaintiff-Appellant*

*v.*

**COKE MORGAN STEWART, Acting Under Secretary of Commerce for Intellectual Property and Acting Director of the United States Patent and Trademark Office,**

*Defendant-Appellee*

---

**Appeal from the United States District Court for the Eastern District of Virginia, Michael S. Nachmanoff, *District Judge*, Civil Action No. 1:24-cv-00262-MSN-WBP**

---

**OPENING BRIEF FOR PLAINTIFF-APPELLANT EDWIN DAVID SCHINDLER**

---

**EDWIN D. SCHINDLER**
**12944 Parrot Pond Road**
**Boynton Beach, Florida 33473**
**(516)662-4231**
**EDSchindler@att.net**
**EDSchindler@optonline.net**

**Dated: May 19, 2025**          *Plaintiff-Appellant/Attorney* **Pro se**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES…………………………………….. iv

    Cases……………………………………………… iv

    International Treaties………………………………….. vii

    United States Constitutional Citations……………………. viii

    United States Code Citations…………………………….. viii

    Federal Rule of Appellate Procedure Citations………….. ix

    Federal Rules of Civil Procedure Citations………………. ix

    Code of Federal Regulations Citations…………………... x

    U.S. Patent and Trademark Office *Official Gazette* Citations.. xi

    *Federal Register* Citations…………………………….. xi

    Federal Circuit Rules Citations………………………….. xi

    Local Civil Rules for the United States District Court
        for the Eastern District of Virginia………………... xi

    Secondary Authorities…………………………………… xii

STATEMENT OF RELATED CASES………………………….. 1

JURISDICTIONAL STATEMENT……………………….......... 1

STATEMENT OF THE ISSUES………………………..………. 1

STATEMENT OF THE CASE……………….……………….... 6

    *A. Proceedings Before the ALJ and PTO*………….……. 6

**TABLE OF CONTENTS**

**(continued)**

Page

B. The Administrative Hearing Before the ALJ and the ALJ's "Initial Decision"…………………………… 12

C. The ALJ Failed to Timely Act in Accordance with 5 U.S.C. §555(b) and 37 C.F.R. §11.39(d)……….. 17

D. The PTO Amended Its Rules of Practice in July 2023 to Now Permit the Alleged "Misconduct" for Which Plaintiff Has Been Sanctioned……………… 20

SUMMARY OF THE ARGUMENT……………………………. 24

ARGUMENT……………………………………………………. 28

A.  Standard of Review…………………………………… 28

B. The OED/PTO Has Never Been Able to Reconcile Why Foreign Patent Agents and Draftsman Retained by Patent Attorneys/Agents Are Not Engaged in the Unauthorized Practice of Law Before the PTO, But That Appellant Enabled Kroll to Engage in the Unauthorized Practice of Law Before the Office…. 30

C. The PTO Amended Its Rules of Practice in July 2023 to Now Permit the Alleged "Misconduct" for Which Appellant Has Been Sanctioned, and Appellant Had the Right to Have the Issued Suspension Reconsidered in Light of the Highly Pertinent Change in the Applicable Rules of Practice……………………… 33

D. Literal Application of Local Civil Rule 83.5 by District Court Denied Appellant All Opportunity to Litigate His Constitutional Challenges, Particularly After the ALJ Explicity Refused to Decide Any Constitutional Issues………………………………… 37

# **TABLE OF CONTENTS**

## **(continued)**

**Page**

*E. The District Court Refused Considertion of Appellant's Summary Judgment Motion Requiring Independent Resolution of Questions of Law and Statutory Interpretation of the "Reasonable Time" Requirement of 5 U.S.C. §555(b)*……………………  40

*F. Local Rule 83.5 is Void, At Least "As Applied," If Not Facially*…………………………………………  46

*1. Supreme Court Case Law*………………………..  47

*2. Local Rule 83.5 is Void as Contrary to the Federal Rules of Civil Procedure*……………  50

*3. Local Rule 83.5 is Void Because the Right to Practice Law is A "Private Right" Requiring "Plenary Article III Adjudication"*…………..  52

CONCLUSION AND RELIEF REQUESTED…………………..  57

ADDENDUM

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

### Cases

**Page**

*02 Micro Intern. Ltd. v. Monolithic Power Systems*,
467 F.3d 1355 (Fed. Cir. 2006)……………………………….  51-52

*Accardi v. Shaughnessy*, 347 U.S. 260 (1954)……………………  42

*Andrus v. Glover Construction Company*, 446 U.S. 608 (1980)…  51-52

*Association of National Advertisers, Inc. v. FTC*,
627 F.2d 1151 (D.C. Cir. 1979)……………………………  17, 41

*Axon Enterprise. Inc. v. FTC*, 598 U.S. 175,
143 S.Ct. 890 (2023)……………………………  24, 39, 48-49, 53, 56

*Catalina Marketing International, Inc. v. Coolsavings.Com*,
289 F.3d 801 (Fed. Cir. 2002)………………………………..  10

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142,
132 S.Ct. 2156 (2012)………………………………………….  44

*Coffin v. Sullivan*, 895 F.2d 1206 (8th Cir. 1990)……………….  17, 38

*Davis v. United States*, 417 U.S. 333 (1974)……………………  22-23, 36

*Doe v. Hampton*, 566 F.2d 265 (D.C. Cir. 1977)………………..  43

*Doe v. United States*, 132 F.3d 1430 (Fed. Cir. 1997)…………..  16, 38

*Ft. Stewart Schools. v. Federal Labor Relations Authority*,
495 U.S. 641 (1990)………………………………………….  43

*Foseco International Limited v. Fireline, Inc.*,
546 F.Supp. 22 (N.D. Ohio 1982)…………………………  8

*In re Griffiths*, 413 U.S. 717 (1973)……….………….  16, 27-28, 53, 55, 57

# TABLE OF AUTHORITIES

## Cases

### (continued)

**Page**

*In re Ruffalo*, 390 U.S. 544 (1968)……………………………… 20, 22, 35, 45

*In re Thalheim*, 853 F.3d 383 (5th Cir. 1988)……………………   45

*Johnson v. United States*, 805 F.2d 1284 (7th Cir. 1986)……….  23, 35-36

*Lansing v. Smith*, 4 Wend. 9 (N.Y. 1829)…………………………  53

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369,
    144 S. Ct. 2244 (2024)………...  3-4, 20, 24, 27, 28, 30, 38-41,47-48

*Marbury v. Madison*, 5 U.S. 137 (1803)…………………………   28, 47

*Marcure v. Lynn*, 992 F.3d 625 (7th Cir. 2021)…………………   52

*Mass. Fair Share v. Law Enforcement Assistance Admin.*,
    758 F.2d 708, (D.C. Cir. 1985)…………………………..   43

*Mid Continental Steel & Wire, Inc. v. United States*,
    41 F.3d 530 (Fed. Cir. 2019)…………………………….   29

*Morton v. Ruiz,* 415 U.S. 199 (1974)…………………………..   43

*Oil States Energy Services, LLC v. Greene's Energy Grp., LLC*,
    584 U.S. 325, 138 S.Ct. 1365 (2018)…………………..  27, 54-55, 57

*Oman Fasteners, LLC v. United States*,
    125 F.4th 1068 (Fed. Cir. 2025)…………………………..   29

*Rewis v. United States*, 401 U.S. 808 (1971)…………………….   12

*Reuters, Ltd. v. FCC*, 781 F.2d 946 (D.C. Cir. 1986)……………   43-44

# TABLE OF AUTHORITIES

## Cases

### (continued)

**Page**

*Schware v. Board of Bar Examiners of New Mexico*,
353 U.S. 232 (1957)……………………………… 16, 27, 52-53, 55, 57

*Sameena, Inc. v. United States Air Force*,
147 F.3d 1148 (9th Cir. 1998)………………………… 42-43

*SEC* v. *Chenery Corp.*, 318 U.S. 80 (1943)…………………. 44

*Service v. Dulles*, 354 U.S. 363 (1957)………………………. 42

*Silvers v. Sony Pictures Entertainment, Inc.*,
402 F.3d 881 (9th Cir. 2005)………………………. 51

*Slingluff v. Occupational Safety & Health Review Commission*,
425 F.3d 861 (10th Cir. 2005)……………………… 29

*Strunk v. United States*, 412 U.S. 434 (1973)………………… 45-46

*Talk America, Inc. v. Michigan Bell Tele. Co.*, 564 U.S. 50,
131 S. Ct. 2254 (2011) (Scalia, J., concurring)………….. 44

*Teleprompter Cable Sys., Inc. v. FCC*,
543 F.2d 1379 (D.C. Cir. 1976)………………………. 44

*Teva Pharmaceuticals USA, Inc. v. Sandoz,Inc.*,
574 U.S. 318 (2015) (Thomas, J., dissenting)…………... 53

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)……….. 39, 49

*Tull v. United States*, 481 U.S. 412 (1987)…………………….. 56

*Trinity Marine Products, Inc. v. Chao*,
512 F.3d 198 (5th Cir. 2007)…………………………. 39

# TABLE OF AUTHORITIES

## Cases

## (continued)

**Page**

*United States v. Addonizio*. 442 U.S. 178 (1979)……………….   36

*United States* v. *Brockamp,* 519 U.S. 347 (1997)………………   51

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)…………   28

*United States v. Newbold*, 791 F.3d 455 (4th Cir. 2015)………..   23, 36

*Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991)……   14

*Vitarelli v. Seaton,* 359 U.S. 535 (1959)………………………….   42-44

*Wallace v. Bowen*, 869 F.2d 187 (3d Cir. 1989)…………………   16-17, 38

*Willemijn Houdstermaatschaapij BV v. Apollo Computer, Inc.*,
707 F.Supp. 1429 (D. Del. 1989)………………………….   7-8

*Wilson v. Commissioner of Social Security*,
378 F.3d 541 (6th Cir. 2004)………………………………   42

## International Treaty Citations

**Page**

Paris Convention……………………………………………….   11

Patent Cooperation Treaty ("P.C.T.")……………………………   10-11

## <u>TABLE OF AUTHORITIES</u>

### <u>United States Constitution Citations</u>

**<u>Page</u>**

Article III…………………………………….. 3, 5, 28, 47, 49, 52-54, 56-57

Fifth Amendment – Due Process Clause……………………… 5, 17, 55-57

Seventh Amendment – Right to Jury Trial.……………….……... 56, 57

Fourteenth Amendment – Due Process
    and Equal Protection Clauses…………………........ 16, 27-28, 53, 55

### <u>United States Code Citations</u>

**<u>Page</u>**

5 U.S.C. §554…………………………………………………….. 17, 41

5 U.S.C. §554(e)……………………………………………… 17

5 U.S.C. §555(b)…………...…… 3, 5, 17, 18, 20, 24, 26, 27, 29, 40, 42, 46

5 U.S.C. §556…………………………………………………….. 17, 41

5 U.S.C. §557…………………………………………………….. 17, 41

5 U.S.C. §706………………………………………………….… 5, 20, 28, 29

5 U.S.C. §706(2)(B)………………………………………….… 29

18 U.S.C. §2255…………………………………………………….. 23, 36

28 U.S.C. §1295(a)(1)…………………………………………….. 1

**TABLE OF AUTHORITIES**

**United States Code Citations**

**(continued)**

**Page**

28 U.S.C. §1331……………………………………………….. 1, 49

28 U.S.C. §1338(a)……………………………………………. 1, 49

28 U.S.C. §2071(a)……………………………………………. 52

28 U.S.C. §2074(a)……………………………………………. 50-51

35 U.S.C. §32……………………………………………... 1, 4, 27, 50-52

35 U.S.C. §112, ¶ 1 (now 35 U.S.C. §112(a))……………………. 14

35 U.S.C. §319………………………………………………. 54

35 U.S.C. §371………………………………………………. 11

**Federal Rules of Appellate Procedure Citations**

**Page**

Federal Rule of Appellate Procedure 4(a)(1)(B)(iii)……………. 1

**Federal Rules of Civil Procedure Citations**

**Page**

Federal Rule of Civil Procedure 1………………………………… 4, 27, 50

Federal Rule of Civil Procedure 2………………………………… 4, 27, 50

Federal Rule of Civil Procedure 3………………………………… 4, 27, 50

# TABLE OF AUTHORITIES

## Federal Rules of Civil Procedure Citations

### (continued)

**Page**

Federal Rule of Civil Procedure 58…………………………….…..        1

Federal Rule of Civil Procedure 81……………………………   4, 27, 50-52

Federal Rule of Civil Procedure 83(a)(1)…………………….…        52

## Code of Federal Regulations Citations

**Page**

37 C.F.R., Part 10……………………………………………….....   9, 31

37 C.F.R., Part 11……………………………………………….   9, 31

37 C.F.R. §11.39(d)…………………………………………   17-20, 26, 40-46

37 C.F.R. §11.504…………………………………….…  20, 21, 23, 26, 27, 35

37 C.F.R. §11.504(a)………………………………………………..  22, 34

37 C.F.R. §11.504(b)………………………………………………..  22, 34

37 C.F.R. §11.504(d)(1)……………………………………………..  22, 34

37 C.F.R. §11.504(d)(2)……………………………………………..  22, 34

37 C.F.R. §11.504(e)…………………………………………….  21, 22, 34

# TABLE OF AUTHORITIES

## U.S. Patent and Trademark Office *Official Gazette* Citations

**Page**

*Official Gazette* (under 37 C.F.R., Part 10), published
December 10, 1987 ((Appx10275-76)……………… 9, 25-26, 31-32

*Official Gazette* (under 37 C.F.R., Part 10), published
May 25, 1988 ((Appx10276)…………….………. 9-10, 25-26, 31-32

## *Federal Register* Citations

**Page**

*Changes to the Representation of Others Before the United
States Patent and Trademark Office*, 88 Fed. Reg.
45078-45088 (July 14, 2023), effective August 14, 2023
(Appx10462-68)……………….............................. 21-22, 26, 33-34

## Federal Circuit Rules

**Page**

Federal Circuit Rule 47.5(a)………………………………….. 1

## Local Civil Rules for the United States District Court for the Eastern District of Virginia Citations

**Page**

Local Civil Rule 83.5....... 3-5, 20, 24, 26-27, 29, 30, 36-40, 46-50, 52, 56-57

## **TABLE OF AUTHORITIES**

### **Secondary Authorities**

**Page**

C. Nelson, "Adjudication in the Political Branches,"
107 Colum. L. Rev. 559 (2007)……………………………..  56

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5(a), there are no cases pending in this Court, or any other court, or any administrative agency that will directly affect, or be directly affected by, this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant Edwin D. Schindler ("Appellant") appeals from a final judgment of the United States District Court for the Eastern District of Virgina, entered January 16, 2025, entitled *Memorandum Opinion and Order*, which resolved all claims. (Appx6-10) (There was no "separate judgment" entered by the District Court under Fed.R.Civ.P. 58.)  Appellant timely filed his *Notice of Appeal* on March 11, 2025, pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B)(iii). (Appx10533-34)

The District Court had subject matter jurisdiction under 28 U.S.C. §§1331, 1338(a) and 35 U.S.C. §32. (Appx60-84)  This Court has jurisdiction over the subject matter of this appeal under 28 U.S.C. §1295(a)(1).

## STATEMENT OF THE ISSUES

1. Having acted with a power-of-attorney and full authority of all clients, while exercising full, complete, absolute and sole discretion of all patent application prosecution filings in the U.S. Patent and Trademark Office ("PTO"),

- 1 -

did Appellant violate any PTO Rules of Practice by accepting work referred from Michael Kroll ("Kroll"), excluded from practice before the PTO, yet who remained a "general attorney" in "good standing" with the New York Bar?

2. How is accepting patent prosecution work from Kroll, an attorney in "good standing" with the New York Bar, and any different from accepting work from foreign patent associates who are not registered to practice before the PTO, yet nevertheless draft patent application papers intended for filing in the PTO?

3.  How is accepting patent prosecution work from a "general" New York attorney, who has been excluded from practice before the PTO, any different from accepting patent application prosecution work from any <u>non</u>-patent general attorney in the United States, or accepting work from a foreign patent associate, who has <u>never</u> been registered to practice before the PTO, when the prosecuting U.S. patent attorney has a power-of-attorney from the ultimate client, exercises <u>absolute</u> professional discretion over what is filed, signs <u>all</u> work product and provides <u>all</u> contact information on <u>all</u> work that is produced for, and sent to, the ultimate client?

4. The ALJ held that no client was injured or suffered any damage or loss of rights; no client filed any grievance; no client testified against Appellant at the hearing before the Administrative Law Judge ("ALJ"), instead the PTO relied upon "double hearsay" to support its case.  Appellant timely objected to the use of

double hearsay, sought to cross-examine the PTO witness and was <u>denied</u> the right to so do.  ALJ opined that Appellant's constitutional rights were denied but refused to make any ruling.  (Appx10086-87; Appx10303-05)  The District Court, likewise, refused to consider any of Appellant's constitutional challenges, including the use of double hearsay by the PTO.  (Appx10066-67; Appx10076)  Were Appellant's constitutional, statutory and procedural rights denied by the ALJ, the PTO and the District Court (Appx6-10), and is Appellant entitled to have those rights adjudicated in an Article III federal court?

5.  The Supreme Court held in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 2263-2266 (2024), that the Administrative Procedure Act ("APA") requires judges to <u>independently</u> decide "all relevant questions of law" and "interpret constitutional and statutory provisions" when reviewing an agency action.  5 U.S.C. § 706.  Appellant raised constitutional defenses before the ALJ, filed a summary judgment motion in the District Court requiring an interpretation of 5 U.S.C. §555(b), and raised other questions of law in the District Court.  (Appx10503-14)  The District Court refused <u>all</u> consideration of constitutional questions, statutory interpretation and independent resolution of other legal questions citing Local Rule 83.5 of the Eastern District of Virginia for declining to resolve all such legal matters (Appx6-10), notwithstanding Appellant's citation of *Loper Bright Enterprises* to the District Court.  (Appx8-10; Appx10525-26)

Subsequent to the Supreme Court's holding in *Loper Bright Enterprises*, does Local Rule 83.5 of the Eastern District of Virginia remain valid, or is this local rule void *per se* or "as applied?" (Appx80-82)

6. Notwithstanding the Supreme Court's holding in *Loper Bright Enterprises*, Rules 1, 2, 3 and 81 of the Federal Rules of Civil Procedure do <u>not</u> exclude district court review of PTO disciplinary decisions under 35 U.S.C. §32 from the application of the Federal Rules of Civil Procedure, while Fed.R.Civ.P. 81 does exclude numerous other types of civil actions in the district courts from application of the Federal Rules of Civil Procedure. Assuming the validity of the local rule, do proceedings in which Local Rule 83.5 of the United States District Court for the Eastern District of Virginia is applicable have to comply with the Federal Rules of Civil Procedure?

7. Notwithstanding the applicability of Local Rule 83.5 of the United States District Court for the Eastern District of Virginia, was the District Court required to consider Appellant's constitutional challenges to proceedings before the ALJ, particularly when the ALJ opined that Appellant's constitutional right of due process/confrontation were violated, but expressly refused to render such a ruling? Is Local Rule 83.5 of the United States District Court for the Eastern District of Virginia void or inapplicable, as applied to Appellant?

8. Was the District Court required to consider Appellant's motion for

summary judgment addressing the timeliness of proceedings under the applicable statutory law, 5 U.S.C. §555(b), before the ALJ and the PTO, notwithstanding Local Civil Rule 83.5 of the United States District Court for the Eastern District of Virginia?  Is Local Civil Rule 83.5 of the Eastern District of Virginia invalid or inapplicable as applied to Appellant's motion for summary judgment filed with the District Court? (Appx10503-14)

9. Does Local Rule 83.5 of the United States District Court for the Eastern District of Virginia bar a constitutional, statutory or procedural challenge to Local Rule 83.5?

10. Is the practice of law before the PTO a "private right," as opposed to a "public right," thereby requiring full due process and equal protection rights under the Fifth Amendment's Due Process Clause and an Article III judicial forum for full adjudication?

11. The PTO amended its Rule of Practice, effective August 2023, to permit Appellant's alleged "misconduct" that formed the basis of the disciplinary Complaint of the PTO in July 2019, and the "*Initial Decision and Order*," issued June 8, 2023.  Should the PTO's amended Rules of Practice permitting Appellant's alleged "misconduct" be applicable to Appellant?  (Appx10462-64; Appx10467-68)

## STATEMENT OF THE CASE

### *A. Proceedings Before the ALJ and PTO*

Plaintiff-Appellant Edwin D. Schindler has been a patent attorney registered to practice before the PTO since 1984.  At all relevant times, Kroll was (now retired) a "general practice" attorney as a member in "good standing" with the New York Bar.  Kroll, however, was excluded from practice before the PTO in 2016. (Appx1893) Thereafter, Kroll referred patent prosecution work to Appellant for prosecution before the PTO.  Kroll did <u>not</u> file <u>any</u> patent prosecution papers with the PTO subsequent to his exclusion from practice before the PTO; Kroll did <u>not</u> sign any papers filed in the PTO subsequent to his exclusion from PTO practice.  Appellant obtained a power-of-attorney to act on behalf of <u>all</u> of Kroll's patent clientele. (*e.g.*, Appx8008; Appx8828; Appx8911; Appx9029; Appx9105; Appx9181; Appx9305; Appx9450; Appx9785)  Appellant, <u>alone</u>, decided upon the content of what was to be filed (or not filed) and exercised <u>sole</u> professional discretion as to <u>all</u> prosecution work in the PTO.  (Appx1839-1841)  Appellant, alone, signed/dated and provided solely his contact information on all papers filed in the PTO for Kroll's clientele.  Neither Kroll nor anyone else has ever made use of Appellant's right to file papers in the PTO.  <u>The PTO has produced no evidence to the contrary because no contrary evidence exists</u>.

A substantial portion of Appellant's patent and trademark prosecution

practice has been working for foreign patent/trademark associates in the United

States on behalf of the foreign associates' clientele and Appellant "modeled" his

work for Kroll's clientele in the same manner that Appellant works with foreign

patent associates. (Appx1846-50)  Instructions and payment from the ultimate

client are relayed through various foreign patent associates (particularly in cases in

which the foreign client does not speak English) and Appellant would act on those

instructions, as may be appropriate, exercising absolute discretion as to what was

to be filed in the PTO.  The foreign associates would generally draft patent

applications (particularly P.C.T. international patent applications) and Appellant

would review and file, as may be appropriate.  Amendments to work received from

foreign associates would be made either via preliminary amendment or, if there

was no declaration upon filing received from the foreign client, Appellant would

have the option to directly amend the U.S. patent application subject to review by

the foreign client prior to execution of the supporting inventor's declaration.

Appellant handled patent prosecution work referred from Kroll in the

identical manner that work received from various foreign patent associates was

handled. It is true that Kroll was "excluded" from practice before the PTO in 2016,

however it was equally true that foreign patent associates (outside of Canada) are

not registered to practice before the PTO either.  *See*, *Willemijn Houdstermaat-*

*schaapij BV v. Apollo Computer, Inc.*, 707 F.Supp. 1429, 1446-1447 (D. Del.

1989) (foreign patent associates, such as British patent agents, prepare U.S. patent applications and directly communicate with the ultimate foreign patent applicant; foreign patent agents, such as British patent agents, "are not patent attorneys under U.S. law"); *Foseco International Limited v. Fireline, Inc.*, 546 F.Supp. 22, 25-26 (N.D. Ohio 1982) (communications with foreign patent attorneys/agents are "privileged" even though such foreign attorneys/agents are not recognized to practice before the United States Patent and Trademark Office in <u>any</u> capacity) Kroll, for his part, remained a member in "good standing" with the New York Bar and was permitted to have a legal clientele, counsel clients in legal matters, and accept a legal fee.

There is nothing in the PTO Rules of Patent Practice that makes a distinction between one <u>never</u> registered to practice, as opposed to someone once registered, but no longer registered or excluded from practice; either both are permitted to practice or neither can practice because neither are registered. Nothing that the PTO cited in prior proceedings supports such a distinction because the distinction makes no sense, unless the PTO is to extend recognition or registration to practice to all "foreign agents," aside from certain Canadian patent agents (which confirms that there is a distinction to be made between Canadian patent agents registered to practice before the PTO and other foreign patent agents not granted recognition to practice in the PTO; otherwise separate registration and recognition of Canadian

- 8 -

patent agents would be pointless.)

In the PTO, the Office of Enrollment and Discipline ("OED") quoted from the *Official Gazette* (under 37 C.F.R., Part 10), as follows, which only supports the lack of <u>any distinction</u> between a U.S. registered patent attorney acting through either a foreign patent agent or a domestic liaison (*e.g.*, a corporate liaison not being a patent attorney/agent), and the working relationship that Appellant had with Kroll:

> " Under 37 CFR Part 10, a practitioner is responsible for taking reasonable steps to avoid foreseeable prejudice to the rights of a client/patent applicant. This responsibility exists in all circumstances including those where the practitioner is operating through a corporate liaison or foreign agent and has no direct contact with the client/patent applicant, who in most cases is the one being represented.
>
> "This notice is intended to clarify the appropriate course of action for a practitioner to follow when the practitioner is operating through such a corporate liaison or foreign agent. In such arrangements, the registered practitioner may rely upon the advice of the corporate liaison or the client/patent applicant's foreign agent as to the action to be taken so long as the practitioner is aware that the client/patent applicant has consented after full disclosure to be represented by the liaison or agent."

*Official Gazette*, published on December 10, 1987 (Appx10275-76)

The PTO/OED further provided the following quote from the *Official Gazette* published May 25, 1988 (Appx10276):

> "In practice it is common for instructions relating to the application of an inventor . . . who is the client of the U.S. practitioner, to be passed to the U.S. practitioner through intermediaries, <u>such as</u> corporate liaisons or foreign agents . . .

- 9 -

In such an arrangement, the practitioner may rely upon instructions of, <u>and accept compensation from, the corporate liaison or the foreign agent as to the action to be taken in a proceeding before the Office</u> so long as the practitioner is aware that the client has consented to have instructions conveyed through the liaison or agent." (emphasis added)

The working relationship that Appellant had established with Kroll was <u>identical</u> to that which thousands of registered patent attorneys and agents have with foreign patent associates, which are referred to in the *Official Gazette* as "foreign agents."  While Kroll was neither a "foreign agent" nor a "corporate liaison," it is unclear why Kroll would not be the equivalent of a "liaison," whether to a corporate client or otherwise, inasmuch as the foregoing language from the *Official Gazette* recites "corporate liaisons or foreign agents" as <u>examples</u> in a <u>non</u>-exclusive list of receiving "instructions relating to the applica-tion of an inventor." <u>*Catalina Marketing International, Inc. v. Coolsavings.Com*</u>, 289 F.3d 801, 811 (Fed. Cir. 2002) ("'Such as' introduces an example of a broader genus rather than limiting the genus to the exemplary species.")  Nothing published in the *Official Gazette* excluded Appellant from working with Kroll in the <u>same</u> manner described by the PTO.

The PTO/OED also made the fallacious argument that "preparing necessary documents in contemplation of filing the documents with the Office" constitutes the unauthorized practice of law before the PTO.  (Appx10267-68)  As of January 1978, the United States adopted the Patent Cooperation Treaty ("P.C.T") and a

multitude of U.S. National Phase P.C.T. application filings under 35 U.S.C. §371 are filed in the PTO each year; the vast majority of U.S. National Phase P.C.T. application filings originate <u>outside</u> of the United States and Canada.  Those P.C.T. international patent applications are "necessary documents" that have been prepared by unregistered foreign patent agents "in contemplation of filing [those] documents with the Office."  In the case of foreign language P.C.T. international applications, the "necessary documents" prepared "in contemplation of filing . . . with the Office" include English language translations, which are almost <u>never</u> prepared by the U.S. patent attorney/agent.  A multitude of U.S. national patent applications are also prepared by foreign patent agents for filing in the U.S. with a priority claim under the Paris Convention.

Then there are the drawing figures that accompany virtually all U.S. utility patent applications and constitute part of the disclosure thereof, and for U.S. design patent applications, the drawings are the entirety of the disclosure and basis for the design claim; these drawings are prepared by draftsman retained by U.S. patent attorneys and agents in this country, or unknown nameless and faceless draftsman in foreign countries, who are also <u>not</u> registered to practice before the PTO and (in the case of foreign patent agents) are retained by the <u>unregistered</u> foreign patent agents.  The PTO/OED's definition of what constitutes the "unauthorized practice of law" before the PTO is so overly broad and all-encompassing that it permits the

OED to charge <u>anyone</u> that the OED so wishes with aiding the "unauthorized practice of law" before the PTO because essentially <u>all</u> U.S. patent attorneys and patent agents retain independent draftsmen (not registered to practice before the PTO) for the preparation of "necessary documents" prepared "in contemplation of filing . . . with the Office." *See*, *e.g.*, <u>*Rewis v. United States*</u>, 401 U.S. 808, 812 (1971) ("[N]either statutory language nor legislative history supports such a broad-ranging interpretation of §1952 [of the Travel Act].  And even if this lack of support were less apparent, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.")

### B. The Administrative Hearing Before the ALJ and the ALJ's "Initial Decision"

Following an administrative hearing on the OED's *Complaint* filed July 10, 2019 (Appx166-205), the ALJ issued the *Initial Decision and Order* ("*Initial Decision*") nearly four years later on June 8, 2023 (Appx10154-174), in which the ALJ determined that "the OED Director has presented no evidence that Respondent [Appellant] caused actual harm to any client" and that:

> "Although Respondent [Appellant] could have improved his client communications in the ways discussed above, <u>the evidence does not establish a general failure to reasonably consult with clients regarding their objectives or to abide by their decisions</u> regarding how to accomplish those objectives." (Appx1072) (emphasis added)

No client suffered any "actual harm" or loss of any rights, and therefore it is not at all surprising that <u>no client</u> "lodged a grievance" against Appellant.  (Appx10173)

(Appx10172: "the record does not support a finding of actual injury")  No client appeared to testify at the administrative hearing conducted November 20, 2019.

Instead, the *Initial Decision* and the PTO's *Final Decision* and related holdings (Appx11-59) rely upon the double hearsay "testimony" of seven clients again, none of whom actually testified or filed a grievance, because none were harmed. Instead, Diana Oleska, a patent attorney working for the OED purported telephoned numerous clients and took notes of her telephone calls with seven clients. Ms. Oleska then entered those notes into evidence and testified as to their content over the timely hearsay (and double hearsay) objections of Appellant (Appx10038-77).  When Appellant sought to cross-examine Ms. Oleska as to her direct testimony based upon double hearsay, the PTO/OED objected. Appx10083-1087)  The ALJ remarked that:

> "THE COURT: Again, I mention the fact that I didn't want to unnecessarily delay the proceedings here, but also the fact is that once an employee has been approved to provide testimony, I don't think the employee is immune from, at least, Cross-Examination on matters raised in Direct testimony.
>
> "Yet, that doesn't seem to be provided for in this [rule], and limits the employee's testimony. <u>So as applied, that might unfairly deny due process to Respondent. But I'm not going to make any Constitutional decisions in this action</u>."

Appx10086-87 (emphasis added)

So, <u>no client filed a grievance</u>, <u>no client testified</u>, <u>no client suffered any "actual injury,"</u> <u>no client suffered any unintended loss of rights</u>, and the <u>PTO/OED</u>

required hearsay and double hearsay testimony of an OED employee, which the OED insisted was immune from cross-examination as to her direct testimony. This "might unfairly deny due process" to Appellant, however the deprivation of the constitutional due process rights of Appellant, evidently, cannot be permitted to impact the imposition of a two-year suspension from PTO practice against Appellant.

Interestingly, Appellant was permitted limited cross-examination of Diana Oleska of the OED, who is a patent attorney and former patent examiner, and was asked whether the "written description" included drawings accompanying a patent application contemplated for inclusion in a utility or design patent application, since drawings are almost always prepared by an independently-contracted outside draftsman.  Ms. Oleska's professional opinion was that the "written description" requirement of 35 U.S.C. §112, ¶ 1 (now 35 U.S.C. §112(a)) did not include patent drawings. (Appx10081-82)  *Cf*., *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1564 (Fed. Cir. 1991) ("drawings alone *may* be sufficient to provide the 'written description of the invention' required by §112, first paragraph") (Fed. Cir. 1991) (emphasis in original)  The PTO's broad definition of "practice before the Office" would thus include independently-contracted draftsman and attendant, allegedly improper, fee-splitting and result in every patent attorney and patent agent being implicated in aiding the unauthorized practice of law via every independent patent

- 14 -

draftsman not otherwise registered to practice before the PTO or functioning as an employee of the law firm of the patent attorney/agent, if, as correctly the law of this Circuit, patent drawings are a part of the "written description" of a patent application.

The result of proceedings in the PTO for a "victimless crime" based upon double hearsay was a two-year suspension for Appellant (Appx56-58), who obtained a power-of-attorney to act for all of Kroll's clientele, personally signed and filed all documents in the PTO on the basis of absolute and sole professional judgment, and for which the ALJ determined that "the evidence [did] not establish a general failure to reasonably consult with clients regarding their objectives or to abide by their decisions regarding how to accomplish those objectives." (Appx1072)  There was no evidence that any client ever paid more than a "reasonable fee" for the patent prosecution services provided by Appellant and, again, no client ever filed a grievance to the contrary; the PTO/OED never contended that any client ever overpaid or paid an unreasonable fee.

Appellant no more aided Kroll in the "unauthorized practice of law" before the PTO than any patent attorney or patent agent aids a foreign patent associate or a corporate liaison carrying out the instructing of the ultimate client in the prosecution of a U.S. patent application, notwithstanding that the foreign patent agent or corporate liaison, in almost all cases, is not registered to practice before the PTO in

patent cases. Similarly, contracting an independent draftsman (one <u>not</u> employed or within the same law firm as the patent attorney) for the preparation of drawings contemplated for inclusion in either a utility or design patent application has <u>never</u> been held to be aiding the independent draftsman in the unauthorized practice of law before the PTO. Apparently, because the PTO <u>arbitrarily</u> says that the foregoing instances of routine and customarily practice before the PTO do <u>not</u> constitute either aiding another in the unauthorized practice of law or an improper division of fees do such instances of patent prosecution practice <u>not</u> constitute violations of the PTO's Rules of Practice of professional responsibility.

The PTO has also been disingenuous in its clear and knowing refusal to acknowledge Supreme Court precedent that the practice of law before the PTO is <u>not</u> a "privilege," but a "right" for those who have qualified under the applicable Rules. (Appx51) *See*, <u>*Schware v. Board of Bar Examiners of New Mexico*</u>, 353 U.S. 232, 238-239 (1957) ("A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment."); <u>*In re Griffiths*</u>, 413 U.S. 717 (1973) (resident alien cannot be denied admission to the Connecticut Bar for lack of U.S. citizenship under Equal Protection Clause of the Fourteen Amendment) (Appx10301-10302) *See*, *also*, <u>*Doe v. United States*</u>, 132 F.3d 1430, 1435 (Fed. Cir. 1997), *citing* <u>*Wallace v. Bowen*</u>, 869 F.2d 187, 191-192

- 16 -

(3d Cir. 1989) ("an opportunity for cross-examination is an element of fundamental fairness of the hearing to which a claimant is entitled"); _Coffin v. Sullivan_, 895 F.2d 1206, 1212 (8th Cir. 1990) ("Due process requires that a claimant be given the opportunity to cross-examine and subpoena the individuals who submit reports.") It is the position of the PTO that because the practice of law is a "privilege," not a "right," that Appellant is not owed constitutional due process under the Fifth Amendment or "fundamental fairness," even after the ALJ opined that Appellant's constitutional due process rights were likely being denied. (Appx10086-87; Appx10303-05) The _Final Decision_ (Appx11-58) of the PTO substantially, if not entirely, followed the _Initial Decision and Order_ (Appx10154-175) of the ALJ.

### C. The ALJ Failed to Timely Act in Accordance with 5 U.S.C. §555(b) and 37 C.F.R. §11.39(d)

PTO disciplinary proceedings are statutorily governed by both the formal hearing provisions of the APA and PTO specific regulations, _Association of National Advertisers, Inc. v. FTC_, 627 F.2d 1151, 1160 (D.C. Cir. 1979); _see_, 5 U.S.C. §§554, 556, 557; 37 C.F.R. Part 11. Section 555(b) of the APA, 5 U.S.C. §555(b), imposes upon the agency involved in an adjudication the affirmative duty ("shall") to conclude an adjudication within "a reasonable time." Section 554(e), of the APA, 5 U.S.C. §554(e), commands that "prompt notice" be given in denying any "request of an interested person made in connection with an agency proceeding." The need for expediency in concluding agency adjudications

- 17 -

reflected in the APA is codified by the PTO in 37 C.F.R. §11.39(d), which targets issuance of an initial decision by the ALJ "within nine months of the date the complaint is filed."  The regulation permits an ALJ to issue an opinion outside of the nine-month time frame, but <u>only</u> if "there exist circumstances, in his or her opinion, that preclude issuance of an initial decision within nine months of filing the complaint."  *Id*.

It <u>cannot</u> be disputed that:

1.  The *Complaint* initiating the disciplinary proceeding before the ALJ was filed by the OED on July 10, 2019. (Appx166-205)

2.  The ALJ conducted the administrative hearing in the disciplinary proceeding on November 20, 2019.  (Appx9873)

3.  The *Initial Decision and Order* of the ALJ is dated (but was <u>not</u> served) September 23, 2021. (Appx10154)

4.  The *Initial Decision and Order* of the ALJ was not served upon Appellant until June 8, 2023. (Appx10154)

5.  Title 37, Code of Federal Regulations §11.39(d), which implements the timeliness requirement of the Administrative Procedure Act, 5 U.S.C. §555(b), states that:

> (d) *Time for making initial decision.* The hearing officer shall set times and exercise control over a disciplinary proceeding such that an initial decision under §11.54 is normally issued within nine months of the date a complaint is filed. The hearing officer may, however, issue

- 18 -

an initial decision more than nine months after a complaint is filed if there exist circumstances, in his or her opinion, that preclude issuance of an initial decision within nine months of the filing of the complaint."

6.   The *Initial Decision and Order* was <u>not</u> issued by the ALJ ("hearing officer") until nearly forty-seven (47) months after the Office of Enrollment and Discipline of the PTO filed its *Complaint* against Appellant ("Respondent.") (Appx166-205; Appx10154)

7.   The *Initial Decision and Order* does <u>not</u> provide any explanation by the ALJ of any "circumstances" that would have "preclude[d] issuance of an initial decision [by the ALJ] within nine months of the filing of the complaint."  *See*, 37 C.F.R. §11.39(d); (Appx10154-174)

8.   Appellant ("Respondent") in the administrative proceeding) was <u>neither</u> the reason nor cause of any delay by the ALJ in issuing the *Initial Decision and Order* thirty-eight (38) months after the time required for its issuance, as set forth in 37 C.F.R. §11.39(d).

9.   Appellant <u>raised</u> the delay in the issuance of the "*Initial Decision and Order*" before the PTO and requested remand to the ALJ for an explanation of the cause or "circumstances" for the delay in issuing the *Initial Order and Decision*, however the PTO <u>refused</u> the request to remand to the ALJ to address the untimely issuance of the *Initial Decision and Order*.  (Appx10360-457)

During the administrative hearing conducted November 20, 2019, Elizabeth

A. Francis, an attorney representing the PTO/OED, during a discussion regarding the applicable Rules, correctly reminded the ALJ that: "*We're bound by the rules as much as anybody else.*" (Appx10085-88)

Appellant filed a summary judgment motion (Appx10503-515) in the District Court asking that the Court interpret the timeliness requirement of 5 U.S.C. §555(b) and 37 C.F.R. §11.39(d), which implements the foregoing statutory provision of the APA.  On July 2, 2024, Appellant filed a supplemental motion (Appx10525-26) citing to the newly-issued Supreme Court case of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 2263-2266 (2024), which held that the APA requires judges to independently decide "all relevant questions of law" and "interpret constitutional and statutory provisions" when reviewing an agency action, 5 U.S.C. § 706.  With citation to Local Rule 83.5, and contrary to the *Loper Bright Enterprises* Supreme Court ruling, the District Court refused to decide the merits of Appellant's summary judgment motion that is now before this Court. (Appx8-10)

### D. The PTO Amended Its Rules of Practice in July 2023 to Now Permit the Alleged "Misconduct" for Which Plaintiff Has Been Sanctioned

Attorney disciplinary proceedings "are adversary proceedings of a *quasi-criminal nature,*" *In re Ruffalo*, 390 U.S. 544, 551 (1968).  The PTO announced a change to the rules of professional responsibility, since implemented as 37 C.F.R. §11.504, and as extensively addressed and published in the *Federal Register* as

*Changes to the Representation of Others Before the United States Patent and Trademark Office*, 88 Fed. Reg. 45078-45088 (July 14, 2023), which became effective August 14, 2023. (Appx10462-68)

The amended Rule addresses the <u>same</u> issues as considered in the disciplinary proceeding brought administratively against Appellant by the PTO. The rules changes published in the *Federal Register* provide, in pertinent part, that:

> "This final rule also <u>defers to a state's attorney licensing authority regarding alternative business structures between a practitioner and a non-practitioner to reduce the potential for conflicts</u> between the USPTO and the attorney licensing authority.

> \* \* \*

> "Certain state attorney licensing authorities have begun permitting <u>alternative business structures between an attorney and a non-attorney, generally consisting of an arrangement where the non-attorney is permitted to partner with the attorney in the practice of law, possess an ownership interest in a law firm, or otherwise share in legal fees</u>. However, <u>such arrangements were previously prohibited by the USPTO Rules of Professional Conduct, creating potential conflicts for patent and trademark practitioners who are licensed to practice law in those states</u>. Therefore, this rule changes the USPTO Rules of Professional Conduct so that, hereafter, <u>the USPTO defers to a state's attorney licensing authority regarding certain aspects pertaining to the sharing of legal fees between a practitioner and a non-practitioner</u> in order to reduce the potential for such conflicts. [emphasis added]

> \* \* \*

> **"Arrangements Between Practitioners and Non-Practitioners**

> "This final rule adds § 11.504(e) to address <u>when a practitioner enters into an arrangement to share legal fees with a non-practitioner, to form a partnership with a non-practitioner</u>, or to be part of a for-profit

association or corporation owned by a non-practitioner. In the event of such arrangement, § 11.504(e) is intended to defer to the attorney licensing authority of the State(s) (as defined in § 11.1, 'any of the 50 states of the United States of America, the District of Columbia, and any commonwealth or territory of the United States of America') that affirmatively regulate(s) such arrangement, in order to avoid a conflict between §11.504(a), (b), and (d)(1) and (2) of the USPTO Rules of Professional Conduct and the laws, rules, and regulations of the attorney licensing authority of any such State(s). It is further intended to treat an attorney subject to the USPTO Rules of Professional Conduct and a registered patent agent similarly when both participate together in the same such arrangement. No deference to an attorney licensing authority of a State is intended when that licensing authority has no laws, rules, and regulations that address such arrangement or the State does not affirmatively regulate such arrangement."

Appx10462-68

This disciplinary proceeding is of "a *quasi*-criminal nature," *In re Ruffalo*, *supra*, 390 U.S. at 551, and the proceeding before the PTO <u>should</u> have taken into consideration the change in the rules and why <u>any</u> sanction might have otherwise <u>still</u> been appropriate.  The question of how New York would treat the professional working arrangement between Appellant and Kroll (an attorney in "good standing" with the New York Bar) was never considered by the PTO nor the District Court, though Appellant did raise the change to the Rules in the District Court, the Court <u>refused</u> to take into account any changes to the applicable Rules. (Appx10458-94) Aside from not considering the Rule changes pertinent to the alleged misconduct and whether New York rules of professional responsibility would alter the result, *Davis v. United States*, 417 U.S. 333, 334, 346-347 (1974), ("collateral relief from

- 22 -

a federal criminal conviction based upon an intervening change in substantive law" is available upon motion); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015) ("Our Circuit has not yet defined the entire universe of errors qualifying as 'fundamental defects.' . . . [W]e know that a post-conviction change in the law that renders the defendant's conduct no longer criminal can be corrected by §2255 motion."); *Johnson v. United States*, 805 F.2d 1284, 1288 (7th Cir. 1986) ("To punish a person criminally for an act that is not a crime would seem the quintessence of denying due process of law"), it is a constitutionally dubious proposition whether 37 C.F.R. §11.504 can treat the <u>identical</u> conduct of <u>different</u> practitioners practicing before the PTO in <u>different</u> states in a <u>different</u> manner for disciplinary purposes in their practices before the PTO.  It is, however, clear that Appellant's constitutional due process rights have been violated by not considering the effect of the intervening change in law.  *Id*.

    None of the constitutional questions raised before the ALJ were considered by the ALJ, and the District Court's *Order* (Appx6-10) dismissing Appellant's *Complaint* (Appx60-86), also <u>refused</u> any consideration of Appellant's challenges to the constitutionality of various rules and procedures, notwithstanding the Government's acknowledgment that Appellant's *Complaint* raised "a number of different issues – including those of a constitutional dimension – with respect to the USPTO's final decision" (Appx88), and Supreme Court law that mandates

<u>independent</u> consideration of legal questions and statutory interpretation by the District Court , <u>*Loper Bright Enterprises v. Raimondo*</u>, 603 U.S. 369, 144 S. Ct. at 2263-2266, including the <u>right</u> of a litigant to raise constitutional challenges in federal district court to administrative proceedings, <u>*Axon Enterprise. Inc. v. FTC*</u>, 598 U.S. 175, 143 S.Ct. 890, 895-896 (2023) (constitutional challenges to administrative agencies' structure can be brought in federal district court and need not be raised through an administrative proceeding with subsequent appellate review).

The District Court expressly refused to consider Appellant's constitutional challenges to Local Rule 83.5, notwithstanding Supreme Court precedent, with the District Court citing the local rule <u>itself</u> as an apparent basis for denying even an "as applied" challenge to Local Rule 83.5. (Appx6-10)  The District Court also refused consideration of Appellant's motion for summary judgment, which would have required constructing §555(b) of the APA, 5 U.S.C. §555(b), even though Appellant cited <u>*Loper Bright Enterprises*</u> to the District Court requiring independent review by the lower Court.

## SUMMARY OF THE ARGUMENT

As to the underlying merits of the OED's *Complaint* (Appx166-205), the working relationship that Appellant had established with Kroll (now retired) is <u>identical</u> to that which thousands of registered patent attorneys and agents have

with foreign patent associates, which are referred to in the *Official Gazette* as "foreign agents," and corporate liaisons. The ALJ determined that no client suffered any "actual harm" or loss of any rights, and no client "lodged a grievance" against Appellant. (Appx10173) (Appx10172: "the record does not support a finding of actual injury") The ALJ further held that "the evidence does not establish a general failure to reasonably consult with clients regarding their objectives or to abide by their decisions regarding how to accomplish those objectives." (Appx1072) The PTO/OED's case amounted to a "victimless crime."

The "testimony" of clients was timely objected to by Appellant as "double hearsay" provided by Diana Oleska of the OED. When Appellant sought to cross-examine Ms. Oleska concerning the double hearsay "evidence," the OED objected and the ALJ sustained the objection. The ALJ, however, did note the likely constitutional violation of Appellant's due process rights:

> "THE COURT: Again, I mention the fact that I didn't want to unnecessarily delay the proceedings here, but also the fact is that once an employee has been approved to provide testimony, I don't think the employee is immune from, at least, Cross-Examination on matters raised in Direct testimony.
>
> "Yet, that doesn't seem to be provided for in this [rule], and limits the employee's testimony. <u>So as applied, that might unfairly deny due process to Respondent. But I'm not going to make any Constitutional decisions in this action</u>."

Appx10086-87 (emphasis added)

Notwithstanding the lack of any grievance by any client being filed, the lack

- 25 -

of any harm to any client, the reliance upon double hearsay evidence, and evidence made of record by Appellant that PTO rules, as announced in the *Official Gazette*, permitted the working relationship between Kroll and Appellant, the ALJ issued a two-year suspension from practice before the PTO against Appellant, which was affirmed by the General Counsel of the PTO.

Soon after the ALJ issued the two-year suspension, the PTO amended its Rules of Practice, *Federal Register* as *Changes to the Representation of Others Before the United States Patent and Trademark Office*, 88 Fed. Reg. 45078-45088 (July 14, 2023), effective August 14, 2023 (Appx10462-68), implemented by 37 C.F.R. §11.504, to permit the alleged "misconduct," including the allegedly improper division of fees.

Appellant also objected to the nearly four-year delay from the time of the OED's *Complaint* to the *Initial Decision and Order* of the ALJ as a violation of the APA §555(b), 5 U.S.C. §555(b), and 37 C.F.R. §11.39(d). The PTO rejected this ground for objection, included refusing the suggestion to remand to the ALJ for seeking an explanation for the delay.

The District Court refused to consider Appellant's constitutional defenses, citing to Local Rule 83.5 of the Eastern District of Virginia, even though the ALJ expressly refused to render any decision on constitutional issues. Similarly, the District Court refused to consider Appellant's constitutional defenses and refused

- 26 -

to address the merits of Appellant's summary judgment motion, which raised the lack of timeliness under 5 U.S.C. §555(b), 37 C.F.R. §11.39(d), even following issuance of, and citation to, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 144 S. Ct. 2244, 2263-2266 (2024), the District Court ruling that Local Rule 83.5 did not permit such a challenge.  (Appx6-10)

The District Court also did not permit Appellant to challenge the validity of Local Rule 83.5, as applied to bar Appellant's constitutional defenses and an independent consideration of legal questions to be resolved.  (Appx6-10)  As a result, neither the ALJ nor the District Court have been willing to consider the validity of Appellant's constitutional defenses.

Appellant further raised challenges in the District Court as to the validity of Local Rule 83.5 on the grounds that: (1) Rules 1, 2, 3 and 81 of the Federal Rules of Civil Procedure do not exclude civil actions under 35 U.S.C. §32 from application of the Federal Rules of Civil Procedure, while expressly excluding an array of other civil actions; and (b) the right to practice law is a "private right" belonging to the individual, and not a "public right," *Oil States Energy Services, LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334, 138 S.Ct. 1365 (2018); *Schware v. Board of Bar Examiners of New Mexico*, 353 U.S. 232, 238-239 (1957); *see*, *also*, *In re Griffiths*, 413 U.S. 717 (1973) (resident alien cannot be denied admission to the Connecticut Bar for lack of U.S. citizenship under Equal Protection Clause of

the Fourteen Amendment), establish that the right to practice law is a "private" right belonging to the individual, not a "public" right, that is subject to constitutional due process (it's not a "privilege"), thereby requiring an Article III forum for adjudication of the right to practice law before the PTO.

## ARGUMENT

### A. Standard of Review

In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 387, 144 S. Ct. 2244, 2248 (2024), *quoting United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950), the Supreme Court analyzed the plain language of the APA's §706, which states that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706, and therefore concluded that the APA "codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment," *Loper Bright Enterprises*, *supra*, 603 U.S. at 391, 144 S.Ct. at 2249. *Loper Bright Enterprises* therefore "direct[s] courts to 'interpret constitutional and statutory provisions' without differentiating between the two, §706, [and] makes clear that agency interpretations of statutes — like agency interpretations of the Constitution—are *not* entitled to deference." *Id*. (emphasis in original)

- 28 -

And while APA §706(2)(B), 5 U.S.C. §706(2)(B), contemplates adjudication of constitutional issues – and courts should still respect agency fact-finding and the administrative record when reviewing agency action for constitutional infirmities – the courts must <u>not</u> defer to the agency on issues of substantive legal interpretation. *See*, *e.g.*, <u>*Slingluff v. Occupational Safety & Health Review Commission*</u>, 425 F.3d 861, 866 (10th Cir. 2005) (noting that the deferential standard of review of agency review "does not apply to questions of law" (internal quotation marks omitted))

This Court decides "legal issues *de novo* and uphold factual determinations if they are supported by substantial evidence," <u>*Oman Fasteners, LLC v. United States*</u>, 125 F.4th 1068, 1084 (Fed. Cir. 2025) (appeal from U.S. Court of International Trade), *quoting* <u>*Mid Continental Steel & Wire, Inc. v. United States*</u>, 941 F.3d 530, 537 (Fed. Cir. 2019).

Except as to the issue of default, the District Court made no legal rulings and did not render any constitutional decisions or resolve any statutory issues, namely, the applicability of 5 U.S.C. §555(b), and instead held that:

> " Consistent with this Court's Local Rules, the USPTO responded to Plaintiff's opening pleading. ECF 10. But Plaintiff improperly responded to that response with a deluge of filings, including a motion to declare Rule 83.5 invalid (ECF 28), a motion for *de novo* review of the Magistrate Judge's order denying default (ECF 30), his own motion for summary judgment on one of the arguments he presented in his opening pleadings (ECF 34), and, after defendant's motion to strike (ECF 34), a motion for leave to file a motion for summary judgment (ECF 45)."

Appx7

- 29 -

The District Court therefore held that its own local rule, namely, Local Rule 83.5 <u>prevented</u> Appellant from raising any constitutional defenses or any questions of statutory interpretation and, in fact, even <u>prevented</u> an "as applied" attack on the local rule itself to allow Appellant to raise constitutional defenses that the ALJ refused to consider. The District Court (with the exception of ruling upon Appellant's default motion) therefore resolved no questions of law, notwithstanding *Loper Bright Enterprises* (Appx10525-26), nor did the District Court engage in any independent fact-finding. It is therefore submitted that this Court should review the District Court decision under a *de novo* standard, without deference.

### *B. The OED/PTO Has Never Been Able to Reconcile Why Foreign Patent Agents and Draftsman Retained by Patent Attorneys/Agents Are Not Engaged in the Unauthorized Practice of Law Before the PTO, But That Appellant Enabled Kroll to Engage in the Unauthorized Practice of Law Before the Office*

Neither Kroll nor a foreign patent/trademark agent are registered to practice before the PTO, and there is <u>nothing</u> in the regulations that makes a distinction between one never registered to practice, as opposed to someone once registered, but no longer registered or excluded from practice; <u>either both are permitted to practice or neither can practice because neither are registered</u>. Nothing that the PTO/OED has cited supports such a distinction because the distinction makes no sense, unless the PTO is to extend recognition or registration to practice to "foreign agents," aside from certain Canadian patent agents (which only operates to <u>confirm</u> the distinction between Canadian foreign patent agents, who are registered to

practice, and all other foreign agents who are not; otherwise separate registration and recognition of Canadian patent agents would be pointless.)

The *Official Gazette* (under 37 C.F.R., Part 10), as published December 10, 1987, supports the lack of any distinction between Appellant receiving patent work from Kroll (a general attorney admitted to the New York Bar) and the manner in which foreign patent agents work with their U.S. patent attorneys and agents. The *Official Gazette* provides that:

> " Under 37 CFR Part 10, a practitioner is responsible for taking reasonable steps to avoid foreseeable prejudice to the rights of a client/patent applicant. This responsibility exists in all circumstances including those where the practitioner is operating through a corporate liaison or foreign agent and has no direct contact with the client/patent applicant, who in most cases is the one being represented.

> "This notice is intended to clarify the appropriate course of action for a practitioner to follow when the practitioner is operating through such a corporate liaison or foreign agent. In such arrangements, the registered practitioner may rely upon the advice of the corporate liaison or the client/patent applicant's foreign agent as to the action to be taken so long as the practitioner is aware that the client/patent applicant has consented after full disclosure to be represented by the liaison or agent."

Appx10275-76

The *Official Gazette*, as published May 25, 1988, further provides that:

> "In practice it is common for instructions relating to the application of an inventor . . . who is the client of the U.S. practitioner, to be passed to the U.S. practitioner through intermediaries, such as corporate liaisons or foreign agents . . . In such an arrangement, the practitioner may rely upon instructions of, and accept compensation from, the corporate

> liaison or the foreign agent as to the action to be taken in a proceeding before the Office so long as the practitioner is aware that the client has consented to have instructions conveyed through the liaison or agent."

Appx10276 (emphasis added)

Appellant operated in his working relationship with Kroll in <u>exactly</u> the same manner as the foregoing provisions of the *Official Gazette* and obtained powers-of-attorney (*e.g.*, Appx8008; Appx8828; Appx8911; Appx9029; Appx9105; Appx9181; Appx9305; Appx9450; Appx9785) to act on behalf of Kroll's patent prosecution clientele. Appellant exercised <u>absolute</u> and <u>sole</u> professional discretion of that which was filed for Kroll's clientele, Appellant personally did <u>all</u> PTO filings himself, and there is <u>zero evidence</u> to the contrary.

In so doing, Appellant, as "the practitioner," had the <u>right</u> to "rely upon instructions of, and accept compensation from [Kroll], the . . . liaison . . . as to the action to be taken in a proceeding before the Office so long as the practitioner is aware that the client [via powers-of-attorney] has consented to have instructions conveyed through the liaison . . . , " <u>precisely</u> as set forth in the *Official Gazette*.

Appellant therefore complied with the applicable rules of the practice before the PTO – and if Appellant's acceptance of patent prosecution work from Kroll violated the applicable rules, then the PTO should have changed the rules for clarification.

***C. The PTO Amended Its Rules of Practice in July 2023 to Now Permit the Alleged "Misconduct" for Which Appellant Has Been Sanctioned, and Appellant Had the Right to Have the Issued Suspension Reconsidered in Light of the Highly Pertinent Change in the Applicable Rules of Practice***

As it turns out, the PTO <u>did</u> change its rules regarding the representation of others before the PTO within two months after the *Initial Decision* (Appx10154-174), though it is unknown whether the timing of the rules change was in any way tied to the OED action against Appellant. The amended rule addresses the <u>same</u> issues as considered in the disciplinary proceeding brought administratively against Appellant. The rule changes published in the *Federal Register* provide, in pertinent part, that:

> "This final rule also <u>defers to a state's attorney licensing authority regarding alternative business structures between a practitioner and a non-practitioner to reduce the potential for conflicts</u> between the USPTO and the attorney licensing authority.
>
>       * * *
>
> "Certain state attorney licensing authorities have begun permitting <u>alternative business structures between an attorney and a non-attorney, generally consisting of an arrangement where the non-attorney is permitted to partner with the attorney in the practice of law, possess an ownership interest in a law firm, or otherwise share in legal fees</u>. However, <u>such arrangements were previously prohibited by the USPTO Rules of Professional Conduct, creating potential conflicts for patent and trademark practitioners who are licensed to practice law in those states</u>. Therefore, this rule changes the USPTO Rules of Professional Conduct so that, hereafter, the USPTO defers to a state's attorney licensing authority regarding certain aspects <u>pertaining to the sharing of legal fees between a practitioner and a non-practitioner</u> in order to reduce the potential for such conflicts. [emphasis added]

- 33 -

\* \* \*

**"Arrangements Between Practitioners and Non-Practitioners**

"This final rule adds § 11.504(e) to address <u>when a practitioner enters into an arrangement to share legal fees with a non-practitioner, to form a partnership with a non-practitioner</u>, or to be part of a for-profit association or corporation owned by a non-practitioner. In the event of such arrangement, § 11.504(e) is intended to defer to the attorney licensing authority of the State(s) (as defined in § 11.1, 'any of the 50 states of the United States of America, the District of Columbia, and any commonwealth or territory of the United States of America') that affirmatively regulate(s) such arrangement, in order to avoid a conflict between §11.504(a), (b), and (d)(1) and (2) of the USPTO Rules of Professional Conduct and the laws, rules, and regulations of the attorney licensing authority of any such State(s). It is further intended to treat an attorney subject to the USPTO Rules of Professional Conduct and a registered patent agent similarly when both participate together in the same such arrangement. No deference to an attorney licensing authority of a State is intended when that licensing authority has no laws, rules, and regulations that address such arrangement or the State does not affirmatively regulate such arrangement."

Appx10462-68 (emphasis added)

So, the PTO now allows for "alternative business structures between an attorney and a non-attorney, generally consisting of an arrangement where the non-attorney [presumably, a non-patent attorney or patent agent] is permitted to partner with the attorney in the practice of law . . . or otherwise share in legal fees." *Id*. "[S]uch arrangements were previously prohibited by the USPTO Rules of Professional Conduct." (The potentially disparate treatment under the amended rule of patent practitioners vis-à-vis the PTO in their patent practice based upon which state a patent attorney resides or is admitted to practice law, such that the

- 34 -

identical conduct may (or may not) be sanctionable to the PTO depending upon the patent attorney's state of residence or state bar admission(s), is almost certainly an unconstitutional violation of equal protection.)  Appellant raised the issue concerning the PTO's amended rules and whether the two-year suspension imposed by the PTO should be reconsidered, however neither the PTO nor the District Court were willing to consider the effect of the change in the applicable rules. (Appx10461-93)

Rather, incredibly, the PTO cited to the District Court *Changes to Representation of Others Before the United States Patent and Trademark Office*, 78 Fed. Reg. 20180, 20186 (Apr. 3, 2013), from a decade earlier (Appx94), but has quite mysteriously "overlooked" citation to *Changes to the Representation of Others Before the United States Patent and Trademark Office*, 88 Fed. Reg. 45078-45088 (July 14, 2023), effective August 14, 2023; 37 C.F.R. §11.504 (Appx10462-68)

Stated more succinctly, the PTO cited to the District Court rules from 2013 as a basis for affirming the two-year suspension from practice before the PTO, when, subsequently, the PTO had issued amended rules in mid-2023 that superseded the rules the PTO cited to the District Court as its justification for affirming the discipline imposed against Appellant.

Attorney disciplinary proceedings "are adversary proceedings of a *quasi-criminal* nature," *In re Ruffalo*, 390 U.S. 544, 551 (1968).  "To punish a person criminally for an act that is not a crime would seem the quintessence of denying

due process of law," *Johnson v. United States*, 805 F.2d 1284, 1288 (7th Cir. 1986).

As the Supreme Court recognized in *Davis v. United States*, 417 U.S. 333, 334,

346-347 (1974), "collateral relief from a federal criminal conviction based upon an

intervening change in substantive law" is available upon motion.  *See*, *also United*

*States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015) ("Our Circuit has not yet

defined the entire universe of errors qualifying as 'fundamental defects.' . . . [W]e

know that a post-conviction change in the law that renders the defendant's conduct

no longer criminal can be corrected by §2255 motion.")  The Third Circuit in

*United States v. Addonizio*. 442 U.S. 178, 186-187 (1979), discussed the Supreme

Court's holding in *Davis* observing that *Davis*:

> ". . . involved a claim that a judgment that was lawful when it
> was entered should be set aside because of a later development.
> The subsequent development in that case, however, was a change
> in the substantive law that established that the conduct for which
> petitioner had been convicted and sentenced was lawful.  To have
> refused to vacate his sentence would surely have been a 'complete
> miscarriage of justice,' since the conviction and sentence were no
> longer lawful." (emphasis added)

Appellant raised this defense in the District Court, but the lower Court refused

consideration citing to Local Rule 83.5 as its rationale for its lack of consideration.

(Appx6-10)

- 36 -

### D. Literal Application of Local Civil Rule 83.5 by District Court Denied Appellant All Opportunity to Litigate His Constitutional Challenges, Particularly After the ALJ Explicity Refused to Decide Any Constitutional Issues

No client filed a grievance against Plaintiff and the ALJ determined that there was "no actual harm to any client." (Appx10172)  No client appeared at the hearing in this matter. (Appx10154-74)  The ALJ further held that "the evidence does not establish a general failure to reasonably consult with clients regarding their objectives or to abide by their decisions regarding how to accomplish those objectives." (Appx10169)  There were no voice or video recordings of client communications between the PTO and any client.  The "evidence" (double hearsay) "presented" concerning various clients was based <u>entirely</u> on notes drafted by a PTO staff member and entered into evidence, over the undersigned's objection.  Appellant sought to cross-examine the PTO's staff member/attorney during the hearing, however the PTO objected.  The ALJ ("The Court") then remarked as follows:

> "THE COURT: Again, I mention the fact that I didn't want to unnecessarily delay the proceedings here, but also the fact is that once an employee has been approved to provide testimony, I don't think the employee is immune from, at least, Cross-Examination on matters raised in Direct testimony.

> "Yet, that doesn't seem to be provided for in this [the Rules], and limits the employee's testimony.  So as applied, that might unfairly deny due process to Respondent [Schindler]. <u>But I'm not going to make any</u> Constitutional decisions in this action."

Appx10086-87 (emphasis added)

"Several circuit courts have emphasized [and] held that hearsay is not substantial evidence when there is no such opportunity to cross-examine the witnesses," *Doe v. United States*, 132 F.3d 1430, 1435 (Fed. Cir. 1997), *citing Wallace v. Bowen*, 869 F.2d 187, 191-192 (3d Cir. 1989) ("an opportunity for cross-examination is an element of fundamental fairness of the hearing to which a claimant is entitled"); *Coffin v. Sullivan*, 895 F.2d 1206, 1212 (8th Cir. 1990) ("Due process requires that a claimant be given the opportunity to cross-examine and subpoena the individuals who submit reports.")  Not until the hearing before the ALJ did the ALJ inform the parties that he would not be deciding any constitutional questions.

Notwithstanding the requirement of *Loper Bright Enterprises*, *supra*, 603 U.S. at 391, 144 S.Ct. at 2249, that "direct[s] courts to 'interpret constitutional and statutory provisions' without differentiating between the two, §706 [of the APA], makes clear that agency interpretations of statutes — like agency interpretations of the Constitution—are *not* entitled to deference" (emphasis in original), the District Court nevertheless cited to Local Rule 83.5 and case law predating *Loper Bright Enterprises* holding that

> "this Court will only set aside the USPTO's order if the petitioner can establish that the order was 'arbitrary, capricious, or otherwise unlawful' under the APA's 'highly deferential standard.' [citations omitted]  This standard "is only met where a reviewing court can conclude with 'definite and firm conviction' that a clear error of judgment or a mistake has been committed. [citations omitted]"

The District Court had the statutory requirement under §706 of the APA, and under the Supreme Court's _Loper Bright Enterprises_ decision to independently consider Appellant's constitutional claims.

In one respect, _Loper Bright Enterprises_ broke no new ground: Appellant was <u>entitled</u> to "meaningful judicial review" in the District Court, irrespective of Local Rule 83.5. _See_, _Axon Enterprise, Inc. v. FTC_, 598 U.S. 175, 143 S.Ct. 890, 895-896 (2023), _citing Thunder Basin Coal Co. v. Reich_, 510 U.S. 200, 213 (1994) (importance of "meaningful judicial review"). With the ALJ having decided no constitutional questions, there was simply nothing for the District Court to give deference to and, as such, all such constitutional questions should have been fully litigated in the District Court and decided _de novo_, _Trinity Marine Products, Inc. v. Chao_, 512 F.3d 198, 201 (5th Cir. 2007) ("[T]he review of whether OSHA acted in accordance with Trinity's constitutional rights is _de novo._") Further, the Supreme Court's holding in _Axon Enterprise_ , _supra_, permits the consideration of constitutional claims outside of the administrative review scheme and, to the extent that Local Rule 83.5 denied Appellant any opportunity to litigate his constitutional challenges in <u>any</u> forum, Local Rule 83.5 <u>must yield</u> to the constitutional rights of Appellant – because even patent attorneys have constitutional rights! The District Court did not agree.

***E. The District Court Refused Considertion of Appellant's Summary Judgment Motion Requiring Independent Resolution of Questions of Law and Statutory Interpretation of the "Reasonable Time" Requirement of 5 U.S.C. §555(b)***

Appellant moved for summary judgment in the District Court on the ground that the administrative proceeding was not completed within a "reasonable time," as required by 37 C.F.R. §11.39(d), which implements the requirement of 5 U.S.C. §555(b) ("With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it.")  (Appx10503-14)  *Loper Bright Enterprises*, *supra*, 603 U.S. at 391, 144 S.Ct. at 2249, required the District Court to <u>independently</u> decide all questions of law and engage in statutory interpretation <u>without</u> deference to the administrative agency.  The District Court did not do that required by *Loper Bright Enterprises*.  Instead, the District Court denied Appellant's motion for summary judgment (as all other motions) explaining that:

> "This Court finds that the USPTO's disciplinary order does not constitute a 'clear error of judgment.' Because the USPTO 'has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision. . . .'"

Appx9

In denying Appellant's motion for summary judgment, the District Court <u>granted</u> (Appx9-10) the PTO's motion to strike the summary judgment motion (Appx10520-23), in which the PTO argued that Appellant's motion for summary judgment should be stricken "[p]ursuant to Local Civil Rule 83.5, and this Court's

inherent authority." (Appx10520) The District Court did not apply the correct standard of review, as set forth in *Loper Bright Enterprises*.

The undisputed material facts in support of Appellant's summary judgment motion were presented to the District Court (Appx10507-09) in accordance with its local rules, and restated in this Opening Appeal Brief at 17-20, and should be granted on the following rationale:

PTO disciplinary proceedings are statutorily governed by both the formal hearing provisions of the APA and PTO specific regulations, *Association of Nationall Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1160 (D.C. Cir. 1979); *see*, 5 U.S.C. §§554, 556, 557; 37 C.F.R. Part 11. Section 555(b) of the APA, 5 U.S.C. §555(b), imposes upon the agency involved in an adjudication the affirmative duty ("shall") to conclude an adjudication within "a reasonable time." Section 554(e), of the APA commands that "prompt notice" be given in denying any "request of an interested person made in connection with an agency proceeding." The need for expediency in concluding agency adjudications reflected in the APA is codified by the PTO in 37 C.F.R. §11.39(d), which targets issuance of an initial decision by the ALJ "within nine months of the date the complaint is filed." The regulation permits an ALJ to issue an opinion outside of the nine-month time frame, but only if "there exist circumstances, in his or her opinion, that preclude issuance of an initial decision within nine months of filing the complaint." *Id*.

In Appellant's administrative disciplinary proceeding, the *Complaint* was filed on July 10, 2019. (Appx166-205)  The *Initial Decision and Order* issued June 8, 2023 (Appx10154-174); nearly four years after the *Complaint* was filed.  The unquestionable delay in issuing the decision violated 5 U.S.C. §555(b) because the PTO failed to conclude this adjudication within a "reasonable time," as the statute requires.  Title 37, C.F.R. §11.39(d) requires that "circumstances" be set forth in the *Initial Decision and Order* by the ALJ that would otherwise "preclude issuance of an initial decision within nine months of filing the complaint."  The *Initial Decision* is silent as to any "circumstances" that could have conceivably justified such an extraordinarily lengthy delay by the ALJ in rendering his *Initial Decision and Order*.  Appellant raised this legal defect to the PTO and suggested remand to the ALJ to seek an explanation (and therefore correction) of the nearly four-year delay, but the PTO refused the request for remand.  (Appx10360-452)

"It is an elemental principle of administrative law that agencies are bound to follow their own regulations," *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 545 (6th Cir. 2004).  As recognized in *Sameena, Inc. v. United States Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998):

> "The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates.  *See*, *Vitarelli v. Seaton*, 359 U.S. 535,545, 79 S.Ct. 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *Accardi v. Shaughnessy*, 347 U.S. 260, 267, 74 S.Ct. 499, 98 L.Ed. 681 (1954). An agency's failure to follow its own regulations 'tends to

cause unjust discrimination and deny adequate notice' and consequently may result in a violation of an individual's constitutional right to due process.  Where a prescribed procedure is intended to protect the interests of a party before the agency, 'even though generous beyond the requirements that bind such agency, that procedure must be scrupulously observed.' *Vitarelli*, 359 U.S. at 547, 79 S.Ct. 968 (Frankfurter, J., concurring)"

As a matter of law, procedural rules that affect a party's rights are enforceable against an agency.  *See*, *Morton v. Ruiz,* 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.")  Indeed, "[i]t has long been settled that a federal agency must adhere firmly to self-adopted rules by which the interests of others are to be regulated," *Mass. Fair Share v. Law Enforcement Assistance Admin.*, 758 F.2d 708, 711 (D.C. Cir. 1985); *see*, *also Doe v. Hampton*, 566 F.2d 265, 280-81 (D.C. Cir. 1977) ("It is, of course, well-established that an agency must abide by its own regulations . . . .")   As the PTO/OED was fond to remind the ALJ during the administrative hearing:

"We're bound by the rules as much as anybody else."

(Appx10085-88)

The failure to issue a timely decision was in plain disregard and a violation of the APA and 37 C.F.R. §11.39(d).  *See*, *Ft. Stewart Schools. v. Federal Labor Relations Authority*, 495 U.S. 641, 654 (1990) ("It is a familiar rule of administrative law that an agency must abide by its own regulations."); *Reuters, Ltd. v. FCC*,

781 F.2d 946, 950-951 (D.C. Cir. 1986) ("Simply stated, rules are rules, and fidelity to the rules which have been properly promulgated, consistent with applicable statutory requirements, is required of those to whom Congress has entrusted the regulatory missions of modern life.").

The ALJ was <u>required</u> to follow 37 C.F.R. §11.39(d) and include the requisite showing of excuse for the delayed issuance of the *Initial Decision and Order*. The *Initial Decision* fails to meet the requirements of 37 C.F.R. §11.39(d), *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) (administrative agency "must be rigorously held to the standards by which it professes its action to be judged."), *citing SEC* v. *Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Teleprompter Cable Sys., Inc. v. FCC*, 543 F.2d 1379, 1387 (D.C. Cir. 1976) ("an agency must adhere to its own rules and regulations. *Ad hoc* departures from those rules . . . cannot be sanctioned.") *See*, *also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 132 S.Ct. 2156, 2166-67 (2012) (regulated parties should be able to "conform their conduct to an agency's interpretations once the agency announces them" and should not be forced to "divine" a new interpretation announced "for the first time in an enforcement proceeding.") By ignoring the plain language of 37 C.F.R. §11.39(d) and failing to issue a timely *Initial Decision*, the ALJ "frustrated the notice and predictability purposes of rulemaking," *Talk America, Inc. v. Michigan Bell Tele. Co.*, 564 U.S. 50, 131 S. Ct. 2254, 2256 (2011) (Scalia, J., concurring).

- 44 -

The failure of the PTO was compounded when Appellant sought remand to the ALJ to address whether any justification existed for taking nearly four years after the *Complaint* was filed for issuance of the *Initial Decision*, however the PTO refused the remand request that may have allowed it to correct its violation of its own rules, namely, 37 C.F.R. §11.39(d). (Appx11-26)

Where the PTO undertakes to suspend Appellant's right to practice before it for allegedly violating the Rules of Practice of the PTO, it was "incumbent upon the [PTO] to observe scrupulously its own rules of disciplinary procedure," *In re Thalheim*, 853 F.3d 383, 390 (5th Cir. 1988).  If the APA and 37 C.F.R. §11.39(d) are inadequate, then the relevant bodies may amend them. However, a court cannot "ignore and circumvent its rules at will to the detriment of those covered by them." *Id.* The PTO is "bound by the rules as much as anybody else" (Appx10085-88); it is inconceivable that the PTO would be "forgiving" of a patent practitioner who missed a deadline for acting by a "mere" 38 months.

Attorney disciplinary proceedings "are adversary proceedings of a *quasi-*criminal nature, *In re Ruffalo*, 390 U.S. 544, 551 (1968).  In context of federal criminal law, a violation of a criminal defendant's right to a speedy trial requires dismissal of the indictment with prejudice, *Strunk v. United States*, 412 U.S. 434, 439-440 (1973) ("Given the unchallenged determination that petitioner was denied a speedy trial [footnote omitted], the District Court judgment of conviction must be

- 45 -

set aside; the judgment is therefore reversed and the case remanded to the Court of Appeals to direct the District Court to set aside its judgment, vacate the sentence, and dismiss the indictment.")  If the PTO Rules of Practice mean anything, and if the PTO is "bound by the rules as much as anybody else" (Appx10085-88), then Appellant is entitled to judgment as a matter of law, dismissing the disciplinary *Complaint* brought by the PTO.

Citing Local Rule 83.5, the District Court refused to consider the summary judgment motion; the PTO never addressed the merits of the motion for summary judgment, but, instead, moved to strike it under Local Rule 83.5, and the District Court granted the PTO's motion to strike.  The legal question of whether the PTO violated 5 U.S.C. §555(b), and its own rule, 37 C.F.R. §11.39(d), has <u>never</u> been considered by any court.

### *F. Local Rule 83.5 is Void, At Least "As Applied," If Not Facially*

Local Rule 83.5 of the District Court for the Eastern District of Virginia provides that:

> "A person refused recognition to practice or suspended or excluded from practice before the United States Patent and Trademark Office ('USPTO') may seek judicial review of such action by filing in the Alexandria Division of this Court a petition against the Under Secretary of Commerce of Intellectual Property and Director of the USPTO ('Director') within 30 days after the date of the order recording the Director's action. . . . [T]he Director shall respond to the petition and file a certified copy of the record and proceedings before the USPTO, which shall constitute the sole basis for the

Court's review. The Court may, in its discretion, require briefing and argument prior to making a decision on the petition."

### *1. Supreme Court Case Law*

The District Court wrote that "Plaintiff Edwin Schindler seeks Article III judicial review of the United States Patent and Trademark Office's ('USPTO') final decision that suspended him from practicing before the agency for two years," but then denied "Article III judicial review" under Local Rule 83.5. (Appx6-10)

Article III judicial review is <u>required</u> as to constitutional issues, statutory interpretations and other questions of law in accordance with the Supreme Court's decision in *Loper Bright Enterprises*, *supra*, 603 U.S. at 387, 144 S. Ct. at 2248, which held that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action," APA §706; 5 U.S.C. §706, and therefore concluded that the APA "codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment," *Loper Bright Enterprises*, *supra*, 603 U.S. at 391, 144 S.Ct. at 2249. *Loper Bright Enterprises* "direct[s] courts to 'interpret constitutional and statutory provisions' without differentiating between the two, §706, [and] makes clear that agency interpretations of statutes — like agency interpretations of the Constitution—are *not* entitled to deference." *Id*.

- 47 -

(emphasis in original)  As even the PTO acknowledged, Appellant's *Complaint* in the District Court (Appx60-86) "raise[d] a number of different issues – including those of a constitutional dimension – with respect to the USPTO's final decision." (Appx88)

The Supreme Court further held in *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 143 S.Ct. 890, 895-896 (2023), that constitutional challenges to administrative agencies' structure can be brought in federal district court and need <u>not</u> be raised through an administrative proceeding with subsequent appellate review, as called for by Local Civil Rule 83.5.  The decision in *Axon Enterprise* considered only the issue of <u>where</u> such challenges can be brought. The Supreme Court did <u>not</u> address substantive questions about whether the ALJ process or the agency structure itself is constitutional; *Axon Enterprises* was decided a year prior to *Loper Bright Enterprises*.

The *Axon Enterprise* case arose from two unrelated enforcement proceedings brought before ALJs by the Securities and Exchange Commission and the Federal Trade Commission.  In each case, the respondent sued in federal district court to enjoin the proceeding.  Each suit alleged that some fundamental aspect of the Commission's structure was unconstitutional, that the entire administrative proceeding was therefore unlawful, and that being subjected to an allegedly illegitimate proceeding caused injury independent of any alleged harm resulting

from rulings that the ALJ might make in that proceeding.  The Ninth Circuit (in the FTC case) affirmed the ruling below, however an *en banc* panel of the Fifth Circuit (in the SEC case) reversed, holding that the plaintiff was entitled to go directly to federal court without needing to raise her constitutional challenge in the SEC's administrative proceeding, *Axon Enterprise*, *supra*, 175 U.S. at ___, 143 S.Ct. at 898-900.  The Supreme Court unanimously reversed the Ninth Circuit's decision and affirmed the Fifth Circuit's ruling.  The 8-1 majority opinion held that the administrative-review schemes in the Exchange Act and the FTC Act

> "do not displace district court jurisdiction over
> [plaintiffs'] far-reaching constitutional claims."

*Axon Enterprise*, *supra*, 175 U.S. at ___, 143 S.Ct. at 900-906.

Justice Gorsuch concurred in the judgment writing that the answer to the question raised "has nothing to do with the '*Thunder Basin* [510 U.S. 2007, 207-213 (1994)] factors,' . . . but follows directly from 28 U.S.C. §1331," which grants district courts jurisdiction over claims raising federal questions, including those under the Constitution.  *Axon Enterprise*, *supra*, 143 S.Ct. 911-916 (Gorsuch, J., concurrence).

Appellant had the right to litigate his constitutional, statutory and questions of law in the District Court, pursuant to 28 U.S.C. §§1331, 1338(a) (Appx60-84), irrespective of Local Rule 83.5, in what would properly be deemed "Article III judicial review."  The District Court committed reversible error by applying Local

Rule 83.5 to the exclusion of Supreme Court case law that provided Appellant with the right to independent judicial review of constitutional questions, statutory interpretation and other questions of law.

### *2. Local Rule 83.5 is Void as Contrary to the Federal Rules of Civil Procedure*

Like a "fish in water who doesn't realize he's wet," it would appear that no litigant has ever challenged the validity of Local Rule 83.5 as being contrary to the Federal Rules of Civil Procedure: Fed.R.Civ.P. 1 provides that "[t]hese rules govern the procedure in all civil actions and proceedings in the United States district courts, except as stated in Rule 81." No provision in Fed.R.Civ.P. 81 exempts any civil action brought under Title 35, United States Code (Patents), including 35 U.S.C. §32, from the applicability of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 2 reads simply that: "There is one form of action — the civil action." Fed.R.Civ.P. 3 states that: "A civil action is commenced by filing a complaint with the court." The action in the lower Court was a "civil action" in a United States district court and the Federal Rules of Civil Procedure were therefore applicable.

Under 28 U.S.C. §2074(a), one of the statutes that provides for the implementation of the Federal Rules of Civil Procedure, the foregoing statutory provision states, in pertinent part, that:

> "(a) The Supreme Court shall transmit to the Congress not later than May 1 of the year in which a rule prescribed under section

- 50 -

2072 is to become effective a copy of the proposed rule.  Such rule shall take effect no earlier than December 1 of the year in which such rule is so transmitted unless otherwise provided by law."

Congress, which wrote 35 U.S.C. §32, also has supervisory authority over the Federal Rules of Civil Procedure and may veto (or otherwise intervene in) the implementation of a Rule that does not meet with its approval.  Fed.R.Civ.P. 81 is <u>very specific</u> and detailed as to the nature of the proceedings to which the Federal Rules of Civil Procedure apply and don't apply.  There is <u>no provision</u> in Rule 81 that excludes judicial review under 35 U.S.C. §32.

Further, the "doctrine of *expressio unius est exclusio alterius* as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions," <u>*Silvers v. Sony Pictures Entertainment, Inc.*</u>, 402 F.3d 881, 885 (9th Cir. 2005).  *See*, *also*, <u>*Andrus v. Glover Construction Company*</u>, 446 U.S. 608, 616-617 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."); <u>*United States* v. *Brockamp,*</u> 519 U. S. 347, 352 (1997) ("explicit listing of exceptions" to running of limitations period considered indicative of Congress' intent to preclude "courts [from] read[ing] other unmentioned, open-ended, 'equitable' exceptions into the statute")

"To be valid, local rules must be consistent with both acts of Congress

and the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 2071(a) (2000); Fed.R.Civ.P. 83(a)(1)," *02 Micro Intern. Ltd. v. Monolithic Power Systems*, 467 F.3d 1355, 1365 (Fed. Cir. 2006); *see*, *also* <u>Marcure v. Lynn</u>, 992 F.3d 625, 632 (7th Cir. 2021) ("Rule 83(a)(1) . . . provides that local rules 'must be consistent with' the Federal Rules of Civil Procedure"). There is <u>no inherent inconsistency or mutual exclusivity</u> that would exempt as an impossibility judicial review in the Eastern District of Virginia under 35 U.S.C. §32 from application of the Federal Rules of Civil Procedure; both Congress and the Supreme Court could have included an exemption or exclusion in Rule 81, but didn't. An exclusion of proceedings under 35 U.S.C. §32 is <u>not</u> listed in Fed.R.Civ.P. 81, is <u>not</u> implied, and <u>cannot</u> be read into Rule 81. *See*, <u>Andrus v. Glover Construction Company</u>, *supra*, 446 U.S. at 616-617.

Local Rule 83.5 is <u>not</u> exempt from the requirements of the Federal Rules of Civil Procedure, which presents a further ground for reversal of the District Court, which should have applied the Federal Rules and considered Appellant's summary judgment motion and the totality of Appellant's motion practice on its merits. As applied by the District Court, Local Rule 83.5 is void.

### 3. Local Rule 83.5 is Void Because the Right to Practice Law is A "Private Right" Requiring "Plenary Article III Adjudication"

Whether or not the right to practice law is a "fundamental right," as the PTO argued to the District Court (Appx119-20), the Supreme Court held in <u>Schware v.</u>

*Board of Bar Examiners of New Mexico*, 353 U.S. 232, 238-239 (1957) that:

> "A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment."

*See*, *also*, *In re Griffiths*, 413 U.S. 717 (1973) (resident alien cannot be denied admission to the Connecticut Bar for lack of U.S. citizenship under Equal Protection Clause of the Fourteen Amendment).

The right to not be excluded from the practice of law is a personal (or private) property right belonging to the "individual" and therefore subject to the protections of constitutional due process and equal protection. *Id*.; *Axon Enterprise*, *supra*, 143 S.Ct. at 907 ("Private rights encompass the three absolute rights, life, liberty, and property, so called because they appertain and belong to particular men merely as individuals").  Unlike "the *private* unalienable rights of each individual," *Axon Enterprise*, *id.* at 908 (Thomas, J., concurrence) (emphasis in original), *quoting Lansing v. Smith*, 4 Wend. 9, 21 (N.Y. 1829), public rights "belon[g] to the people at large," and governmental privileges are "created purely for reasons of public policy and ha[ve] no counterpart in the Lockean state of nature," *Teva Pharmaceuticals USA, Inc. v. Sandoz Inc.*, 574 U.S. 318, 344 *n. 2* (2015) (Thomas, J., dissenting) (internal quotation marks omitted)).

The PTO further argued to the District Court that "Congress has 'significant latitude to assign adjudication of public rights to entities other than Article III

courts,'" with citation to *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 584 U.S. 325, 334, 138 S.Ct. 1365 (2018). (Appx111-12)  However, the right to practice (or continuing to practice) law belongs to individuals and has been held by the Supreme Court on numerous occasions to be unquestionably subject to constitutional due process and equal protection, as explained above. This critical distinctive was driven home in *Oil States Energy Services*, *supra*, 138 S.Ct. 1365, 1373-1374, in which the Supreme Court clarified that patents provided "public rights" ("the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States"), as opposed to private rights, because:

> "[P]atents are 'public franchises' that the Government grants 'to the inventors of new and useful improvements.' [citations omitted] The franchise gives the patent owner 'the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States' . . . *Inter partes* review involves the same basic matter as the grant of a patent. So it, too, falls on the public-rights side of the line."

The Supreme Court then explained its narrow holding in *Oil States Energy Services*, as follows:

> "We emphasize the narrowness of our holding. We address the constitutionality of *inter partes* review only. We do not address whether other patent matters, such as infringement actions, can be heard in a non-Article III forum.  And because the Patent Act provides for judicial review by the Federal Circuit, see 35 U.S.C. §319, we need not consider whether *inter partes* review would be constitutional 'without any sort of intervention by a court at any stage of the proceedings,' [citation omitted] Moreover, we address only the

- 54 -

> precise constitutional challenges that Oil States raised here. Oil States does not challenge the retroactive application of *inter partes* review, even though that procedure was not in place when its patent issued. <u>Nor has Oil States raised a due process challenge. Finally, our decision should not be misconstrued as suggesting that patents are not property for purposes of the Due Process Clause or the Takings Clause.</u> [citations omitted]"

*Oil States Energy Services*, *supra*, 138 S.Ct. at 1379 (emphasis added)

The Supreme Court suggested that had Oil States raised a due process challenge under the Fifth Amendment's Due Process Clause, the outcome would likely have been different.  There is no implication in *Oil States Energy Services* that raising constitutional claims particular to a <u>single</u> individual implicates resolution of a "public right," but, instead, the <u>opposite</u> is implied: Constitutional claims under the Due Process Clause would likely be treated differently from the "public right" that is a patent, which gives a right to exclude others; the right of an individual not to be excluded from the practice of law is constrained by constitutional due process and equal protection.  *See*, *Schware v. Board of Bar Examiners of New Mexico*, *supra*, 353 U.S. at 238-239 ("A State cannot exclude a person from the practice of law . . . in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment."); *In re Griffiths*, *supra*, 413 U.S. 717 (resident alien cannot be denied the right to practice law under Equal Protection Clause of the Fourteen Amendment).  There is a significant distinction to be drawn between a patent claim that is enforceable

against the public-at-large ("public right"), and an individual's Fifth Amendment due process right to practice law, or to be excluded from the practice of law, a "private right" held by individual persons.

"For much of the Nation's history, it was understood that Article III precluded 'the political branches' from exercising 'power over the determination of individualized adjudicative facts when core private rights were at stake,'" *Axon Enterprise*, *supra*, 143 S.Ct. at 910 (Thomas, J., concurrence), *quoting* C. Nelson, "Adjudication in the Political Branches," 107 Colum. L. Rev. 559, 593 (2007). "[W]hether any form of administrative adjudication is constitutionally permissible likely turns on the nature of the right in question.  If private rights are at stake, the Constitution likely requires plenary Article III adjudication," *Axon Enterprise*, *supra*, 143 S.Ct. at 910 (Thomas, J., concurrence), or at least plenary judicial review of private rights by an Article III court.  The appellate review model (which Local Rule 83.5 effectively implements) may run afoul of the Seventh Amendment by allowing an administrative agency to adjudicate what may be core private rights without a jury.  *Tull v. United States*, 481 U.S. 412, 417 (1987) (explaining that the Seventh Amendment ensures the right to a jury trial for all adjudications "analogous to `Suits at common law'").

While this area of the law is in flux with the Supreme Court likely to render further decisions delineating "public rights" versus "private rights," what is

apparent from *Schware* and *Griffiths* is that being individually excluded from the practice of law <u>requires</u> that the particular attorney be given constitutional due process protections and, as surmised from *Oil States Energy Services*, constitutional due process rights are <u>individual</u> private rights requiring full, robust and plenary Article III adjudication, particularly when constitutional rights and other legal issues were <u>never</u> considered (or refused consideration) by the ALJ.

Local Rule 83.5 is likely unconstitutional because it implements little more than (and seemingly less than) an appellate review process of an Executive Branch administrative proceeding, when the attorney sought to be excluded from the practice of law – a "core" private right" – is not afforded protection under the Fifth Amendment's Due Process Clause and the Seventh Amendment's right to a jury trial in an Article III Judicial Branch forum.  Having been denied a constitutional Article III forum due to Local Rule 83.5, the judgment of the District Court should be reversed.

## <u>CONCLUSION AND RELIEF SOUGHT</u>

Accordingly, Plaintiff-Appellant Edwin D. Schindler respectfully requests that this Court reverse the District Court's affirmance of a disciplinary sanction against Appellant; that the disciplinary Complaint against Appellant be dismissed;

and order that the initial and final disciplinary decisions of the United States Patent

and Trademark Office be vacated.

Respectfully submitted,

Dated:  May 19, 2025                          By /s/ *Edwin D. Schindler*

Edwin D. Schindler
*Plaintiff-Appellant/Attorney Pro se*
12944 Parrot Pond Road
Boynton Beach, Florida 33473
*Telephone*: (516)662-4231
*E-Mail*: EDSchindler@att.net
            EDSchindler@optonline.net

# ADDENDUM

## Table of Contents

                                                                    Page

*Memorandum Opinion and Order*, Entered January 16, 2025
    (Document No. 51), in the United States District Court
    for the Eastern District of Virginia, from which appeal
    has been taken……………………………………………    Appx6

*Final Order* of the United States Patent and Trademark Office,
    Issued January 19, 2024…………………………………    Appx11

*Order* on Motion for Reconsideration filed in the United States
    Patent and Trademark Office, Issued January 19, 2024…...    Appx23

*Final Order* of the United States Patent and Trademark Office,
    Issued December 6, 2023………………………………..    Appx27

*Initial Decision and Order* of the Administrative Law Judge,
    Issued June 8, 2023……………………………………. Appx10154

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

EDWIN D. SCHINDLER,
        *Plaintiff,*

      v.

KATHI VIDAL,
        *Defendant.*

No. 1:24-cv-262-MSN-WBP

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on various motions, including Plaintiff's Motion for Declaration of Invalidity of Local Rule 83.5 (ECF 28), Plaintiff's Motion for De Novo Review by the District Court of Magistrate Judge's Order (ECF 30), Plaintiff's Motion for Summary Judgment on Count V of the Complaint (ECF 34), Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (ECF 38), and Plaintiff's Motion for Leave to File Motion for Summary (ECF 45). The Court will resolve each motion in turn and, for the reasons that follow, ultimately dismiss Plaintiff's claims (ECF 1).

## I.    BACKGROUND

In essence, Plaintiff Edwin Schindler seeks Article III judicial review of the United States Patent and Trademark Office's ("USPTO") final decision that suspended him from practicing before the agency for two years. ECF 1 ("Compl."). That USPTO decision affirmed an Administrative Law Judge's ("ALJ") conclusion that Schindler had violated several USPTO Rules of Professional Responsibility.[1] *Id.* at ¶ 6. Plaintiff now asks this Court to reverse the USPTO's

---

[1] For example, Schindler would file applications and other papers with the USPTO that another practitioner, Michael Kroll (who had been suspended and later excluded from practicing before the USPTO), prepared. *See* ECF 10 at 1-2. The USPTO ultimately concluded that "Schindler had violated several USPTO regulations, including those

Appx6

final disciplinary order, asserting several arguments in favor of his position, including that the ALJ delayed in issuing its decision (*id.* at ¶¶ 92-101), and that this Court's Local Rule 83.5$^2$ is unlawful and should be declared void (*id.* at ¶¶ 102-12). Consistent with this Court's Local Rules, the USPTO responded to Plaintiff's opening pleading. ECF 10. But Plaintiff improperly responded to that response with a deluge of filings, including a motion to declare Rule 83.5 invalid (ECF 28), a motion for *de novo* review of the Magistrate Judge's order denying default (ECF 30), his own motion for summary judgment on one of the arguments he presented in his opening pleadings (ECF 34), and, after defendant's motion to strike (ECF 34), a motion for leave to file a motion for summary judgment (ECF 45).

## II.    ANALYSIS

### A.    Default

Pursuant to Federal Rule of Civil Procedure 55, the entry of default against a party is warranted only when that party "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). As courts have recognized, consistent with the "strong policy" dictating "that cases be decided on their merits," *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 453 (4th Cir. 1993), default is inappropriate when "a defendant appears and indicates a desire to contest an action," *Lee v. Bhd. of Maintenance of Way Employees*, 139 F.R.D. 376, 381 (D. Minn. 1991); *see also Hudson v. North Carolina*, 158 F.R.D. 78, 80 (E.D.N.C. 1994).

Upon review of a Magistrate Judge's order on default, this Court reviews a "nondispositive" order only to determine whether it "is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); *see also Giganti v. Gen-X*, 222 F.R.D. 299, 304-05 n.9 (E.D. Va. 2004). If

---

precluding assistance with another practitioner's unauthorized practice of law, fee splitting, and inadequate communication with clients." *Id.* at 2.

$^2$ Local Rule 83.5 concerns the review of orders as to admission, suspension, or exclusion of practitioners before the USPTO.

the Magistrate Judge's order was "dispositive," this Court reviews the same *de novo*. *See* Fed. R. Civ. P. 72(b)(3).

Courts disagree as to whether an order on default is a dispositive motion, *see* ECF 32 at 7-8, but under either standard this Court will uphold Magistrate Judge Porter's order denying entry of default (ECF 27). Defendant timely responded to Plaintiff's Complaint consistent with the Court's local rules. *See* ECF 10. Accordingly, there is no default and Plaintiff's objections to the Magistrate Judge's refusal to enter default (ECF 30) are overruled.

### B. Local Rule 83.5

Under Local Rule 83.5, only a petitioner's opening pleading and the USPTO's response may be filed. *See* Loc. Civ. R. 83.5. No party may file any other substantive paper without prior leave of this Court. *Id.* This Court will therefore not authorize Plaintiff's additional filings, which were submitted several months after the close of briefing under Local Rule 83.5.[3] Accordingly, this Court will deny Plaintiff's motion for declaration of invalidity of Local Rule 83.5 (ECF 28), grant Defendant's motion to strike (ECF 38) Plaintiff's motion for summary judgment (ECF 34), and deny Plaintiff's subsequent motion for leave to file a motion for summary judgment (ECF 45).

### C. Review of the USPTO Suspension Order

The Court proceeds now to Plaintiff's ultimate challenge of the USPTO's final order. The USPTO "Director may, after notice and opportunity for a hearing, suspend ... from further practice before the [USPTO], any person ... shown to be incompetent or disreputable, or guilty of gross misconduct, or who does not comply with the regulations [governing patent attorneys promulgated by the USPTO]." 35 U.S.C. § 32. The Administrative Procedure Act ("APA") 5 U.S.C. §

---

[3] This Court also rejects Plaintiff's contention that Rule 83.5 is invalid. *See Kroll v. Lee*, 2017 WL 2240674, at *4 (E.D. Va. May 22, 2017) (finding that this Court properly acted on a congressional grant of authority in adopting Local Civil Rule 83.5 and the rule does not violate Article III).

500 *et seq.* governs this Court's review of the USPTO's suspension order. Accordingly, this Court will only set aside the USPTO's order if the petitioner can establish that the order was "arbitrary, capricious, or otherwise unlawful" under the APA's "highly deferential standard." *Chaganti v. Lee*, 187 F. Supp. 3d 682, 690 (E.D. Va. 2016) (quoting *Ohio Valley Envtl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)). This standard "is only met where a reviewing court can conclude with 'definite and firm conviction' that a clear error of judgment or a mistake has been committed." *President & Fellows of Harvard College v. Lee*, 589 Fed. Appx. 982, 986 (Fed. Cir. 2014) (quoting *PGBA, LLC v. United States*, 389 F.3d 1219, 1231 (Fed. Cir. 2004)).

This Court finds that the USPTO's disciplinary order does not constitute a "clear error of judgment." Because the USPTO "has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision," this Court finds no reversible error. *Cornish v. Dudas*, 715 F. Supp. 2d 56, 63 (D.D.C. 2010). Accordingly, this Court will dismiss Plaintiff's original petition.

## III. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Plaintiff's Motion for Declaration of Invalidity of Local Rule 83.5 (ECF 28) is DENIED; it is further

ORDERED that Plaintiff's Motion for De Novo Review of the Magistrate Judge's Order (ECF 30) is DENIED; it is further

ORDERED that Plaintiff's Motion for Summary Judgment on Count V (ECF 34) is DENIED; it is further

ORDERED that Defendant's Motion to Strike Plaintiff's Motion for Summary Judgment (ECF 38) is GRANTED; it is further

ORDERED that Plaintiff's Motion for Leave to File Motion for Summary Judgment on Count V (ECF 45) is DENIED; it is further

ORDERED that Plaintiff's Motion to Vacate Hearing Scheduled for July 12, 2024 (ECF 47) is DENIED AS MOOT; it is further

ORDERED that Defendant's Consent Motion for Leave to File Excess Pages (ECF 9) is DENIED AS MOOT; and it is further

ORDERED that Plaintiff's Complaint (ECF 1) is DISMISSED.

**SO ORDERED.**

/s/

Michael S. Nachmanoff
United States District Judge

January 16, 2025
Alexandria, Virginia

5
Appx10

**BEFORE THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE
UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Edwin D. Schindler, | ) | Proceeding No. D2019-43 |
| | ) | |
| Appellant. | ) | |
| | ) | |

**FINAL ORDER**

On December, 22, 2023 Edwin D. Schindler ("Appellant") filed a pleading entitled "Respondent Edwin D. Schindler's Combined Motion For Reconsideration, Pursuant To 37 C.F.R. §11.56(c), Or, In The Alternative, For Remand To The Administrative Law Judge And Stay Of Proceedings." ("Request" or "Request for Reconsideration"). The Request followed the USPTO Director's Final Order on Appellant's hearing appeal, dated December 5, 2023. That Final Order affirmed the Initial Decision of the ALJ that Appellant violated the USPTO's disciplinary rules and suspended Appellant from practice before the USPTO in patent, trademark, and other nonpatent matters for not less than 2 years. For the reasons set forth below, Appellant's Request for Reconsideration is denied.

**I.    PROCEDURAL BACKGROUND**

The OED Director issued a Complaint and Notice of Proceedings against Appellant under 35 U.S.C. §§ 2(b)(2)(D), 32, and 37 C.F.R. §§ 11.32, 11.34, 11.39 on July 10, 2019 (A.25-64).[1] The Complaint alleged three Counts of misconduct including assisting in the unauthorized practice of law (Count I), improperly dividing fees without client consent (Count II), and failure to communicate with clients (Count III). (*Id*). The OED Director requested that Appellant be

---

[1] References to specific pages in the Administrative Record are designated as "A.__".

Appx11

excluded or suspended from practice before the USPTO in patent, trademark, and other non-patent matters. (A.61). Appellant filed his "Answer to Complaint and Notice of Proceeding Under 35 U.S.C. § 32" ("Answer") on August 9, 2019 and raised various defenses and counterclaims. (A.73-187).

Following a hearing, the ALJ issued the Initial Decision on September 24, 2021. The ALJ concluded Appellant engaged in misconduct as set forth in the Complaint. (A.17). The ALJ thoroughly considered the factors under 37 C.F.R. § 11.54(b) and concluded that Appellant should be suspended from practice before the USPTO in patent, trademark, and non-patent matters for not less than two (2) years. (A.20). Although the Initial Decision was issued in 2021, transmittal of the Initial Decision was delayed until 2023, as documented by the ALJ in a memorandum dated June 8, 2023. (A.1939).

Appellant filed an appeal of the ALJ's Initial Decision on June 20, 2023, arguing that he should not have been found to have engaged in misconduct and he should not have been sanctioned by the ALJ. However, on December 5, 2023, the USPTO Director denied Appellant's appeal. This Request for Reconsideration followed.

## II.    LEGAL STANDARD

Following a final decision of the USPTO Director, either party may make a single request for reconsideration or modification of the decision by the USPTO Director if such request is filed within twenty days from the date of entry of the decision. *See* 37 C.F.R. § 11.56(c). The provisions governing reconsideration state:

> "No request for reconsideration or modification shall be granted unless the request is based on newly discovered evidence or error of law or fact, and the requestor must demonstrate that any newly discovered evidence could not have been discovered any earlier by due diligence."
> *Id.*

The standard of review governing requests under § 11.56(c) are not defined beyond what appears in the text of the regulation. However, although the Federal Rules of Civil Procedure are not applicable in administrative proceedings,[2] courts have at times looked to them for useful guidance in judging actions taken by the USPTO.[3] The standard of review used by federal courts for motions to alter or amend a judgment under Rules 59(e) and 60 of the Federal Rules of Civil Procedure are most similar to requests for reconsideration filed pursuant to § 11.56(c). Because of that, the standard set forth in those rules has been previously utilized by the USPTO in analyzing reconsideration requests. *See In re Walpert*, Proceeding No. D2018-07 (USPTO Apr. 29, 2021); *In re Faro*, Proceeding No. D2015-27 (USPTO Feb. 9, 2018); *In re Denison*, Proceeding No. D2016-01 (USPTO Oct. 25, 2017); *In re Piccone*, Proceeding No. D2015-06 (USPTO Feb. 9, 2018); *See in re Kroll,* Proceeding No. D2014-14 (USPTO May 18, 2016); *In re Bang-er Shia*, Proceeding No. D2014-31 (USPTO Aug. 1, 2016). Accordingly, those authorities are referenced and utilized here to analyze Appellant's Request for Reconsideration.

Federal courts have viewed the standard of review for Rules 59(c) and 60 as narrow and limited to only circumstances involving new evidence, or to correct errors of law or fact. *See Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993). Any new evidence submitted must not have been available before the issuance of the final decision. *See Boryan v. United States*, 884 F.2d 767, 771-72 (4th Cir. 1989) ("Evidence that is available to a party prior to entry of judgment, therefore, is not a basis for granting a motion for reconsideration as a matter of law.") (citing *Frederick S. Wyle Pro. Corp. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985)). Furthermore, it is long-settled that requests for reconsideration are not a vehicle to state a party's

---

[2] *See Bender v. Dudas*, 2006 WL 89831, at *23 (D.D.C. Jan. 13, 2006), *aff'd*, 490 F.3d 1361 (Fed. Cir. 2007).
[3] *See Gerritsen v. Shirai*, 979 F.2d 1524, 1532 (Fed. Cir. 1992).

3

Appx13

disagreement with a final judgment. *See Hutchinson*, 994 F.2d at 1082 ("mere disagreement does not support a Rule 59(e) motion"); *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007), *cert. denied*, 552 U.S. 1040 (2007) (stating that a Rule 59(e) motion cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment). A request for reconsideration should not be used to rehash "arguments previously presented" or to submit evidence that should have been previously submitted. *Wadley v. Park at Landmark, LP,* 2007 WL 1071960, at *2 (E.D. Va. 2007) (citing *Hutchinson*, 994 F.2d at 1081-82); *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983) (holding improper a motion for reconsideration "to ask the Court to rethink what the Court had already thought through—rightly or wrongly"); *Durkin v. Taylor*, 444 F. Supp. 879, 889 (E.D. Va. 1977) (stating that Rule 59(e) is not intended to give "an unhappy litigant one additional chance to sway the judge"). Instead, reconsideration is appropriate where, for example, "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Above the Belt, Inc.*, 99 F.R.D. at 101; *United States v. Ali*, 2014 WL 5790996, at *3 (D. Md. 2014).

Requests for reconsideration are permitted but they are seldom granted. These types of motions are extraordinary remedies reserved only for extraordinary circumstances. *See Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993) (limiting relief under Rule 60(b)(6) to "extraordinary circumstances"); *Projects Mgmt. Co. v. DynCorp Int'l, LLC*, 17 F. Supp. 3d 539, 541 (E.D. Va. 2014), *aff'd*, 584 F. App'x 121 (4th Cir. 2014) (reconsideration of a judgment after its entry is an "extraordinary remedy which should be used sparingly") (quoting *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998)); *see also*

4

Appx14

*Netscape Commc'ns Corp. v. ValueClick, Inc.*, 704 F. Supp. 2d 544, 546 (E.D. Va. 2010)).

Consequently, the standard for granting a Request for Reconsideration under § 11.56(c) is very high and are granted sparingly and only in extraordinary circumstances. For the reasons discussed below, Appellant's Request for Reconsideration is denied.

## III.    DECISION

### A. Appellant Has Not Satisfied the Requirements for Granting Reconsideration Under 37 C.F.R. § 11.56(c).

The standard for granting reconsideration under 37 C.F.R. § 11.56(c) is that "[n]o request for reconsideration or modification shall be granted unless the request is based on newly discovered evidence or error of law or fact. . . ." As detailed below, Appellant's Request completely fails to satisfy this standard. Appellant does not argue, and there is not a single reference to any "newly discovered evidence" in his Request. That being the case, a grant of reconsideration rests solely on Appellant's ability to show and error of law or fact and he fails to make such a showing.

1. Appellant's Challenge to the Standard for Reviewing Requests for Reconsideration Have no Merit.

Appellant spends nearly eight pages of his request objecting to the USPTO Director's longstanding practice of viewing motions to amend or alter a judgment under Federal Rules of Civil Procedure 59(e) and 60 as analogs to requests for reconsideration under 37 C.F.R. § 11.56(c). *See* Request for Reconsideration, at 1-8. In sum, Appellant argues that only the words of § 11.56(c) should be applied to Requests for Reconsideration and argues that referencing the Federal Rules provides additional "hurdles" to, and do not mirror the language in, § 11.56(c) and claims that practitioners have no notice that the Federal Rules will be so utilized in reviewing Requests for Reconsideration.

First, there is nothing inappropriate about the USPTO Director looking to analogous federal rules to assist in the interpretation of the USPTO regulations, a practice which the Federal Circuit

5

Appx15

has also found useful. *See Gerritsen v. Shirai*, 979 F.2d at 1532(looking to Federal Rule of Civil Procedure for comparison in judging the USPTO action). Appellant's cited authority, which generally concerns strict applicability of the federal rules to disciplinary proceedings, does not prohibit referencing Federal Rules and does not negate *Gerritsen* or the USPTO's disciplinary precedent. Further, the USPTO is not applying the Federal Rules to the exclusion of 11.56(c). As stated in prior precedent, Federal Rules 59(e) and 60 are most consistent with §11.56(c) and are utilized as further guidance for analyzing requests for reconsideration. *See supra* pp. 3-5. This is because, similar to § 11.56(c), both Rule 59(e) and Rule 60 rely on new evidence or errors of law or fact as a basis for granting Requests for Reconsideration. Thus, there is no inconsistency with § 11.56(c) or additional hurdles placed on Appellant. Further, to the extent that Appellant argues that practitioners have no notice of the USPTO's reference to the Federal Rules, that claim has no merit. Appellant's Request for Reconsideration inherently acknowledges that such notice is available to practitioners and, as such, he had such notice. Further, he was counsel of record for at least one other Request for Reconsideration in which the USPTO stated its practice to consult with Rules 59(e) and 60. *See in re Kroll,* Proceeding No. D2014-14 (Appellant as counsel on request for reconsideration that references Rules 59(e) and 60).

Not having proffered any authority that would prohibit the USPTO's looking to analogous federal rules to assist in the interpretation of the USPTO regulations, having not shown that precedent is inconsistent with § 11.56(c), and failing to show he was deprived notice of this practice, his challenge to the USPTO's standard of review is rejected.

2.  <u>Appellant Waived Challenge to Delay of Proceedings.</u>

Appellant next claims that reconsideration is warranted due to "the USPTO's many years delay in issuing the initial decision" in violation of the Administrative Procedures Act. *See*

6

Appx16

Request for Reconsideration, at 8-13. However, as noted by the OED Director, Appellant has waived this argument and, as a result, cannot raise it for the first time on reconsideration.

Reconsideration, to include the alternative request for remand based on delay, is limited to issues actually decided in the decision of which reconsideration is sought. "Arguments not raised or developed during the appeal are waived on reconsideration." *In re Correll*, Proceeding No. D2018-12 at 8 (USPTO Jul. 26, 2021) (Order on Reconsideration) (internal citation omitted); *see also In re Walpert*, Proceeding No. D2018-07 at 11 (Order on Reconsideration); *Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-20 (Fed. Cir. 2006). A review of Appellant's underlying filings conclusively shows that Appellant never raised, mentioned, or argued the issue of delay in his initial appeal or his Reply brief to the USPTO Director. *See generally* Appellant's Appeal Brief; Appellant's Reply Brief. Similarly, his appellate briefings did not request remand to the ALJ for any issue. *See id.* Having not raised these issues on appeal, Appellant may not raise them for the first time at the reconsideration stage. Accordingly, Appellant has waived these issues. *See Correll*, *supra* at 8; *Walpert*, *supra* at 11.

In addition to the foregoing, Appellant's arguments concerning the delay in issuing the Initial Decision also fail on the merits for the reasons stated in the January 5, 2024, OED Director's Opposition ("Opposition"). *See* Opposition, at 6. Specifically, and contrary to Appellant's assertions, 37 C.F.R. § 11.39(d) plainly allows that Initial Decisions may be issued outside a 9-month timeframe. And here, the ALJ issued the decision in 2021[4], but it was the transmittal of the Initial Decision that was delayed until 2023. The ALJ documented the delayed transmittal in his Memorandum dated June 8, 2023 in compliance with § 11.39(d) ("The hearing officer may, however, issue an initial decision more than nine months after a complaint is filed if there exist

---

[4] It is noted that this period of time coincided with the Coronavirus pandemic.

7

Appx17

circumstances, in his or her opinion, that preclude issuance of an initial decision within nine months of the filing of the complaint.")

### 3. Appellant's Challenge to 37 C.F.R. § 11.5 is Waived and Has no Merit.

Appellant next argues that the 37 C.F.R. § 11.5 definition of what constitutes "practice before the Office" is so overbroad that it fails to provide adequate notice of either the conduct that is alleged to violate the rule or what the rule means. *See* Request for Reconsideration, at 14-17. Thus, according to Appellant, the rule as stated is void for vagueness. *Id.* at 16. Further, he claims that he is being treated differently from the class of practitioners who are disciplined and who receive timely initial decisions, thus violating his equal protection rights. *Id.* at 17.

Although Appellant did raise challenges to § 11.5 during the appeal on the basis that it was generally overbroad, he raised no arguments that § 11.5 was void for vagueness during his appeal and instead raises it for the first time in his request for reconsideration. Thus, as noted above, that argument is waived. *See supra*., at 7 (discussion of waiver).

Even if Appellant's arguments concerning delay were not waived, Appellant's challenge fails on the merits as there is no error of law or fact with how the ALJ applied § 11.5 to find misconduct. The plain language of §11.5 directly and unequivocally address Appellant's misconduct here. There is no need to address Appellant's arguments concerning the "but is not limited to" language identified in the § 11.5 because the ALJ relied on Appellant's conduct that is specifically stated in § 11.5 to conclude that he assisted Mr. Kroll's unauthorized practice of law in violation of 37 C.F.R. § 11.505. Specifically, the ALJ found that Mr. Kroll's conduct included "communicating with and advising . . . client[s] concerning matters pending or contemplated to be presented before the Office" and "consulting with or giving advice to a client

in contemplation of filing documents with the Office." (A.10-11 (citing and quoting § 11.5(b)).

Thus, there is no error of law or fact and no basis to permit reconsideration.

On the issue of the Equal Protection Clause, the argument is also waived as it is raised for the first time on reconsideration. *See supra.*, at 7 (discussion of waiver). Additionally, this argument is entirely without merit and does not constitute an error of law for reasons stated in the OED Director's Opposition. *See* Opposition, at 7, n.5. He makes no attempt to develop this argument or demonstrate his disparate treatment, including that he cites to no other comparators who have been treated differently.

### 4. Appellant's Challenge to Hearsay Evidence Is Insufficient to Grant Reconsideration.

Appellant next summarily argues that the ALJ erred by accepting hearsay evidence and in denying him the opportunity to cross-examine witnesses. *See* Request for Reconsideration, at 17-18. However, in making this argument, Appellant points to no error of law or fact in this determination. Nor does he address or argue the authority set forth in the Final Order permitting the introduction of hearsay evidence in the USPTO disciplinary proceedings. Rather, he simply restates the argument he previously made in his appeal and reply briefs. This argument wholly fails to constitute an error of law and is an insufficient basis to permit reconsideration. And, as already stated, a request for reconsideration should not be used to rehash "arguments previously presented" or to submit evidence that should have been previously submitted. *See Wadley,* 2007 WL 1071960, at *2 (citing *Hutchinson*, 994 F.2d at 1081-82).

Though Appellant cites to 5 U.S.C. § 556(d) of the Administrative Procedures Act which provides that "[a] party is entitled to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts" this argument was not previously made. Given that

9

Appellant is raising this argument for the first time on appeal, it is waived. *See supra*. at 7 (discussion of waiver). But, alternatively, it is noted that Appellant fully participated in the underlying state disciplinary proceedings. He cross-examined at least one witness. He listed other potential witnesses for the hearing, including clients, but did not request any subpoenas or otherwise call them to testify. A.1661; A.9946 (Appellant resting without calling any witnesses). Any failure to call witnesses rests entirely with himself and does not create an error of law or fact that would justify reconsideration.

     5.   <u>There Are No Exceptional Circumstances Justifying A Stay of Discipline.</u>

Review of the final decision by the USPTO Director in a disciplinary case may be had by a petition filed in accordance with 35 U.S.C. 32. 37 CFR § 11.57(a). Any such petition shall be filed within 30 days after the date of the final decision. *id*. "Except as provided for in § 11.56(c), an order for discipline in a final decision will not be stayed except on proof of exceptional circumstances." 37 C.F.R. §11.57(c). Here, Appellant argues that any suspension should be stayed pending resolution of any review by the Eastern District of Virginia. *See* Request for Reconsideration, at 19.

Appellant makes no argument of "exceptional circumstances" under § 11.57(c). Instead, he recites a standard akin to the one applied in federal courts when considering petitions for a temporary restraining Order. *See* Request for Reconsideration, at 19-24. This standard, however, is not applicable to questions of a stay under § 11.57(c). To the extent that Appellant is relying on these arguments as a showing of "exceptional circumstances", those arguments are rejected for the reasons stated in the OED Director's Opposition. Specifically, Appellant continues to rely in his timeliness argument as evidence of his likelihood to succeed on the merits. *See id*., 20-21. However, as already noted, since he failed to timely raise this issue of delay, that argument has

10

been waived. *See supra.*, at 7 (discussion of waiver). It is also wholly without any merit since the USPTO rules permit decisions outside a 9-month window and the ALJ appropriately noted the delay in transmitting the Initial Decision in his June 8, 2023 memorandum. (A.1939). Thus, contrary to his argument, Appellant is unlikely to succeed on the merits. Next, any injury he suffers from a lack of stay is not irreparable or exceptional as every suspended practitioner suffers the same potential injury to reputation, business, and finances. Contrary to his opinion, *see* Request for Reconsideration, at 21-22, there is nothing unique or special to Appellant as to these things. In contrast, allowing a suspended practitioner to practice while under court review could harm the USPTO and potential clients. Finally, public interest counsels in favor of a stay since he was found to have violated his duty to the public and his clients and allowing him to continue practicing could put additional clients at risk.

In sum, there is nothing special or exceptional about Appellant's situation that other suspended or excluded practitioners do not also experience. Having not provided any proof of the exceptional circumstances required by 37 C.F.R. § 11.57(c) for the imposition of a stay of his suspension, that request is denied.

## IV.    CONCLUSION

Having considered Appellant's Request for Reconsideration of Director's Final Order dated December 5, 2023, as well as the other pleadings, it is **ORDERED** that Appellant's Request for Reconsideration is **DENIED**.

## APPEAL RIGHTS

Appellant is notified that he is entitled to seek judicial review on the record in the U.S. District Court for the Eastern District of Virginia under 35 U.S.C. § 32 "within thirty (30) days after the date of the order recording the Director's action." *See* E.D.Va. Local Civil Rule 83.5.


**IT IS SO ORDERED.**


_____          _____
David Berdan                                              Date
General Counsel
Office of the General Counsel
United States Patent and Trademark Office

on delegated authority by

Katherine K. Vidal
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

12

Appx22

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE**

In the Matter of         )
                        )
Edwin D. Schindler,      )      Proceeding No. D2019-43
                        )
      Appellant.      )
                        )

**ORDER**

On July 10, 2019, the Director of the Office of Enrollment and Discipline ("OED Director") filed a disciplinary Complaint against Appellant, alleging that he had violated ten Rules of Professional Conduct. After a 2019 hearing before an Administrative Law Judge ("ALJ"), on September 23, 2021, the ALJ issued his initial decision, concluding that Appellant had violated each of the charged rule violations and imposing a sanction of a suspension of not less than two years. That initial decision was transmitted to the parties on June 8, 2023, along with a memorandum from the ALJ which documented the delay in transmitting the initial decision to the parties. After an appeal to the USPTO Director, on December 5, 2023, the USPTO Director issued a Final Order affirming the ALJ's initial decision.

Thereafter, on December 22, 2023, Appellant filed a pleading entitled "Respondent Edwin D. Schindler's Combined Motion For Reconsideration, Pursuant To 37 C.F.R. §11.56(C), Or, In The Alternative, For Remand To The Administrative Law Judge And Stay Of Proceedings" ("Request for Reconsideration"). The OED Director replied on January 5, 2024. That same day, Appellant filed a pleading entitled "Respondent Edwin D. Schindler's Motion For Leave, On Consent, To File A Reply To The OED's Opposition To Respondent's Motion For Reconsideration" ("Motion for Leave To File Reply"). However, as there is no provision that

1

Appx23

permits the filing of a Reply brief during reconsideration, in an Order dated January 8, 2024, the Motion for Leave to File Reply was denied on the basis that Appellant did not make the requisite showing under 37 C.F.R. § 11.3 ("In an extraordinary situation, when justice requires, any requirement of the regulations of this Part which is not a requirement of statute maybe suspended or waived by the USPTO Director. . . .") *See also* 37 C.F.R. § 11.56(c).

This Order concerns a January 10, 2024, pleading filed by Appellant. That pleading is entitled "Respondent Edwin D. Schindler's Renewed Motion for Leave to File Reply in Support of Respondent's Motion for Reconsideration") ("Renewed Motion"). Therein, Appellant identifies what he contends is new evidence relevant to his appeal. However, as with his prior Motion for Leave to File Reply, Appellant similarly fails to satisfy § 11.3 here and his Renewed Motion is denied.

Analysis and Order

The provisions of 37 C.F.R. § 11.56(c) govern the framework for making and responding to Requests for Reconsideration. After such a request is filed, "[t]he other party may file a response to the request for reconsideration within 14 days of the filing of the request." *Id*. There is no allowance in the rule for a Reply brief, or any other filings. As the regulatory provisions of § 11.56(c) do not permit filing of a Reply brief, allowing Appellant's Renewed Motion and allowing him to file a Reply brief would require a suspension or waiver of that regulatory provision under 37 C.F.R. § 11.3. Appellant's claims, arguing the discovery of new evidence, falls well short of an "extraordinary situation" under § 11.3.

Appellant's Renewed Motion simply continues to offer additional arguments that could have been previously raised during the hearing appeal but were not. Thus, Appellant has waived these arguments. *In re Correll*, Proceeding No. D2018-12 at 8 (USPTO Jul. 26, 2021) (Order on

2

Appx24

Reconsideration) (internal citation omitted); *see also In re Walpert*, Proceeding No. D2018-07 at 11 (Order on Reconsideration); *Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-20 (Fed. Cir. 2006). Further, these arguments are simply not an extraordinary situation under § 11.3. That provision was not meant to act as a mechanism to allow unlimited attempts to raise new arguments that could have previously made.

Additionally, it is noted that Appellant makes no showing as to why any new evidence he identifies could not have been discovered by reasonable diligence and presented during the hearing appeal, especially when Appellant formal notice of the delay in transmitting the initial decision as of June 8, 2023. He also presumptive notice of the delay earlier than that, however, as he was surely aware that he had not received an ALJ initial decision between the 2019 hearing and the June 8, 2023 ALJ memorandum. It was the ALJ that formally disclosed the delay to the parties on June 8, 2023. It was also the ALJ who gave Appellant notice of the Interagency Agreement between USPTO and HUD to carry out disciplinary hearings, no later than June 8, 2023 when he transmitted the initial order. (A.1, n. 1) (initial decision).[1] There is also nothing to indicate, and Appellant does not allege, that he objected to any delay in issuing or receiving the initial decision prior to June 8, 2023. He similarly raised no such arguments during the hearing appeal. That he wishes to raise it now, and couch it as "new evidence" is insufficient to raise a showing of due diligence on his part and is insufficient to satisfy the high standard under § 11.3 to allow additional reconsideration pleadings.

Based on the foregoing, the Renewed Motion is DENIED.

(signature page follows)

---

[1] References to specific pages in the Administrative Record are designated as "A._".

(signature page for Order (Renewed Motion), *In re Schindler*, D2019-43)

**IT IS SO ORDERED.**

_____

Date

_____

David Berdan
General Counsel
Office of the General Counsel
United States Patent and Trademark Office

on delegated authority by

Katherine K. Vidal
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

4

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| Edwin D. Schindler, ) | Proceeding No. D2019-43 |
| ) | |
| Appellant. ) | |
| ) | |

## FINAL ORDER

Pursuant to 37 C.F.R. § 11.55, Edwin D. Schindler ("Appellant") has appealed the September 23, 2021 Initial Decision and Order ("Initial Decision") of Administrative Law Judge ("ALJ") J. Jeremiah Mahoney to the Director of the United States Patent and Trademark Office ("USPTO" or "Office"). In that Initial Decision, the ALJ concluded that Appellant violated USPTO's disciplinary rules[1] 37 C.F.R. §§ 11.505, 11.804(d), 11.105(b) and (e), 11.102(a), 11.104(a)(2), (a)(3), and b, and 11.804(c) and (d), and, after considering the relevant factors set forth in 37 C.F.R. § 11.54(b), the ALJ ordered that Appellant be suspended from practice before the USPTO for not less than two years.

For the reasons set forth below, the ALJ's Initial Decision is **AFFIRMED.**

## I.  FINDINGS OF FACT

### A. Background

1. At all times relevant to the Complaint, Appellant has been a registered patent attorney (Registration No. 31,459) who has been authorized to practice before the USPTO in patent

---

[1] Effective May 3, 2013, the USPTO Rules of Professional Conduct, 37 C.F.R. §§ 11.101 through 11.901, apply to persons who practice before the Office. Prior to May 3, 2013, the USPTO Code of Professional Responsibility applied to persons practicing before the Office. *See* 37 C.F.R. §§ 10.20-10.112.

1

matters. (A.1781 ¶ 1; A.1963)[2]. As such, he is subject to the USPTO Rules of Professional Conduct ("USPTO Rules"). *See* 37 C.F.R. §§ 11.101 through 11.901.

2. Appellant was admitted to practice law in New York on May 22, 1985, and is currently an active member in good standing. (A.1781 ¶ 2; A.1962; A.9754).

3. Appellant's practice consists mostly of "patent and trademark law, mostly prosecutions, some litigation." (A.9754). Appellant testified that he performs most of his work "through foreign patent associates" who send him work for their clients, which Appellant then reviews and files with the USPTO. (A.9754).

4. Appellant has known and worked on patent and trademark matters with a New York attorney, Michael Kroll for many years. (A.9755; A.9768-69).

B. Kroll's Disciplinary History

5. Mr. Kroll is an attorney licensed to practice law in the state of New York. (A.1781 ¶ 4). Mr. Kroll was formerly authorized to practice as a patent attorney before the USPTO. (A.1781 ¶ 3).

6. Mr. Kroll was suspended from practice before the USPTO effective May 18, 2016. (A.2070-2077) (Gov. Ex. 10). Mr. Kroll is currently excluded from practice pursuant to Final Orders dated December 11, 2017 and April 5, 2021. (A.2101-2132).[3] Appellant represented Mr. Kroll in the disciplinary proceedings before the USPTO. (A.2076-77; A.2132).

---

[2] References to specific pages in the Administrative Record are designated as "A.__".

[3] On April 5, 2021, an ALJ in a separate disciplinary proceeding issued an Initial Decision and Order concluding, among other things, that Mr. Kroll's arrangement with Respondent at issue in this matter constituted the unauthorized practice of law and imposing a sanction of exclusion. *In re Kroll*, Proceeding No. D2019-15 (USPTO Apr. 5, 2021) (Initial Decision and Order) https://foiadocuments.uspto.gov/oed/Kroll_Initial_Decision_and_Order_D2019-15_dated_04_05_2021_Redacted.pdf. The Initial Decision and Order became the final decision of the USPTO Director pursuant to 37 C.F.R. § 11.54(d).

2

7. Appellant admitted that, at all times relevant to the current charges, he was aware Mr. Kroll was not authorized to practice before the USPTO. (A.1781 ¶ 3; A.9756-57).

8. Prior to Mr. Kroll's suspension, Appellant helped draft patent prosecution documents for Mr. Kroll, some of which Mr. Kroll would file and some of which Appellant would file under his own name. (A.9769, lines 4-8). For more than a decade prior to his suspension, Mr. Kroll listed Appellant on powers of attorney that he filed on behalf of his clients. (A.9769, lines 9-18; A.9770, lines 3-11).

9. Following his suspension, Mr. Kroll purportedly told Appellant that he sent a notification to all of his clients informing them that he had been suspended. (A.9816; lines 12-25; A.9817; lines 2-22). Appellant produced a copy of the "general notification," dated July 17, 2016, that Mr. Kroll claimed to have sent to his clients informing them of his suspension and that Appellant would be handling their patent file until the suspension was resolved. (A.8262; A.9818, lines 5-12). Appellant never saw proof that the notification was sent to specific clients. (A.9817, lines 11-14).

C. Appellant and Mr. Kroll's representation of specific joint clients

a. Dr. Carlos Botero

10. Appellant and Mr. Kroll jointly represented Dr. Carlos Botero with respect to multiple patent applications. (A.1781-82 ¶¶5, 14, 15). Appellant never directly communicated with Dr. Botero and allowed Mr. Kroll to handle all communications with the client. (A.3140; A.9835, lines 21-24).

11. On December 20, 2013, Dr. Botero executed a Declaration and Power of attorney in favor of Appellant and Mr. Kroll. (A.1781 ¶ 5; A.8242; A.5000). The Declaration and Power of

3

Appx29

Attorney did not list any information of the Appellant except his name and USPTO registration number. (A.8242; A.5000).

12. On December 27, 2013, Mr. Kroll filed U.S. Patent Application No. 14/142,134 application ("the '134 application"), which named Dr. Botero as the sole inventor of his "Medical Imaging Device with an Integral Multiple Surgical Masers and/or Lasers" invention. (A.1781 ¶ 5; A.4949). The '134 application was still pending when Mr. Kroll was suspended from practice in 2016. (A.9815, lines 11-14).

13. Dr. Botero told the USPTO's Office of Enrollment and Discipline ("OED") that Mr. Kroll had never disclosed his suspension or exclusion to him and that he had continued to work directly with Mr. Kroll on his patent matters uninterrupted. (A.3140; A.9916, lines 10-15). He also told OED that he did not know who Appellant was and that he had no idea Appellant was working on his patent matters. (A.3140; A.9916, lines 16-20). He produced to OED 786 pages of correspondence he had received from Mr. Kroll, none of which contained the "general notification" Mr. Kroll claimed he had sent to all of his clients. (A.3141-3926).

14. On September 30, 2016, the USPTO issued an Office Action in the '134 application. (A.5089-5110). Because Mr. Kroll had not filed a notice of withdrawal in the '134 application following his May 18, 2016 suspension, the Office Action was mailed directly to him. (A.5089; A.9815, lines 15-19). On October 3, 2016, Mr. Kroll sent Dr. Botero a letter notifying him of the Office Action, advising on options for responding, consequences for not responding, and quoting a $3,650 fee for the filing of a response. (A.3143-44). The letter identified Mr. Kroll as "Attorney at Law" and prominently featured his contact information with the words "Patents Trademarks &

4

Appx30

Copyrights" directly below. (A.3143). Appellant was only mentioned in a footnote, stating "Above to be performed by Leonard Belin, Reg. #18,062; Edwin D. Schindler, Reg. #31,459; and/or Joseph C. Merek, Reg. #57,953 all of whom are registered to practice before the US Patent and Trademark Office." (A.3144). The letter did not contain Appellant's telephone number, address, or any other contact information; it provided only his USPTO registration number. (A.3143-44; A.9821-22, lines 25-4).

15. On January 12, 2017, Mr. Kroll emailed Dr. Botero stating that "the response to the last office action is being processed and we will advise as soon as we hear back from the Patent Office." (A.3162). Thereafter, on February 28, 2017, Appellant filed a response to the Office Action and Change of Correspondence Address with the USPTO. (A.5111-31). Of the $3,650 in funds collected by Mr. Kroll for the response, Appellant received only $800. (A.9826-27, lines 25-6). Appellant testified that Mr. Kroll had earned the most of the fee by referring the client, dealing with the client, and contacting the client. (A.9287, lines 15-17).

16. On June 28, 2017, the USPTO issued another Office Action in the '134 application. (A.5136-61). The Office Action was sent directly to Appellant. (*Id.*) On August 30, 2017, Mr. Kroll sent Dr. Botero a letter advising him about the Office Action and again quoting a $3,650 fee for the filing of a response. (A.3250-51). Again, Mr. Kroll signed the correspondence, which contained only Mr. Kroll's contact information and identified him as an "Attorney At Law" in "Patents, Trademarks & Copyrights." (*Id.*) Appellant was again only mentioned in a footnote. (*Id.*) On September 28, 2017, Appellant filed an Amendment in response to the Office Action. (A.5162-72).

17. On January 23, 2018, the USPTO issued a Final Rejection for the '134 Application. (A.5176-5202). In a January 24, 2018 letter, Mr. Kroll advised Mr. Botero that "we need to

respond to the attached office action" and quoted a fee of $3,275 for the filing of a response. (A.3324-27). On July 23, 2018, Appellant filed a Request for Continued Examination. (A.5203-19). Out of that fee, Mr. Kroll paid Appellant $1,625 in the form of two checks, $800 of which was for Appellant and the remainder for USPTO fees. (A.8254-55, A.9850, lines 17-20).

18. On February 22, 2019, the USPTO issued another Office Action. (A.5225-62). As of the date of the hearing, the application remained pending. (A.9848, lines 2-4).

19. In addition to the '134 application, Appellant and Mr. Kroll represented Dr. Botero in connection with U.S. Patent Application No. 15/650,924 ("the '924 application"), which named Dr. Botero as the sole inventor of his "Super-Cooled Electromagnetic Turbine Engine" invention. (A.1782 ¶14; A.5285-94). On February 25, 2017, Mr. Kroll sent an email stating, "This will confirm we are working on your Electric Turbine invention" and recommending Dr. Botero "file a patent application ASAP so that you can maintain priority and not lose the invention to an earlier filer." (A.3167). On March 17, 2017, Mr. Kroll emailed Dr. Botero, attaching a draft patent application and asking Dr. Botero to review and advise if there were any necessary changes or additions. (A.3175-76). Mr. Kroll did not copy Appellant on the email or provide Dr. Botero with Appellant's contact information. (*Id.*)

20. On March 27, 2017, Mr. Kroll sent Dr. Botero another draft of the patent application. (A.3201-02). Again, Mr. Kroll did not copy Appellant or provide Dr. Botero with Appellant's contact information. (*Id.*) Mr. Kroll advised Dr. Botero that "[t]rademark protection may also be available if you have a special name for your invention." (*Id.*) At the hearing, Appellant admitted that Mr. Kroll's advising Dr. Botero of the availability of trademark protection constituted legal advice. (A.9860-61, lines 25-8).

6

21. On July 16, 2017, Appellant filed the '924 application. (A.5285-94). Mr. Kroll drafted the application and Appellant revised it "as to form." (A.9857, lines 3-13). Appellant never directly communicated with Dr. Botero prior to filing the application. (A.9857, lines 22-25; A.9858, lines 1-2). This is so, even though Appellant was the only practitioner listed on the Declaration and Power of Attorney filed in the '924 application. (A.5279). Mr. Kroll gave Appellant $400 of the funds he received from Dr. Botero for what Appellant testified was five hours of work. (A.9857, lines 2-3, 13-14). Dr. Botero paid Mr. Kroll "a lot more money" for prosecution of the '924 application than the $400 Appellant received. (A.9857, lines 16-21).

22. Appellant and Mr. Kroll also represented Dr. Botero with respect to U.S. Patent Application No. 15/650,961 ("the '961 application"), which named Dr. Botero as the sole inventor of his "High-Pressure Heat Bulb" invention. (A.1782 ¶15; A.5316-25). On July 16, 2017, Appellant filed the '961 application. (*Id.*) That same day, Mr. Kroll sent an email to Dr. Botero notifying him of the filing and advising him to file in Canada. (A.3248). On July 27, 2017, Mr. Kroll sent another email reiterating his advice that Dr. Botero file to patent his invention in Canada. (A.3247-48). In neither email did Mr. Kroll mention Appellant or provide his contact information. (A.3247-48).

23. On March 30, 2018, the USPTO issued an Office Action in the '961 Application and, on April 5, 2018, Mr. Kroll sent Dr. Botero a letter in which he informed Dr. Botero of the Office Action. (A.3270-3273; A.5327-39). As in the other applications, Mr. Kroll referred to himself as "Attorney at Law" in "Patents, Trademarks & Copyrights," did not provide Appellant's contact information, and only mentioned him in a footnote as one of multiple practitioners who might work on the matter. (A.3272-73). On September 30, 2018, Appellant filed a response to the

7

Office Action with the USPTO. (A.5341-54). Appellant received a payment from Mr. Kroll of $1,500 with respect to this response; $900 to pay USPTO fees and $800 for himself. (A.8253).

24. On January 23, 2019, the USPTO issued another Office Action in the '961 Application. (A.5356-62). On July 12, 2019, Mr. Kroll paid Appellant $2,150 for his work on the '961 Application, $800 of which was for Appellant and the remainder for USPTO fees. (A.8256).

### b. Mr. Sheikh Moussa Drammeh

25. On February 9, 2015, prior to his 2016 suspension, Mr. Kroll filed U.S. Patent Application No. 14/617,538 ("the '538 application"), which named Sheikh Moussa Drammeh as the sole inventor of his "Taharah Water Vessel" invention. (A.1782 ¶ 12; A.5535). The filing included a power of attorney executed in favor of Mr. Kroll and Appellant. (A.1782 ¶ 12; A.5573).

26. On March 8, 2017, after Mr. Kroll's suspension, the USPTO sent a notice of abandonment to Mr. Kroll, who had not withdrawn from the representation or changed the correspondence address for the application. (A.5667-69). Appellant did not inform Mr. Drammeh that the '538 application had become abandoned. (A.4051).

27. Appellant was also listed on the power of attorney for two additional applications filed by Mr. Kroll on behalf of Mr. Drammeh prior to Mr. Kroll's suspension. (A.5851; A.5944). Following Mr. Kroll's suspension, Appellant made filings in at least one of the applications. (A.5996; A.6004; A.6022).

28. Mr. Drammeh later told OED that he did not know that Mr. Kroll had been suspended and excluded from practice before the USPTO and that he was not aware of Appellant's involvement with his applications or that Appellant was receiving a portion of the fees that Mr. Drammeh had paid to Mr. Kroll. (A.4051; A.9919-20, lines 18-3).

8

#### c. Mr. Adel El-Hennawy and Dr. Elena Frolova.

29. On March 6, 2015, prior to his suspension, Mr. Kroll filed U.S. Patent Application No. 14/641,078 ("the '078 application"), which named Adel Sayed El-Hennawy and Elena Frolova as joint inventors of their "Lock Solution for Venous Catheters Using Sodium Bicarbonate" invention. (A.1782 ¶ 10; A6033-34). The filing included a power of attorney executed in favor of Mr. Kroll and Appellant. (A.1782 ¶ 10; A.6060)

30. On January 11, 2017, after Mr. Kroll's suspension, the USPTO issued a nonfinal rejection in the '078 application. (A.6128-37). On May 5, 2017, Appellant submitted an amendment and request for reconsideration. (A.6148-51). On October 17, 2017, the USPTO issued Patent Number 9,789,227 based on the '078 application. (A.6176). Appellant did not have any direct communication with Mr. El-Hennaway or Dr. Frolova or explain his fee structure to them. (A.9868, lines 20-25; A.9869, lines 1-2).

31. Mr. El-Hennaway later told OED that Mr. Kroll had never disclosed that he had been suspended or excluded from practice before the USPTO, he had no idea who Appellant was or that he was working on his application, and he had not agreed for Appellant to do so. (A.2406; A.9907-08, lines 17-5). Mr. El-Hennaway estimated that he paid Mr. Kroll around $30,000 to prosecute the '078 application. (A.2406).

#### d. Mr. Amer Samad

32. On June 5, 2015, prior to his suspension, Mr. Kroll filed U.S. Patent Application No. 14/732,076 ("the '076 application"), which named Amer Samad as the sole inventor of his "Portable Adjustable Stair Railing" invention. (A.1782 ¶ 6; A.6190-92). The filing included a power of attorney executed in favor of Mr. Kroll and Appellant. (A.1782 ¶ 6; A.6233).

9

33. On January 8, 2018, after Mr. Kroll's suspension, Appellant filed a response to an Office action issued in the '076 application. (A.6309-25). In September 2018, Appellant received a $1,275 check from Mr. Kroll in connection with the '076 application. (A.8261). On October 1, 2018, Appellant filed an Amendment to the '076 application. (A.6481-90) Appellant never directly communicated with Mr. Samad about the '076 application and did not communicate with him in writing regarding the structure of his fees. (A.9866, lines 7-16).

34. Mr. Samad later told OED that Mr. Kroll never informed him that he had been suspended or excluded from practice before the USPTO, that he had continued to work directly with Mr. Kroll on the '076 application, and that he did not know who Appellant was or that Appellant was involved in the prosecution of his patent application. (A.2534).

**e. Mr. Daniel McGauley**

35. On June 29, 2015, prior to his suspension, Mr. Kroll filed U.S. Patent Application No. 14/754,407 ("the '407 application"), which named Daniel McGauley as the sole inventor of his "Electric Vehicle Safe Touch Voltage Detector" invention. (A.1782 ¶ 13; A.6702-06). The filing included a power of attorney executed in favor of Mr. Kroll and Appellant. (A.1782 ¶ 13; A.6736).

36. In the '407 application, Appellant submitted a response to an Office Action on April 4, 2017; a request for continued examination on August 14, 2017; an amendment and request for reconsideration on March 6, 2018; and another request for continued examination on December 13, 2018. (A.6756-58; A.6782; A.6809-15; A.6844). Appellant received a $1,400 check from Mr. Kroll for his work responding to an Office Action on Mr. McGauley's behalf, consisting of $800 for his legal fee and the remainder for USPTO filing fees. (A.8260; A.9800, lines 12-

10

Appx36

25). Appellant did not speak directly with Mr. McGauley until 2019 and never informed Mr. McGauley of his fee structure. (A.9869-70, lines 19-16).

**f. Mr. Tetteh Kwashi Tawiah**

37. On April 12, 2016, prior to his suspension, Mr. Kroll filed U.S. Patent Application No. 15/097,095 ("the '095 application"), which named Tetteh Kwashi Tawiah as the sole inventor of his "Method for Constructing and Combining Hexahedron Building Blocks" invention. (A.1782 ¶ 7; A.6889-93). The filing included a power of attorney to Mr. Kroll and Appellant. (A.1782 ¶ 7; A.6939).

38. On December 15, 2016, Appellant filed a response to an Office Action in the '095 application. (A.6963-68). On February 27, 2017, the USPTO issued a Final Rejection in the '095 application and sent it to Appellant. (A.6996-7007). Appellant did not file a response, causing the USPTO to issue a Notice of Abandonment on September 19, 2017. (A.7008-09).

39. Appellant never directly communicated with or explained his fee structure to Mr. Tawiah. (A.9866-67, lines 17-8). Mr. Tawiah later told OED that Mr. Kroll had not informed him of his suspension or exclusion from practice before the USPTO, he had never met Appellant and did not know that Appellant was making filings in the '095 application, and he was unaware that the application had become abandoned nearly a year earlier. (A.4404; A.9927-28, lines 5-2).

**g. Mr. Andrew Cochran**

40. On April 21, 2016, prior to his suspension, Mr. Kroll filed U.S. Patent Application Nos. 15/136,286 ("the '286 application") and 15/135,322 ("the '322 application"), which named Andrew Cochran as the sole inventor of his "Segmented Shaped Swim Fin" and "Segmented Rounded Swim Fin" inventions. (A.1782 ¶¶ 8-9). Both filings included powers of attorney executed in favor of Mr. Kroll and Appellant. (A.1782 ¶¶ 8-9; A.7037; A.7145).

11

Appx37

41. On June 14, 2018, Notices of Abandonment for both the '286 application and '322 application were mailed directly to Appellant. (A.7116-17; A.7221-22). Approximately a month earlier, on May 7 and 8, 2018, Appellant had submitted two design patent applications on Mr. Cochran's behalf, both titled "Swim Fin" under U.S. Patent Application Nos. 29/646,781 and 29/646,956. (A.7224-25; A.7261-62). Appellant did not directly communicate with Mr. Cochran until March 2019 and did not disclose the structure of his fee to Mr. Cochran. (A.9867, lines 20-25; A.9868, lines 1-10).

42. On August 15, 2018, Mr. Cochran told OED that Mr. Kroll had never disclosed his suspension or exclusion from practice before the USPTO and that Mr. Kroll had recently informed him that his patent matters were on track. (A.4516; A.9930, lines 1-6). Mr. Cochran was not aware of Appellant or his involvement in his patent applications, that his utility patent applications had been abandoned, or that design patent applications had been filed on his behalf. (A.4516; A.9930, lines 7-10).

## II.    OED DISCIPLINARY PROCEEDING

The OED Director issued a Complaint and Notice of Proceedings against Appellant under 35 U.S.C. §§ 2(b)(2)(D), 32, and 37 C.F.R. §§ 11.32, 11.34, 11.39 on July 10, 2019 (A.25-64). The Complaint alleged three Counts of misconduct including assisting in the unauthorized practice of law (Count I), improperly dividing fees without client consent (Count II), and failure to communicate with clients (Count III). (*Id*). The OED Director requested that Appellant be excluded or suspended from practice before the USPTO in patent, trademark, and other non-patent matters. (A.61).

Appellant filed his "Answer to Complaint and Notice of Proceeding Under 35 U.S.C. § 32" ("Answer") on August 9, 2019 and raised various defenses and counterclaims. (A.73-187).

12

Appx38

After consideration and denial of various motions filed by Appellant, a hearing was held on November 20, 2019 in Islip, New York. (A.9728-10006). Both Appellant and OED Staff Attorney, Diana Oleksa, testified at the hearing and exhibits were received into evidence. (A.9731-9733). Post-hearing briefs were filed in lieu of closing arguments. (A.1822-1911).

## III.    INITIAL DECISION BY ADMINISTRATIVE LAW JUDGE

The Initial Decision concluded that Appellant violated 37 C.F.R. ¶¶ 11.505 and 11.804(d)(Count I); 11.105(b) and (e)(Count II), and 11.102(a), 11.104(a)(2), (a)(3) and (b), and 11.804(c) and (d) (Count III). (A.17). The ALJ ordered that Appellant be suspended for not less than two years from practice before the USPTO. (A.20).

Appellant filed a timely Notice of Appeal To The USPTO Director on June 20, 2023.[4] Thereafter he filed "Respondent Edwin D. Schindler's Appeal brief, Pursuant to 37 C.F.R. § 11.55" (Appeal Brief). In the Appeal Brief, Appellant claims the findings concerning the unauthorized practice of law must be reversed since the definition of "practice before the Office" is overly broad and improperly prohibits Mr. Kroll from engaging in activities before the office that are permissible for non-registered foreign attorneys. *See* Appeal Brief, at 36-41. He also asserts that any division of legal fees was appropriate since Mr. Kroll remained an attorney in good standing in New York and he was properly associated with and supervised by Appellant. *See id.* at 22-25. Finally, he argues that he should not have been sanctioned by the ALJ. *See id.* at 49-54.

---

[4] The parties never received the Initial Decision issued on September 23, 2021 due to delays from the ALJ's office. *See* Memorandum from J. Jeremiah Mahoney to Sydney O. Johnson, re: *In the Matter of Edwin D. Schindler*, Proceeding No. D2019-43 (June 8, 2023). The Initial Decision was redistributed to the parties in June 8, 2023 and Respondent was allotted fourteen (14) days after the service of the redistributed Initial Decision to appeal to the USPTO Director. *See id.* As a result, the Appellant's appeal was timely filed.

13

Appx39

## IV.    DECISION

The USPTO Director shall decide an appeal from an initial decision of the hearing officer. On appeal from the initial decision, the USPTO Director has authority to conduct a *de novo* review of the factual record. 37 C.F.R. §§ 11.55(*l*), 11.56(a). *See also Marinangeli v. Lehman*, 32 F. Supp. 2d 1, 5 (D.D.C. 1998). The USPTO Director may affirm, reverse, or modify the initial decision or remand the matter to the hearing officer for such further proceedings as the USPTO Director may deem appropriate. 37 C.F.R. §§ 11.55(*l*), 11.56(a).

The OED Director has the burden of proving the alleged violations by clear and convincing evidence. 37 C.F.R. § 11.49. "Evidence is clear 'if it is certain, unambiguous, and plain to the understanding,' and it is convincing 'if it is reasonable and persuasive enough to cause the trier of facts to believe it.'" *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1194 (10th Cir. 2002).

Having considered the record, as well as the arguments presented by the parties, the ALJ's Initial Decision is Affirmed.

### A. Appellant Engaged in Misconduct That Violated USPTO's Disciplinary Rules.

As noted, the USPTO Director reviews an appeal from an ALJ Initial Decision on the record before the ALJ. *See* 37 C.F.R. §§ 11.55(l), 11.56(a). And as discussed more fully below, the record plainly and unambiguously supports the ALJ's conclusions that Appellant violated USPTO's disciplinary rules. Thus, the ALJ's Initial Decision is Affirmed.

#### 1.    37 C.F.R. §§ 11.505 and 804(d).

The Complaint charged Appellant with assisting Mr. Kroll in the unauthorized practice before the USPTO in violation of 37 C.F.R. §§ 11.505 and 804(d), by enabling Mr. Kroll's continued representation and counseling of clients before the USPTO. (A.57-58). The ALJ concluded that the OED Director sufficiently proved this charge and, consequently, Appellant

14

Appx40

was found to have violated both §§ 11.505 and 11.804(d). (A.13). After a review of the record, as well as the parties' arguments and briefs, this finding is Affirmed.

### a. 37 C.F.R. § 11.505

The USPTO Rules plainly state that "[a] practitioner shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so." 37 C.F.R. § 11.505. The USPTO is considered a jurisdiction for the purposes of this rule. Changes To Representation Of Others Before The United States Patent And Trademark Office, 78 Fed. Reg. 20180-01, 2013 WL 1309612 (Apr. 3, 2013); *see also In re Discipline of Peirce*, 128 P.3d 443 (Nev. 2006) ("We therefore conclude that 'another jurisdiction' includes the USPTO."). Thus, to prove its claim that Appellant violated 37 C.F.R. § 11.505, the OED Director must establish that Mr. Kroll engaged in unauthorized practice before the Office and that Appellant facilitated such practice. *See In re* Bang-er Shia, Proceeding No. D2014-31, at 34 (USPTO Mar. 4, 2016)[5]. As discussed further, below, the OED Director is able to establish both of these factors.

### i. Mr. Kroll's Unauthorized Practice of Law.

The USPTO's definition of "practice before the office" is clearly articulated in the disciplinary rules. "Practice before the Office" includes, but is not limited to, any "law-related service that comprehends any matter connected with the presentation to the Office or any of its officers or employees relating to a client's rights, privileges, duties, or responsibilities under the laws or regulations administered by the Office for the grant of a patent or registration of a trademark." 37 C.F.R. § 11.5(b) (2012). This includes "preparing necessary documents in contemplation of filing the documents with the Office … as well as communicating with and

---

[5] https://foiadocuments.uspto.gov/oed/0874_dis_2016-03-04.pdf

15

advising a client concerning matters pending or contemplated to be presented before the Office." *Id.; see, e.g., In re* Piccone, Proceeding No. D2015-06, at 24-25 (USPTO May 25, 2017)[6] (finding that disbarred attorney engaged in "practice before the Office" where he was identified as attorney-of-record and correspondent for patent application and participated in drafting response to Office action).

That Mr. Kroll continued to communicate with an advise clients concerning matters pending or contemplated to be presented before the Office is not in dispute. During the disciplinary hearing, for example, Appellant conceded that Mr. Kroll continued to give legal advice to their joint clients with respect to matters pending before the Office even after being suspended from practice in May 2016. (A.9860-61, lines 25-8).

While Appellant's concession is sufficient to establish that Mr. Kroll engaged in the unauthorized practice of law, the record identifies and sets forth many other instances of practice before the Office as defined by § 11.5(b). Mr. Kroll's actions with regard to Dr. Botero, alone, reveal that he counseled him regarding options for prosecuting patents, advised him of the legal significance of Office correspondence, strategized with him regarding the filing of documents such as patent applications and responses to office actions, and identified himself as a current patent attorney. *See Supra*, Sect. I.C. ¶¶ 14, 16, 17, 19, 20, 22, 23. This is all activity that constitutes practice before the Office.

Other activities that indicate Mr. Kroll engaged in the unauthorized practice of law include that he did not promptly withdraw or change the correspondence address for some applications and remained attorney-of-record for after he was suspended from the practice before the USPTO in violation of 37 C.F.R. § 11.58(b)(1)(i)(c), and that he remained the sole point of contact for

---

[6] https://foiadocuments.uspto.gov/ocd/0942_dis_2017-05-25.pdf

16

clients on patent matters. *See Supra*, Sect. I.C. ¶¶ 33, 36, 39, 41. In fact, many clients had no idea that Mr. Kroll had been suspended or knew who Appellant was or that he was working on their matters. *See Supra*, Sect. I.C. ¶¶ 28, 31, 34, 39, 42. Mr. Kroll also unilaterally set the fee for legal services that Appellant provided. *See Supra*, Sect. I.C. ¶¶ 14, 15, 17, 21, 23, 24. These actions, all occurring while Mr. Kroll was suspended or excluded, all constitute unauthorized practice before the Office in violation of §11.5. *See also In re Piccone, supra* at 25 (remaining attorney of record in trademark matter and receiving correspondence from USPTO while suspended was unauthorized practice of law).

In opposition to this conclusion, Appellant asserts that Mr. Kroll is a general practice attorney who is an attorney in good standing with the New York State Bar. *See* Appeal Brief, at 7-8. As such, Appellant argues that Mr. Kroll is permitted to engage in litigation before federal and state courts, even in matters involving intellectual property matters, and he has first amendment rights to provide legal advice to others. *See id.* at 10-13. However, these arguments do not provide Appellant with respite from discipline.

First, Mr. Kroll's active New York license is of little relevance to this matter. It is long settled that the USPTO's has the exclusive authority to exclude practitioners from practice before it and that the USPTO's "regulations governing the recognition and conduct of agents, attorneys, or other persons representing applicants or other parties before the Patent Office" preempt state laws governing the practice of law. *See Sperry v. State of Fla., x rel. Fla. Bar*, 373 U.S. 379, 384 (1963); *see also Kroll v. Finnerty*, 242 F.3d 1359, 1364 (Fed. Cir. 2001) ("The [US]PTO has exclusive authority to establish qualifications and procedures for admitting persons to practice before the [US]PTO, and to suspend or exclude those patent practitioners from practicing before the [US]PTO."); *In re Shia*, Proceeding No. D2014-31 at 20 ("It is long-settled that regulating

17

admission and disciplinary issues before the USPTO lies within USPTO's exclusive jurisdiction.") Accordingly, while Mr. Kroll's New York license may permit him to lawfully practice in the New York courts, that license does not permit him to practice before the USPTO subsequent to his suspension, and later, exclusion before the USPTO. Only the USPTO may authorize practitioners to engage in practice before it.

Appellant's First Amendment argument is also without merit and the OED Director correctly sets forth the reasons why. "The [United States] Supreme Court has long recognized that governmental regulation of the professions is constitutional if the regulations 'have a rational connection with the applicant's fitness or capacity to practice' the profession." *Acct's. Soc'y. of Va. v. Bowman,* 860 F.2d 602, 603–04 (4th Cir. 1988) (quoting *Lowe v. S.E.C.,* 472 U.S. 181, 228 (1985) (Justice White, concurring)); *see also Cap. Associated Indus., Inc. v. Stein,* 922 F.3d 198, 207–08 (4th Cir. 2019) ("Many laws that regulate the conduct of a profession or business place incidental burdens on speech, yet the [United States] Supreme Court has treated them differently than restrictions on speech.") Jurisdictions "have a right to restrict the practice of law to qualified individuals, thus justifying the unauthorized practice rule's provision that lawyers may not assist non-lawyers in the unauthorized practice of law. Any abridgment of the right to free speech is merely the incidental effect of observing an otherwise legitimate regulation." *Lawline v. Am. Bar Ass'n,* 956 F.2d 1378, 1386 (7th Cir. 1992) (citing, *inter alia, Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 459, 467–468 (1978)).

Further, also as the OED Director notes, prior precedent does not support or sanction the argument that Appellant is making here. *See* OED Response, at 28-29. *See also In re Correll,* Proceeding No. D2018-12, at 16-21 (USPTO Feb. 4, 2021)10 (Final Order) (government employee did not have First Amendment right to represent private clients before the USPTO),

18

Appx44

affirmed on appeal, *Correll v. Under Sec'y of Com. Of Intell. Prop. ("Director")*, No. 121CV898AJTIDD, 2022 WL 298125, at *2 (E.D. Va. Jan. 13, 2022), *aff'd sub nom., Correll v. Vidal*, No. 2022-1420, 2022 WL 2564106, at *4-5 (Fed. Cir. July 8, 2022) (USPTO's interests outweigh any alleged burden on free speech; alternatively, practitioners waive any such free speech rights when they register to practice before the PTO by signing an "Oath or Affirmation" in which they promise to "observe the laws and rules of practice of the [PTO]"). Appellant offers no legal argument, analysis, or precedent that undermines this line of cases or to rebut the OED Director's arguments.

Based on the foregoing, the ALJ's conclusion that "after May 2016, Mr. Kroll carried on practicing patent law much as he had before his suspension, and because he continued to provide legal advice to clients concerning patent applications pending before the USPTO, his conduct amounted to 'practice before the Office'", and that practice was unauthorized, is Affirmed. (A.11).

*ii. Appellant Assisted Mr. Kroll in the Unauthorized Practice of Law.*

The ALJ also correctly concluded, and the record also shows, that Appellant assisted Mr. Kroll's unauthorized practice in violation of 37 C.F.R. § 11.58(e)(1)(2013).[7] That provision prohibits a suspended or excluded practitioner from aiding another practitioner in any way in the other practitioner's practice of law before the Office unless the suspended or excluded practitioner was a salaried employee under the practitioner's direct supervision.

First, Mr. Kroll was unequivocally not a salaried employee of Appellant's firm and there is nothing in the record, or credibly argued by Appellant, to establish such a business arrangement.

---

[7] This provision was amended on May 26, 2021. This citation is the version of the rule that was in effect on the dates of Respondent's misconduct.

19

Appx45

Additionally, as the OED Director correctly notes, even if Mr. Kroll had been a salaried employee, he was still prohibited from "communicat[ing] directly in writing, orally, or otherwise with a client of the other practitioner in regard to any immediate or prospective business before the Office" and "[r]ender[ing] any legal advice or any legal services to a client of the other practitioner in regard to any immediate or prospective business before the Office." 37 C.F.R. § 11.58(e)(3) (2013). Those actions, as already discussed, were the unauthorized practice of law by Mr. Kroll after his suspension and exclusion, and negate any argument that he was somehow only operating under Appellant's direct supervision.

Appellant argues that his arrangement with Mr. Kroll "is both legally and factually indistinguishable from the acknowledged and acceptable practice before the [US]PTO by foreign patent attorneys and agents who cannot legally practice before the [US]PTO but 'associate' with U.S. patent attorneys and agents having recognition to practice before the [United States] Patent and Trademark Office." Appeal Brief, at 19 (emphasis omitted). *See also*, Reply at 9-22. However, as an initial matter, Mr. Kroll is not a foreign agent or corporate liaison and, unlike those liaisons, he had been explicitly suspended, then excluded, from practice before the Office. Additionally however, and as the OED Director explains, the USPTO's published guidance regarding the use of corporate liaisons and foreign agents as intermediaries states that "when [a] practitioner is operating through such a corporate liaison or foreign agent . . . the registered practitioner may rely upon the advice of the corporate liaison or the client/patent applicant's foreign agent as to the action to be taken *so long as the practitioner is aware that the client/patent applicant has consented after full disclosure to be represented by the liaison or agent.*" OED Response, at 30-31 (citing 1086 OG 457 (Dec. 10. 1987) (emphasis added). *see also* 1091 OG 26 (May 25, 1988)13 ("In practice it is common for instructions relating to the

20

Appx46

application of an inventor . . . who is the client of the U.S. practitioner, to be passed to the U.S. practitioner through intermediaries, such as corporate liaisons or foreign agents ... In such an arrangement, the practitioner may rely upon instructions of, and accept compensation from, the corporate liaison or the foreign agent as to the action to be taken in a proceeding before the Office so long as the practitioner is aware that the client has consented to have instructions conveyed through the liaison or agent."). Here, there is no support offered or provided by Appellant demonstrating that any of Appellant and Mr. Kroll's clients consented to the arrangement between them. To the contrary, many of their joint clients were not aware of who Appellant was or that Appellant was involved in their legal matters. *See* § C.1 ¶¶ 28, 31, 34, 39, 42. Finally, but no less importantly, the USPTO guidance does not permit intermediary arrangements between a registered practitioner, like Appellant, and an individual who has been suspended or excluded before the office, like Mr. Kroll. *See In re Colitz*, Proceeding No. D1999-04 at 5-8 (USPTO, Dec. 3, 2002) (Final Decision) (determining that USPTO guidance does not permit intermediary arrangement without direct client contact between practitioners party who is not foreign agent or corporate liaison). Appellant cites no authority allowing such an arrangement and for good reason. Such an arrangement plainly contradicts the USPTO's regulation and guidance. *See* 37 C.F.R. § 11.58(e)(3).[8] (2013).

In sum, after he was suspended, and then excluded, from practice before the Office, Mr. Kroll continued with his client practice before the USPTO much as he had before he was suspended and excluded. He was only able to so continue with his practice with Appellant's support and enabling. Indeed, because his credentials had been suspended, he could not continue

---

[8] The ALJ and Respondent cite to 37 C.F.R. § 11.58(e) which, at the time of the hearing, governed a disciplined practitioner's ability to aid a registered practitioner in practice before the Office. This regulation was amended on May 26, 2021 and the provision governing a disciplined practitioner's ability to aid a registered practitioner is now found at 37 C.F.R. §11.58(h).

21

with his activities without reliance on, and the use of, Appellant's credentials and status as a registered practitioner. (A.2131) (language suspending Mr. Kroll's credentials with the USPTO). As such, the ALJ's conclusion that Appellant violated 37 C.F.R. § 11.505 is Affirmed.

### b.  37 C.F.R. § 11.804(d)

The Disciplinary Complaint also charged Appellant with, by assisting in unauthorized practice, engaging in conduct prejudicial to the administration of justice, in violation of 37 C.F.R. § 11.804(d) (2020). (A.58) Complaint and Notice of Proceeding Under 35 U.S.C. § 32 (Complaint). *See also* OED Response, at 33. Under that provision, 37 C.F.R. § 11.804(d), it is professional misconduct to engage in conduct that is prejudicial to the administration of justice. Generally, an attorney engages in conduct prejudicial to the administration of justice when his behavior negatively impacts the public's perception of the courts or legal profession or undermines public confidence in the efficacy of the legal system. *See Att'y Grievance Comm'n v. Rand*, 981 A.2d 1234, 1242 (Md. 2009). Courts have found the unauthorized practice of law to represent a serious threat to the effective administration of justice. *See, e.g., United States v. Johnson*, 327 F.3d 554, 560 (7th Cir. 2003); *Am. Express Co. v. Monfort Food Distrib. Co.*, 545 S.W.2d 49, 52 (Tex. Civ. App. 1976). Further, the USPTO Director has previously concluded that assisting in the unauthorized practice of law is conduct prejudicial to the administration of justice. *See Shia, supra,* at 35. Appellant provides no argument or analysis on this point. Thus, having affirmed the finding that Mr. Kroll engaged in the unauthorized practice of law, and Appellant assisted in that misconduct, the ALJ's conclusion that Appellant's conduct was prejudicial to the administration of justice and violated § 11.804(d) is Affirmed.

22

Appx48

2.  <u>37 C.F.R. §§ 11.105(b) and (e)</u>

The Complaint charged Appellant with violating 37 C.F.R. § 11.105(b) and (e) when he improperly divided fees with Mr. Kroll and failed to obtain written client agreement before accepting compensation for client work from Mr. Kroll. (A.34-35). The provisions of 37 C.F.R. § 11.105(b) require that the scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the practitioner will charge a regularly represented client on the same basis or rate. Further, 37 C.F.R. § 11.105(e) provides that a division of a fee between practitioners who are not in the same firm may be made only if: (1) The division is in proportion to the services performed by each practitioner or each practitioner assumes joint responsibility for the representation; (2) The client agrees to the arrangement, including the share each practitioner will receive, and the agreement is confirmed in writing; and (3) The total fee is reasonable.

The ALJ concluded Appellant violated these provisions when he and Mr. Kroll did not notify their clients of their fee division arrangement or obtain the clients' written consent to the arrangement. (A.13-14). In support of this conclusion, the ALJ noted that not only did Appellant fail to communicate to his joint clients the basis or rate of the fees for which the clients would responsible, as required under § 11.105(b), but Appellant admitted he rarely communicated with the joint clients at all. (A.13; A.9829, lines 20-24; A.9835, lines 21-24; A. 9866, lines 7-10; A.9866-67, lines 25-4; A.9868, lines 20-24; A.9870, lines 1-7). Further, Appellant admitted he did not know the total fee amount Mr. Kroll charged to each client and instead he merely assumed the clients had agreed to a reasonable fee. (A.13; A.9850, lines 17-22; A.9866, lines 11-16; A.9867, lines 5-8; A.9868, lines 6-10; A.9868-69, lines 25-2). Further, none of the clients

23

Appx49

consented to any fee arrangement as the power of attorney used by Appellant and Mr. Kroll did not disclose the fee division arrangement. (A.14). *See Supra*, § I.C ¶¶ 28, 33, 36, 39. Consequently, the joint clients could not have meaningfully consented to the fee arrangement as required by § 11.105(e)(2). (*Id.*)

In his Appeal Brief, Appellant argues that Mr. Kroll has the right to collect and share in a legal fee as his is a general practice attorney in good standing in the state of New York and he relies on the American Bar Association's Formal Opinion 08-451 (Aug. 5, 2008) as support for the idea that he may have any fee arrangement with Mr. Kroll that he chooses. *See* Appeal Brief, at 22-24. He also complains about the ALJ's determination that, under the USPTO rules, an excluded or suspended practitioner can only perform paralegal or other services for a registered practitioner if he was a salaried employee operating under the registered practitioner's direct supervision, claiming it infringes upon Mr. Kroll's "constitutional right to earn a livelihood." Appeal Brief, at 22-25. Alternatively, he argues that he and Mr. Kroll formed a law firm. *Id. at* 48. Finally, he asserts that no client filed a grievance or complained of, or is known to have paid, an unreasonable fee. *Id. at* 49). These arguments are without merit.

First, as the OED Director notes, the ABA Formal Opinion is not binding authority on the USPTO. *See* OED Response, at 35. Additionally, the opinion that Appellant relies upon plainly states that "appropriate disclosures should be made to the client regarding the use of lawyers or nonlawyers outside of the lawyer's firm" and "[t]he fees charged must be reasonable and otherwise in compliance with Rule 1.5."[9] The record is clear that Appellant made no such disclosures to his clients, in violation of § 11.105(b) and (e), *see supra.* §. IC.1 ¶¶ 28, 30, 33, 36, 39, and the ABA Formal Opinion doesn't excuse Appellant's misconduct here.

---

[9] Model Rule 1.5(b) and (e) are the equivalent rule to USPTO's §§ 11.105(b) and (e).

24

Appx50

Appellant's constitutional argument is also without merit as there is no right to practice before the USPTO. Rather, as the OED Director notes and supports with case law, Mr. Kroll's right to practice before the USPTO was a privilege granted to him, but since revoked.[10] OED Response, at 36 (citing *Asher v. Mississippi Bar*, 661 So. 2d 722, 728 (Miss. 1995) (citing *Mississippi Bar v. Young*, 509 So. 2d 210, 219 (Miss. 1987) and *In re Isserman*, 345 U.S. 286, 289 (1953), judgment set aside 348 U.S. 1 (1954)). Having failed to abide by the USPTO's rules, his ability to practice before the USPTO was properly rescinded.

Next, there is no credible evidence that Appellant and Mr. Kroll formed a law firm, or that their business arrangement otherwise met the definition of a law firm such that the provisions of § 11.105 are inapplicable. There is no evidence that the two share office space or letterhead, share office resources, have a joint account, advertise their services jointly or present themselves as a firm, and Mr. Kroll is not a salaried employee of Appellant's firm. (A.13-14). To the contrary, Appellant conceded that he merely performs referral work for Mr. Kroll. (A.9827, lines 15-17; A.9777, lines 21-24). And finally, more than once during his hearing testimony, Appellant made clear that he and Mr. Kroll were not part of the same firm. Appellant stated that he had his own practice where 90-95% of his practice is his own work and the remainder is acting as a "gatekeeper" for filings and work that Mr. Kroll would have done on his own and for "his own practice" before his suspension. (A.9783, lines 16-24; A.9785, lines 2-13). This undermines his claims of having formed a law firm and he is required to comply with, and failed to comply with, the provisions of § 11.105 here.

---

[10] To the extent that Appellant appears to argue that he or Mr. Kroll have suffered due process during their respective disciplinary processes, Reply, at 5 (*citing Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-572 (1972)), those claims are rejected. The record of Mr. Kroll's prior discipline, as well as these disciplinary proceedings, reveal that both were provided extensive due process.

25

Lastly, Appellant asserts that no client filed a grievance or complained of, or is known to have paid, an unreasonable fee. Appeal Brief at 49. Though that is a factor relevant to sanction, and it was a factor considered by the ALJ here, it does not negate the existence of a violation of the USPTO's rules.

### 3.   37 C.F.R. §§ 11.102(a), 11.104(a)(2), (a)(3), (b), and 11.804(c) and (d).

The final count, Count III, of the Complaint charged Appellant with failing to adequately communicate with his clients in violation of 37 C.F.R. § 11.102(a), 11.104(a)(2), (a)(3), (b) and, because of that same misconduct, violated § 11.804(c) and (d). (A.59-60). Here, the ALJ concluded that Appellant violated these provisions as charged by the OED Director. (A.17).

### a.   37 C.F.R. § 11.102(a), 11.104(a)(2), (a)(3), (b)

The USPTO Rules set forth a number of requirements that concern a practitioner's duty to reasonably communicate with their clients. First, 37 C.F.R. § 11.102(a)(2020) requires that a practitioner to abide by a clients' decisions regarding the objectives of the representation and to consult with the client as to the means by which the objectives are to be pursued. Also, § 11.104(a)(2) requires practitioners to reasonably consult with clients regarding the means by which the clients' objectives are to be accomplished. Finally, a practitioner must also keep a client reasonable informed about the status of the client's matters and explain matters to the extent reasonably necessary to permit the client to make informed decisions. 37 C.F.R. §§ 11.104(a)(3) and (b).

The record supports the ALJ's conclusions that Appellant violated each of these rules by having no direct communication with his joint clients with Mr. Kroll. At least seven (7) clients had no idea who Appellant even was, much less that he was working on their legal matters. See Supra, § C.1,¶¶ 13, 28, 31, 36, 39, 42. Appellant admitted that he rarely spoke to his and Mr.

26

Kroll's joint clients and clients were not given Appellant's contact information. (A.15; A.3143-44; A.3175-76; A.3201-2; A.3248-49; A.3250-51; A.3272-73; A.5000; A.5573; A.5851; A.5944; A.6060; A.6233; A.6939; A.8242; A.9829, lines 20-24; A.9835, lines 21-24; A. 9866, lines 7-10; A.9866-67, lines 25-4; A.9868, lines 20-24; A.9870, lines 1-7). Simply put, Appellant's statements and the record shows that Appellant impermissibly relied on Mr. Kroll, who was suspended and then excluded from practice before the USPTO, to communicate with clients about their patent applications.

As specific evidence of his failure under these rules, the OED Director notes, and Appellant did not contest at the hearing, Appellant's failures in this Count lead to two clients, Messrs. Tawiah and Drammeh, not being informed that their patent applications had become abandoned. *See* OED Response, at 37. His misconduct also led Mr. Cochran to not being informed that his utility patent applications were abandoned and design patent applications were filed, or provided information about the differences between the two types of application. *See id.* at 37-38. Though Appellant is correct the ALJ did not find that a general failure to consult with clients, the ALJ did find and the record supports that Appellant failed to specifically communicate with his clients in several specific circumstances, (A.16), and as already discussed that conclusion finds support in the record.

Appellant argues that that the ALJ's conclusions rely on hearsay evidence and, as a result, supporting evidence under this Count are inadmissible and cannot be used to support the conclusion that his clients were not reasonably informed about the status of their matters. Appeal Brief, at 9-10, 31, 49; Reply, at 6-9. However, it is long-settled that hearsay is admissible in USPTO disciplinary proceedings. *See Colitz, supra* at 22 (rules of evidence are not applicable in USPTO disciplinary proceedings); *Kroll, supra* at 28 (hearsay admissible in USPTO disciplinary

27

proceedings); *see also* 37 C.F.R. § 11.50 ("The rules of evidence prevailing in courts of law and equity are not controlling in hearings in disciplinary proceedings"). Thus, this argument does not negate the ALJ's conclusions.

Finally, in his reply brief, Appellant claims that he informed Mr. Kroll's clients of his suspension and that certain clients took steps in response to that information. Reply at 1-2. He states there may have been some "lazy" clients didn't read what was sent to them and/or that clients were not helpless to discover the information to contact him. Reply at 2-4. This is irrelevant. While some may have known about Mr. Kroll's suspension and exclusion, as already discussed, the record shows many did not.

### b. 37 C.F.R. § 11.804

The OED Director also charged that Appellant, by failing to inform his clients that Mr. Kroll was suspended, he also violated 37 C.F.R. § 11.804(c) and (d) (2020). Section 11.804(c) proscribes "conduct involving dishonesty, fraud, deceit or misrepresentation," while §11.804(d) proscribes conduct prejudicial to the administration of justice. See *In re Lane*, Proceeding No. D2013-07, at 14 (USPTO Mar. 11, 2014) (discussing definitions of "deceit," "dishonesty," and "misrepresentation"). The ALJ agreed and concluded that Appellant violated these provisions by deceptively allowing Mr. Kroll to continue counseling and directly communicating with their joint clients and using Appellant's name and customer number for filings while Mr. Kroll was suspended and excluded from practice before the Office. (A.16). For reasons already discussed, the record supports these findings. Consequently, the ALJ's conclusion here is Affirmed.

## V. SANCTION

The ALJ's Initial Decision concluded that Appellant engaged in misconduct and ordered that a not less than two-year suspension from the practice of patent, trademark, and other nonpatent law before the USPTO was the appropriate discipline here. (A.17-20). In rendering the sanction,

28

Appx54

the ALJ explained the reason for imposing such a sanction after consideration of the following four factors set forth in 37 C.F.R. § 11.54(b):

(1) Whether the practitioner has violated a duty owed to a client, to the public, to the legal system, or to the profession;

(2) Whether the practitioner acted intentionally, knowingly, or negligently;

(3) The amount of the actual or potential injury caused by the practitioner's misconduct; and

(4) The existence of any aggravating or mitigating factors.

37 C.F.R. § 11.54(b)(1)-(4).

The Director of the USPTO reviews an appeal from an ALJ Initial Decision on the record before the ALJ. *See* 37 C.F.R. § 11.56; *see also Marinangeli v. Lehman*, 32 F. Supp. 2d 1, 5 (D.D.C. 1998).

Here, the ALJ concluded that Appellant violated his duties to clients by failing to communicate with them and to keep them informed. (A.17). He was also found to have violated duties to the public, the legal system, and the legal profession when he assisted in the unauthorized practice before the Office. (A.17). The ALJ found that Appellant acted knowingly with regard to assisting Mr. Kroll's unauthorized practice and acted negligently in failing to ensure that his and Mr. Kroll's client communications and information conformed to the USPTO's Rules. (A.18). ALJ also identified two (2) aggravating factors (dishonest motive of undermining the disciplinary system, substantial experience as a patent attorney) and one (1) mitigating factor (absence of prior disciplinary record) relevant to the sanction issued. (A.19-20).

Appellant argues that he should not be subject to any sanction because he believes that this matter is a novel legal interpretation for which he was not provided notice as to what constitutes "practice before the office." Appeal Brief, at 50-52. However, there is no merit to this argument.

29

As the OED Director notes in his response, the USPTO Rules expressly prohibit assisting another in the unauthorized practice of law and plainly describe what constitutes the "practice before the Office." 37 C.F.R. §§ 11.5(b), 11.505. These rules, along with interpreting case law, provided Appellant with sufficient notice about the parameters of associating with suspended and excluded practitioners.

Lastly, Appellant argues that a two-year suspension is not consistent with USPTO precedent. Appeal Brief, at 52-54. However, for the reasons stated in the OED Director's Response, this argument also has no merit. The cases cited by Appellant in support of this argument are not relevant to the facts of his disciplinary case as they do not involve the unauthorized practice of law. Further, cases cited by the OED Director show that cases involving the unauthorized practice routinely involve disciplinary suspensions. *See* OED Response, at 43 (citing *Piccone* and *Achterhof*). Of particular note, the OED Director raises the 2021 case of Mr. Kroll where he was excluded from practice before the office for the conduct that Appellant has assisted him in carrying out. *See In re Kroll*, Proceeding No. D2019-15 (USPTO April 5, 2021). The ALJ's sanction is Affirmed.

## ORDER

Having considered Appellant's appeal from the September 23, 2021 Initial Decision of the ALJ, it is **ORDERED** that the ALJ's initial decision is **AFFIRMED**.

It is further:

**ORDERED** that the OED Director give notice pursuant to 37 C.F.R. § 11.59 of the public discipline and the reasons for the discipline to disciplinary enforcement agencies in

30

Appx56

the state(s) where Appellant is admitted to practice, to courts where Appellant is known to be admitted, and to the public.

## RECONSIDERATION AND APPEAL RIGHTS

Any request for reconsideration of this decision must be filed within twenty (20) days from the date of entry of this decision pursuant to 37 C.F.R. § 11.56(c). Any request for reconsideration mailed to the USPTO must be addressed to:

David Berdan
General Counsel
United States Patent and Trademark Office
600 Dulany St.
P.O. Box 1450
Alexandria, VA 22313-1450

A copy of the request must also be served on the attorney for the Director of Enrollment and Discipline:

Sydney Johnson
Counsel for the Director of Office of Enrollment and Discipline
600 Dulany St.
P.O. Box 1450
Alexandria, VA 22313-1450

Any request hand-delivered to the USPTO must be hand-delivered to the Office of the General Counsel. Service copies of hand-delivered requests should be delivered to the Solicitor's Office.

If a request for reconsideration is not filed, and Appellant desires further review, Appellant is notified that he is entitled to seek judicial review on the record in the U.S. District Court for the Eastern District of Virginia under 35 U.S.C. § 32 "within thirty (30) days after the date of the order recording the Director's action." *See* E.D. Va. Local Civil Rule 83.5.

(Signature page follows)

31

Appx57

(Signature page for Final Order, *In re: Schindler*, D2019-43)

**IT IS SO ORDERED.**

Users, Berdan, David    Digitally signed by Users, Berdan, David
Date: 2023.12.05 17:11:44 -05'00'

Date

David Berdan
General Counsel
Office of the General Counsel
United States Patent and Trademark Office

on delegated authority by

Katherine K. Vidal
Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Final Order was sent to the parties below, in the manner indicated:

**Via Email to Respondent:**

Mr. Edwin Schindler
edschindler@att.net
*Respondent*

**Via E-mail to the OED Director:**

Sydney Johnson
Hendrik deBoer,
Sydney.Johnson@uspto.gov
Hendrik.deBoer@uspto.gov
SO-OEDcases@uspto.gov
*Counsel for OED Director*

12/6/2023
Date

United States Patent and Trademark Office



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
Office of Hearings and Appeals
451 7th Street, S.W., Suite B-133
Washington, D.C. 20410

June 8, 2023

MEMORANDUM FOR:     Sydney O. Johnson, Jr., Associate Solicitor, Office of the Solicitor
U.S. Patent & Trademark Office

Edwin D. Schindler, Respondent

FROM:     J. Jeremiah Mahoney, United States Administrative Law Judge

SUBJECT:     In the Matter of Edwin D. Schindler, Proceeding No. D2019-43

The above-captioned matter, which arises from a disciplinary complaint filed by the Director of the Office of Enrollment and Discipline ("OED Director") for the U.S. Patent and Trademark Office against Respondent, was heard on November 20, 2019.

On June 2, 2023, when the *Request to Withdraw* for the now departed Associate Solicitor Robin Crabb was filed, it was discovered that PTO still had this matter as open in their files because it never received the *Initial Decision and Order*, dated September 23, 2021.

The time lapse in transmission and notation on PTO's records of the *Initial Decision and Order* will not count against Respondent's time to file an appeal. As such, upon re-distribution to OED and the Respondent, Respondent will have fourteen (14) days after the service of the *Initial Decision and Order* to appeal to the USPTO Director. 37 C.F.R. § 11.55(a) (2021).

We regret that the receipt of the *Initial Decision and Order*, dated September 23, 2021, by the parties was delayed.  The Docket Clerk will transmit that document to the parties, with a copy of this memorandum.

J. Jeremiah Mahoney
United States Administrative Law Judge

Appx10154                                                                 [A10013]

UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE ADMINISTRATIVE LAW JUDGE

In the Matter of:

EDWIN D. SCHINDLER,

Respondent.

Proceeding No. D2019-43

September 23, 2021

Appearances:

Robin J. Crabb, Esq.
Elizabeth A. Francis, Esq.
*Associate Solicitors for the U.S. Patent and Trademark Office*

Edwin D. Schindler, Esq.
*Pro Se*

Before:   J. Jeremiah **MAHONEY**, United States Administrative Law Judge

**INITIAL DECISION AND ORDER**

This above-captioned matter arises from a *Complaint and Notice of Proceeding Under 35 U.S.C. § 32* ("Complaint") filed by the Director of the Office of Enrollment and Discipline ("OED Director") for the United States Patent and Trademark Office ("USPTO" or "Office") against Edwin D. Schindler ("Respondent") pursuant to 37 C.F.R. §§ 11.32 and 11.34.

**I. Procedural Posture**

On July 10, 2019, the *Complaint* in this matter was received and assigned to the undersigned[1] for hearing pursuant to 35 U.S.C. § 32 as implemented by 37 C.F.R. part 11. The *Complaint* alleged three Counts of misconduct under the USPTO disciplinary rules. Those counts include (Count I) assisting in the unauthorized practice of law; (Count II) improperly dividing fees without client consent; and (Count III) failure to communicate with clients. This Court issued a *Notice of Hearing and Order* on July 11, 2019.

Respondent filed an *Answer* on August 9, 2019, asserting various defenses and counterclaims. In addition, on August 14, 2019, Respondent filed a *Motion to Dismiss the OED's Complaint as Barred by the Statute of Limitations Under 35 U.S.C. § 32*, which the OED Director opposed. This Court denied the motion to dismiss on August 30, 2019.

---

[1] Pursuant to an Interagency Agreement in effect beginning March 27, 2013, Administrative Law Judges of the U.S. Department of Housing and Urban Development have been appointed by the U.S. Commerce Secretary and are authorized to hear cases brought by the USPTO.

[A10014]

On October 21, 2019, Respondent filed a *Motion for the Entry of a Default Judgment on Respondent's Constitutional Counterclaims*, which the OED Director opposed. The Court denied Respondent's motion and rejected his counterclaims by order dated November 11, 2019.

A hearing took place on November 20, 2019, in Islip, New York. The Court heard testimony from Respondent and from Diana Oleksa, staff attorney in the USPTO Office of Enrollment and Discipline ("OED"). The following exhibits were admitted into evidence: Government's Exhibits 1-15, 19-22, 24-52, 54-64, 66-69, 71-74, and 76-98 and Respondent's Exhibits 1, 11, 12, 19, 21, and 26-33. Following the Court's receipt of the transcript on December 11, 2019, the parties were ordered to file post-hearing briefs in lieu of closing arguments in accordance with the *Post-Hearing Order* issued December 11, 2019.

After extensions of the deadlines, the parties filed their *Post-Hearing Briefs* on February 28, 2020 and *Response Briefs* on March 16, 2020. This matter is now ripe for decision.

## II. Applicable Law

The USPTO has the "exclusive authority to establish qualifications for admitting persons to practice before it, and to suspend or exclude them from practicing before it." Kroll v. Finnerty, 242 F.3d 1359, 1364 (Fed. Cir. 2001); see Sperry v. Fla. ex rel. Fla. Bar, 373 U.S. 379 (1963) (upholding the USPTO's exclusive authority against challenge from state bar); Haley v. Lee, 129 F. Supp 3d 337, 386 (E.D. Va. 2015) (noting that "Congress gave the USPTO wide latitude to govern the conduct of the members of its bar"). The Director of the USPTO may suspend or exclude a person from practice before the Office if the person is "shown to be incompetent or disreputable, or guilty of gross misconduct," or if the person violates regulations established by the Office. 35 U.S.C. § 32; see also 37 C.F.R. § 11.19(b)(1)(iv) (2020).

Effective May 3, 2013, the USPTO promulgated its Rules of Professional Conduct, which govern the conduct of persons authorized to practice before the Office and are modeled on the American Bar Association's Model Code of Professional Responsibility. See CHANGES TO REPRESENTATION OF OTHERS BEFORE THE UNITED STATES PATENT AND TRADEMARK OFFICE, 78 Fed. Reg. 20179 (Apr. 3, 2013) (Final Rule) (codified at 37 C.F.R. §§ 11.101-11.901). A practitioner accused of violating the USPTO Rules of Professional Conduct must receive "notice and opportunity for a hearing" before the USPTO may take disciplinary action against him. 35 U.S.C.§ 32. Disciplinary hearings are conducted in accordance with USPTO's procedural rules and with section 7 of the Administrative Procedure Act, 5 U.S.C. § 556, by a hearing officer appointed by the USPTO. See 37 C.F.R. §§ 11.39, 11.44 (2020).

The OED Director has the burden of proving the alleged violations by clear and convincing evidence. 37 C.F.R. § 11.49 (2020). Thereafter, Respondent has the burden to prove any affirmative defense by clear and convincing evidence. Id. The clear and convincing standard is applied "to protect particularly important interests . . .where there is a clear liberty interest at stake." Thomas v. Nicholson, 423 F.3d 1279, 1283 (Fed. Cir. 2005). This is an intermediate standard "between a preponderance of the evidence and proof beyond a reasonable doubt." Addington v. Texas, 441 U.S. 418, 424-25 (1979). The standard requires evidence "of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without

2

Appx10156                                                                 [A10015]

hesitancy, as to the truth of the allegations sought to be established." <u>Jimenez v. Daimler-Chrysler Corp.</u>, 269 F.3d 439, 450 (4th Cir. 2001). "Evidence is clear 'if it is certain, unambiguous, and plain to the understanding,' and it is convincing 'if it is reasonable and persuasive enough to cause the trier of facts to believe it.'" <u>Foster v. Allied Signal, Inc.</u>, 293 F.3d 1187, 1194 (10th Cir. 2002).

## III. Findings of Fact

Respondent is a registered patent attorney (Registration No. 31,459) who has been authorized to practice before the USPTO in patent matters since September 4, 1984. Respondent was admitted to practice law in New York on May 22, 1985, and is currently an active member in good standing. At the time of the hearing, Respondent was listed as attorney-of-record on 726 United States patents. Respondent testified that he performs most of his work "through foreign patent associates" who send him work for their clients, which Respondent then reviews and files with the USPTO.

Relevant to this case, Respondent has also worked on patent and trademark matters with a New York attorney, Michael I. Kroll, for many years. Respondent testified that approximately five to ten percent of his work comes from Mr. Kroll. Respondent and Mr. Kroll maintain separate legal offices but have a longstanding working relationship.

## A. <u>Mr. Kroll's Disciplinary History and OED's Current Investigation</u>

Mr. Kroll is an attorney licensed to practice law in the state of New York and is a registered patent practitioner. Over the past two decades, Mr. Kroll has been the subject of multiple disciplinary actions from the USPTO. As relevant here, Mr. Kroll has not been authorized to practice before the USPTO in patent or trademark matters since the USPTO Director suspended him from practice effective May 18, 2016, and he is currently excluded from practice pursuant to a Final Order issued by the USPTO Director on December 11, 2017.[2] Respondent represented Mr. Kroll in the disciplinary proceedings before the USPTO and admits that, at all times relevant to the current charges, he was aware Mr. Kroll was not authorized to practice before the USPTO.

In March 2018, the OED Director received a grievance complaining that, despite Mr. Kroll's suspension and exclusion from practice before the Office, Mr. Kroll was still holding himself out as authorized to practice. In the ensuing months, OED sent Mr. Kroll three cease-and-desist letters signed by OED attorney Diana Oleksa asking Mr. Kroll to explain his conduct, to stop engaging in practice before the Office, to stop holding himself out as being authorized to engage in such practice, and to otherwise comply with the USPTO's rules governing suspended and excluded practitioners. As part of its investigation of Mr. Kroll's post-suspension conduct, OED sent Respondent several Requests for Information and Evidence ("RFIs") under 37 C.F.R. § 11.22(f) and interviewed Respondent by phone in July 2018.[3]

---

[2] According to Respondent, although Mr. Kroll may have been reprimanded for misconduct by the state of New York, he remains an attorney in good standing with the New York State Bar.

[3] OED's internal memorandum summarizing the interview explains that, during the phone call, Respondent described performing referral work for Mr. Kroll's clients in patent matters. According to the memo, Mr. Kroll's

Based on information gathered during the investigation of Mr. Kroll, the OED Director came to believe that Respondent's conduct had also violated the USPTO Rules of Professional Conduct. Specifically, OED initiated the instant disciplinary proceeding because the OED Director disapproved of Respondent's continued working relationship with Mr. Kroll.

B. Respondent's Relationship with Mr. Kroll

Respondent has worked with Mr. Kroll since approximately 1986. Although they maintain separate legal offices, Mr. Kroll refers patent and trademark clients to Respondent from time to time for Respondent's assistance. Between 1986 and 2016, Respondent regularly drafted documents for Mr. Kroll related to patent prosecutions. In some instances, the documents were filed under Mr. Kroll's name, and in other instances Respondent was listed as the attorney. Respondent testified that he "would often do work for [Mr. Kroll]—pretty much to help him, because I've known him for many years, and he helped me get started."

Mr. Kroll told Respondent that on or about July 17, 2016, he sent notification to all of his clients, including his and Respondent's joint clients, that he had been suspended. Respondent has produced a copy of the general notification allegedly sent to the clients, which stated that Mr. Kroll was suspended, that Mr. Kroll believed the suspension was unjustified, and that Respondent now had power of attorney. Respondent never saw actual proof that the letter was delivered to Mr. Kroll's clients.

Since Mr. Kroll's 2016 suspension, he and Respondent have continued to work together representing joint clients in patent and trademark matters. Typically, Respondent will receive a drafted patent application from Mr. Kroll and will edit and redraft it. Respondent will then ask Mr. Kroll to discuss the edited application with the client and obtain a new declaration certifying that the client is the inventor, after which Respondent will sign and file the application, usually without ever speaking to the client. Respondent indicated that this working arrangement is similar to his foreign practice, in which he receives work from foreign attorneys on behalf of clients with whom he has no direct contact. Respondent maintains that he files and signs all the work he undertakes with Mr. Kroll and retains ultimate discretion over what is filed with the USPTO for their joint clients, even though he rarely communicates directly with the clients.

**Powers of Attorney.** Mr. Kroll and Respondent typically do not execute any written engagement agreement with their joint clients other than the power of attorney that Mr. Kroll has each client sign. Approximately fifteen years ago, when Mr. Kroll first became the subject of disciplinary action from the USPTO, he began including Respondent's name on the power of attorney. In Respondent's view, the inclusion of both names on the power of attorney signaled that he and Mr. Kroll were functioning in a manner similar to two attorneys in the same firm, and placed clients on notice that either or both attorneys had the right to perform legal work for them. Upon Mr. Kroll's suspension in 2016, Mr. Kroll stopped including his own name on the power of attorney. Respondent typically files the power of attorney with the USPTO at Mr. Kroll's direction without speaking to the client beforehand.

---

role was to engage with and counsel the clients, while Respondent's role was to edit drafted patent applications and sign and file them. Respondent also reportedly told OED that his and Mr. Kroll's business practice had not changed much since Mr. Kroll lost his authorization to practice except that they no longer included Mr. Kroll's name on any Office correspondence.

4

**Fee Division Arrangement.**  Mr. Kroll collects fees from clients and divides those fees with Respondent.  Respondent explained that Mr. Kroll pays him directly for work performed on the joint clients' cases, usually via checks drawn from an account held in the name of Marcia Kroll, Mr. Kroll's wife.  Respondent emphasized that he does not accept payment for a particular case unless he has done actual work on it.  He indicated that Mr. Kroll usually pays him $800 per Office action.  He acknowledged he could charge more, but testified he gives Mr. Kroll "a little bit of a break" because they are longtime friends.  Although Respondent does not know the total amount Mr. Kroll charges each client, he "assume[s] the fee is reasonable and that the client agreed to it."  Mr. Kroll does not inform his clients about his fee division arrangement with Respondent, nor does he obtain the clients' written consent to the arrangement.

**Communication with Clients.**  Before his suspension, Mr. Kroll had the primary responsibility to communicate with the joint clients, while Respondent "[s]ometimes, but not very often" communicated directly with them.  It appears this practice has not changed since Mr. Kroll was suspended in 2016.  Respondent testified that, although he mainly communicates with clients through Mr. Kroll, all have the ability to contact Respondent directly, and some do—for example, he named one client who purportedly communicated that he no longer wished to be represented by Mr. Kroll after Mr. Kroll's exclusion.  Respondent maintained that he is not required to communicate directly with clients, and indicated that he considers Mr. Kroll a trustworthy intermediary.

C. Representations of Specific Joint Clients

  *1.  Dr. Carlos Botero*

Respondent and Mr. Kroll jointly represented Dr. Carlos Botero with respect to multiple patent applications.  Respondent has never directly communicated with Dr. Botero and allowed Mr. Kroll to handle all communications with the client.

Mr. Kroll filed U.S. Patent Application No. 14/142,134 ("the '134 application") on Dr. Botero's behalf on December 27, 2013.  Dr. Botero executed a power of attorney in favor of Respondent and Mr. Kroll on or about December 20, 2013.  The power of attorney did not list any contact information for Respondent beyond his registration number.  The '134 application was still pending when Mr. Kroll was suspended from practice before the USPTO on May 18, 2016, but Mr. Kroll did not file a notice of withdrawal from the representation.[4]

As noted above, Mr. Kroll told Respondent that on or about July 17, 2016, he sent a letter to all his clients, including Dr. Botero, notifying them of his suspension.  However, in a telephone interview with Ms. Oleksa in August 2018, Dr. Botero indicated that Mr. Kroll had never disclosed he had been suspended or excluded from practice before the USPTO.  Dr. Botero sent OED 786 pages of correspondence he had received from Mr. Kroll; the notice Mr. Kroll

---

[4] The USPTO regulations require a suspended or excluded practitioner to file a notice of withdrawal in every matter pending before the Office within 30 days of the date of the suspension or exclusion.  37 C.F.R. § 11.58(b)(1)(i) (2020).  The practitioner also has 30 days to notify any clients having immediate or prospective business before the Office of the order of suspension or exclusion and of his consequent inability to act as a practitioner, and to either conclude his work for the client or advise the client that it cannot be concluded so that the client may make other arrangements.  Id. § 11.58(b)(1)(ii), (c).

5

allegedly sent Dr. Botero does not appear anywhere in those 786 pages.  At the time of the telephone interview with Ms. Oleksa, Dr. Botero stated he did not know who Respondent was, had no idea that Respondent was working on his patent matters, and had continued to work directly with Mr. Kroll on his patent matters after October 2016.

The USPTO issued an Office action in the '134 application on September 30, 2016.  The USPTO sent it to Mr. Kroll's address, as Mr. Kroll had not withdrawn and Respondent had not yet changed the correspondence address associated with the application.  On October 3, 2016, Mr. Kroll sent Dr. Botero a letter notifying him of the Office action and advising how "we may decide to respond."  The letter identified Mr. Kroll as "ATTORNEY AT LAW" and prominently featured his contact information with the words "Patents Trademarks & Copyrights" directly below.  The only mention of Respondent was in a footnote, which stated, "Above to be performed by Leonard Belkin, Reg. #18,063; Edwin D. Schindler, Reg. #31,459; and/or Joseph C. Merek, Reg. #57,953, all of whom are registered to practice before the US Patent and Trademark Office."  The letter did not contain any contact information such as an address or phone number for Respondent.

Mr. Kroll forwarded the Office action to Respondent.  On January 12, 2017, Mr. Kroll sent Dr. Botero an email stating that "the response to the last office action is being processed, and we will advise as soon as we hear back from the Patent Office."  Approximately six weeks later, on February 28, 2017, Respondent filed a response to the Office action, as well as a change of address and extension of time, with the USPTO without ever directly communicating with Dr. Botero.  Mr. Kroll collected a $3650 fee from Dr. Botero for responding to the Office action and paid Respondent $800 of that amount.  Respondent testified that Mr. Kroll earned his portion of the fee—$2850—by referring the client, dealing with the client, and contacting the client.

On June 28, 2017, the Office issued a non-final Office action in the '134 application.  This Office action was sent directly to Respondent.  On August 30, 2017, Mr. Kroll sent Dr. Botero a letter reporting the Office action and again asking for $3650 to draft and file a response.  As with Mr. Kroll's previous communications with Dr. Botero, the correspondence was signed by Mr. Kroll; contained Mr. Kroll's contact information and identified him as an "ATTORNEY AT LAW" in "Patents Trademarks & Copyrights"; and mentioned Respondent only in a footnote, without including any contact information for him.  On September 28, 2017, Respondent filed an Amendment in response to the Office action.

On January 23, 2018, the USPTO issued a Final Rejection.  On January 24, 2018, Mr. Kroll sent a notice to Dr. Botero informing him that "we need to respond to the attached office action" and that the fee to proceed would be $3275.  On July 23, 2018, Respondent filed a Request for Continued Examination.  Two checks drawn from the account of Marcia Kroll in July 2018 suggest that Respondent was paid $1625 to file the Request for Continued Examination.  On February 22, 2019, the USPTO issued a non-final rejection.  As of the hearing date, Respondent indicated the case was still pending.

In addition to the '134 application, Respondent and Mr. Kroll represented Dr. Botero in connection with two other patent applications after Mr. Kroll's May 2016 suspension.  On February 25, 2017, Mr. Kroll sent an email to Dr. Botero stating "we are working on your

6

Appx10160                                    [A10019]

Electric Turbine invention" and advising of the need to file quickly to maintain priority. On March 17, 2017, he emailed a draft patent application for Dr. Botero's review. Mr. Kroll did not copy Respondent on the emails or provide Respondent's contact information to Dr. Botero. On July 16, 2017, Respondent filed the patent application without ever speaking to Dr. Botero. Respondent was the sole representative listed on the power of attorney for this application. He testified he had spent about five hours revising the drafted application as to form, and for this work, Mr. Kroll paid him $400; Mr. Kroll received "a lot more money" for his own efforts.

Also on July 16, 2017, Respondent filed another patent application—this one relating to a heat bulb invention—naming Dr. Botero as the sole inventor/applicant. USPTO subsequently issued two actions, a non-final rejection and a final rejection, in connection with this application. Although Mr. Kroll was the attorney who communicated with Dr. Botero regarding the two rejections, Respondent filed the responses to both. Records indicate that Mr. Kroll paid Respondent $1500 of the $1825 fee he collected from Dr. Botero for responding to the non-final rejection, and he also paid Respondent $2150 to respond to the final rejection.

*2. Mr. Sheikh Moussa Drammeh*

On February 9, 2015, prior to his suspension, Mr. Kroll filed U.S. Patent Application Serial No. 14/617,538 (the '538 application") naming Sheikh Moussa Drammeh as the sole inventor/applicant. The filing included a power of attorney executed in favor of Mr. Kroll and Respondent. Respondent was also listed on the power of attorney for at least two other applications filed on behalf of Mr. Drammeh prior to Mr. Kroll's suspension, and Respondent helped prosecute one of those applications after Mr. Kroll's suspension by filing documents including an Amendment and an extension request. The '538 application went abandoned after Mr. Kroll was suspended. On March 8, 2017, USPTO sent a notice of abandonment to Mr. Kroll, as he had not withdrawn from the representation or changed the correspondence address for the application.

Mr. Drammeh later told OED that he had not been informed the '538 application was abandoned. He also stated that Mr. Kroll had not disclosed that he had been suspended and excluded from practice before USPTO. Mr. Drammeh also told OED he was not aware that Respondent had performed work on his applications or that Mr. Kroll and Respondent may have shared fees for work on the applications.

*3. Mr. Adel El-Hannawy and Dr. Elena Frolova*

On March 6, 2015, prior to his suspension, Mr. Kroll filed U.S. Patent Application Serial No. 14/641,078 ("the '078 application"), naming Adel Sayed El-Hennawy and Elena Frolova as joint inventors/applicants. The filing included a power of attorney executed in favor of Mr. Kroll and Respondent. After Mr. Kroll's suspension, the USPTO issued a non-final rejection. Respondent submitted an amendment and request for reconsideration on May 5, 2017. The USPTO issued Patent No. 9789227 on the '078 application on September 27, 2017.

In August 2018, Mr. El-Hannawy told OED that Mr. Kroll had never disclosed that he had been suspended or excluded from practice. Mr. El-Hannawy estimated he had paid Mr.

7

Appx10161                                                          [A10020]

Kroll around $30,000. He stated he had no idea Respondent was working on his application, he did not know who Respondent was, and he had never agreed to have Respondent work on his application. Respondent admits he never directly communicated with Mr. El-Hannawy or Dr. Frolova, and did not notify them how much he received in legal fees.

### 4. Mr. Amer Samad

On June 5, 2015, prior to the date of Mr. Kroll's suspension, Mr. Kroll filed U.S. Patent Application No. 14/732,076 naming Amer Samad as the sole inventor/applicant. The filing included a power of attorney executed in favor of Mr. Kroll and Respondent. After Mr. Kroll's suspension, in January and October 2018, Respondent filed an Amendment and a response to an Office action in connection with Mr. Samad's application. In September 2018, Respondent received a $1275 check from Marcia Kroll's account in connection with Mr. Samad's application.

Despite submitting the filings to USPTO and receiving payment, Respondent testified that he never directly communicated with Mr. Samad and never had any written communication with Mr. Samad regarding the structure of attorney fees. Further, as of August 2018, Mr. Samad told OED that he did not know who Respondent was or that Respondent was involved in his patent application; that Mr. Kroll had never disclosed his suspension or exclusion from practice to Mr. Samad; and that Mr. Kroll had continued to work directly with Mr. Samad in relation to Mr. Samad's patent application after being suspended.

### 5. Mr. Daniel McGauley

On June 29, 2015, prior to his suspension, Mr. Kroll filed U.S. Patent Application Serial No. 14/754,407 ("the '407 application") naming Daniel McGauley as the sole inventor and applicant. The filing included a power of attorney executed in favor of Mr. Kroll and Respondent. Respondent submitted a response to an Office action in the '407 application on April 4, 2017; a request for continued examination on August 14, 2017; an amendment and request for reconsideration on March 6, 2018; and a request for continued examination on December 13, 2018.

Respondent testified he received an $800 legal fee for responding to an Office action on behalf of Mr. McGauley, and also $650 in reimbursement for related USPTO filing fees, but never informed Mr. McGauley of the amounts he was charging to perform legal work. He stated he communicated with Mr. McGauley exclusively through Mr. Kroll until July 31, 2019, at which time Mr. McGauley asked if he could stop by Respondent's office to discuss why Respondent believed he would not be able to obtain a patent. Respondent said he advised Mr. McGauley of his availability, but never heard back from him, leading Respondent to assume that Mr. McGauley was not interested in reviving his application.

### 6. Mr. Tetteh Kwashi Tawiah

On April 12, 2016, prior to the effective date of Mr. Kroll's suspension, Mr. Kroll filed U.S. Patent Application No. 15/097,095, naming Tetteh Kwashi Tawiah as the sole

8

inventor/applicant. The filing included a power of attorney to Mr. Kroll and Respondent. Respondent filed an Amendment and Request for Reconsideration after Non-final Rejection in connection with Mr. Tawiah's application on December 15, 2016. The USPTO issued a Final Rejection on February 27, 2017, and sent that notification to Respondent. As no reply was filed, the application was abandoned, and a Notice of Abandonment was sent to Respondent on September 19, 2017.

In September 2018, Mr. Tawiah told OED that Mr. Kroll had not informed Mr. Tawiah that he had been suspended and excluded from practice before the USPTO. Mr. Tawiah further stated that he had never met Respondent and did not know that Respondent was making filings in his patent application, and he was unaware that his patent application had become abandoned nearly a year ago. Respondent admits that he never directly communicated with Mr. Tawiah, including in regard to the fee charged for his legal work.

### 7. Mr. Andrew Cochran

On April 21, 2016, prior to Mr. Kroll's suspension, Mr. Kroll filed U.S. Patent Applications No. 15/135,286, for a "Segmented Shaped Swim Fin," and 15/135,322, for a "Segmented Rounded Swim Fin." Both applications were non-provisional utility patents naming Mr. Andrew Cochran as the sole inventor and applicant. Both filings included powers of attorney executed in favor of Mr. Kroll and Respondent. Both applications later went abandoned. The notices of abandonment were mailed to Respondent on June 14, 2018. Meanwhile, on May 7, 2018, Respondent had submitted two design applications on Mr. Cochran's behalf, both titled "Swim Fin," under serial numbers 29/646,781 and 29/646,856. A design patent was issued in May 2019.

On August 15, 2018, Mr. Cochran told OED that Mr. Kroll had never disclosed his suspension or exclusion. Mr. Cochran also said Mr. Kroll had informed him the day before that his patent matters were on track. Mr. Cochran apparently was not aware that his utility applications had been converted to design applications. In September 2018, Mr. Cochran told OED that Mr. Kroll had recently notified him for the first time of the conversion from utility to design applications, but had not explained the difference between the two. Respondent did not communicate with Mr. Cochran about the applications until March 2019. Respondent stated that, as of May 2019, the client was pleased that a patent had been issued.

## IV. Discussion

In the *Complaint*, the OED Director alleges three counts of misconduct. As to Count I, the OED Director claims Respondent assisted Mr. Kroll in the unauthorized practice of law before the USPTO. For Count II, the OED Director claims Respondent engaged in the impermissible division of fees without client consent by sharing legal fees with Mr. Kroll. Finally, Count III alleges Respondent engaged in misconduct by failing to adequately communicate with his clients.

A. The OED Director has proven, by clear and convincing evidence, that Respondent assisted in Mr. Kroll's unauthorized practice of law.

9

Appx10163                                    [A10022]

As Count I of the *Complaint*, the OED Director argues that Respondent assisted Mr. Kroll in engaging in unauthorized practice before the Office, in violation of 37 C.F.R. § 11.505 and § 11.804(d). The gist of the OED Director's case is that clients have "pa[id] Mr. Kroll lots of money" to continue to prosecute their patents before the Office despite his suspension and exclusion, and Respondent has enabled this unauthorized practice by "allowing Mr. Kroll to, essentially, use [Respondent's] license" in all his dealings with the USPTO. Respondent counters that Mr. Kroll is allowed to provide legal advice because he remains an attorney in good standing in the state of New York. Respondent disputes that his working relationship with Mr. Kroll violates the USPTO rules of conduct and analogizes the relationship to a permissible arrangement between a patent attorney and a foreign attorney, a draftsman, or a general attorney within the same firm.

The USPTO disciplinary rules state that "[a] practitioner shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so." 37 C.F.R. § 11.505 (2020). The USPTO is considered a jurisdiction for the purposes of this rule. CHANGES TO REPRESENTATION OF OTHERS BEFORE THE UNITED STATES PATENT AND TRADEMARK OFFICE, 78 Fed. Reg. 20180, 20180-01 (Apr. 3, 2013); see also *In re Discipline of Peirce*, 128 P.3d 443, 444 (Nev. 2006) ("We therefore conclude that 'another jurisdiction' includes the USPTO."). Thus, to prove its claim that Respondent violated 37 C.F.R. § 11.505, the OED Director must establish that Mr. Kroll engaged in unauthorized practice before the Office, and that Respondent facilitated such practice. See *In re* Bang-er Shia, Proceeding No. D2014-31, at 34 (USPTO Mar. 4, 2016).[5]

"Practice before the Office" includes, but is not limited to, any "law-related service that comprehends any matter connected with the presentation to the Office or any of its officers or employees relating to a client's rights, privileges, duties, or responsibilities under the laws or regulations administered by the Office for the grant of a patent or registration of a trademark." 37 C.F.R. § 11.5(b) (2020). This includes "preparing necessary documents in contemplation of filing the documents with the Office … as well as communicating with and advising a client concerning matters pending or contemplated to be presented before the Office." Id.; see, e.g., *In re Piccone*, Proceeding No. D2015-06, at 24-25 (USPTO May 25, 2017) (finding that disbarred attorney engaged in "practice before the Office" where he was identified as attorney-of-record and correspondent for patent application and participated in drafting response to Office action).

Mr. Kroll's communication with his and Respondent's joint clients constituted "practice before the Office" because, through these communications, Mr. Kroll continued to counsel and advise clients concerning legal matters pending before the USPTO. As noted above, "practice before the Office" includes consulting with or giving advice to a client in contemplation of filing documents with the Office. 37 C.F.R. § 11.5(b)(1) (2020). Respondent conceded on the witness stand that Mr. Kroll continued to give legal advice to their joint clients with respect to matters pending before the Office even after being suspended from practice in May 2016. As one specific example, Respondent admitted that Mr. Kroll was providing legal advice to Dr. Botero when Mr. Kroll wrote in a March 2017 email that trademark protection may be available for an invention, as well as when Mr. Kroll wrote in a June 2017 email that it would be prudent to file

---

[5] All USPTO disciplinary decisions cited in this opinion are available at: https://foiadocuments.uspto.gov/oed/.

[A10023]

in Canada.  The record reveals many other instances of Mr. Kroll "communicating with and advising … client[s] concerning matters pending or contemplated to be presented before the Office" within the meaning of 37 C.F.R. § 11.5(b), such as by counseling clients regarding their options for prosecuting a patent and the legal consequences of such options; by advising clients of the legal significance of Office correspondence; and by strategizing with clients regarding the filing of documents such as patent applications and responses to Office actions.

In addition, in some cases, such as when prosecuting patents for Dr. Botero and Mr. Drammeh, Mr. Kroll remained attorney-of-record for months after his suspension took effect without changing the correspondence address or withdrawing from the representation, as contemplated under the USPTO regulations.  See 37 C.F.R. § 11.58(b)(1)(i), (c) (2020) (giving suspended practitioner 30 days to withdraw from matters pending before the Office and either conclude the work or advise the client to make alternate arrangements).  Mr. Kroll also continued to hold himself out as authorized to practice before the USPTO by using a letterhead identifying himself as an "ATTORNEY AT LAW" in "Patents Trademarks & Copyrights."  Moreover, although Mr. Kroll told Respondent that he had notified all his clients of his suspension, the clients interviewed by OED were unaware of the suspension.  The foregoing supports a finding that, after May 2016, Mr. Kroll carried on practicing patent law much as he had before his suspension, and because he continued to provide legal advice to clients concerning patent applications pending before the USPTO, his conduct amounted to "practice before the Office."

An attorney is not authorized to engage in practice before the Office if he has been suspended or excluded by the USPTO.  See 37 C.F.R. § 11.58(a) (2020).  Even if the suspended or excluded attorney is hired as a paralegal or assistant for another USPTO practitioner, the USPTO's regulations prohibit the suspended or excluded attorney from communicating directly with clients or rendering legal advice or services in regard to the clients' immediate or prospective business before the Office.  Id. § 11.58(e)(3).  Because Mr. Kroll was suspended in May 2016, his continued practice before the Office after that date, including his direct communication with clients and provision of legal advice concerning matters pending before the Office, was unauthorized and violated 37 C.F.R. § 11.505.

Respondent testified that it was acceptable for Mr. Kroll to continue to provide legal advice to clients because he remained an attorney in good standing in the state of New York.  However, the states' power to regulate the practice of law within their respective jurisdictions does not preempt the USPTO's authority to regulate its own bar.  Congress conferred this authority exclusively upon the USPTO.  See 35 U.S.C. §§ 2(b)(2)(D), 32, 33; Kroll v. Finnerty, 242 F.3d 1359, 1364 (Fed. Cir. 2001) (referencing USPTO's "exclusive authority" to admit persons to practice before it); Sperry v. Fla. ex rel Fla. Bar, 373 U.S. 379 (1963) (upholding USPTO's exclusive authority against challenge from state bar).  Thus, Mr. Kroll's state law license does not authorize him to represent clients in patent matters before the Office.  Only the USPTO can grant recognition to practice before it.  See 37 C.F.R. part 11, subpart B (establishing criteria under which OED Director grants such recognition).  In this case, the USPTO has expressly excluded Mr. Kroll.  Accordingly, his continued practice before the Office after May 2016 was unauthorized.

11

Appx10165                                                [A10024]

Respondent assisted in Mr. Kroll's unauthorized practice by lending his name and customer number to all documents filed with the USPTO on behalf of their joint clients, while allowing Mr. Kroll to continue to represent the clients' legal interests in almost every other respect. Respondent may have served as the "gatekeeper" for all USPTO filings, but he let Mr. Kroll continue to provide legal advice and counsel to their joint clients, to serve as the clients' sole point of contact in most cases, and even to set the fee for the legal services to be provided with no apparent input from Respondent, which are not the type of duties normally entrusted to a non-practitioner. By contrast, the USPTO regulations clearly contemplate that a suspended or excluded practitioner will withdraw from representations before the Office, cease providing legal advice in matters pending before the Office, and stop holding himself out to clients as a USPTO practitioner. See 37 C.F.R. § 11.58 (2020). Respondent ignored these restrictions on Mr. Kroll's practice and allowed Mr. Kroll to circumvent them by hiding behind Respondent's registration number in all dealings with the USPTO, thereby facilitating Mr. Kroll's unauthorized practice.

At hearing, Respondent suggested that, due to their joint power of attorney, he and Mr. Kroll together comprised a "law firm" permitted to represent joint clients. However, the USPTO Rules of Professional Conduct impose specific limitations on suspended or excluded practitioners who work with other USPTO practitioners, and Respondent's business arrangement with Mr. Kroll did not comply with these limitations. A suspended practitioner may not work with another practitioner except as a salaried employee under the other practitioner's direct supervision. 37 C.F.R. § 11.58(e)(1) (2020). Further, a suspended practitioner is barred from offering legal advice or communicating directly with clients regarding any business before the Office. Id. § 11.58(e)(3). But Respondent allowed Mr. Kroll to provide legal advice to their joint clients and relied on Mr. Kroll to directly communicate with the clients. Mr. Kroll clearly was not Respondent's salaried employee. In fact, he was the one who paid Respondent. Nor did Mr. Kroll operate under Respondent's direct supervision. Respondent's "supervision" appears to have been limited to reviewing drafts and filing them under his USPTO customer number. In other words, Respondent allowed Mr. Kroll to engage in unauthorized practice while Respondent supplied the credentials.

Respondent argues that his working arrangement with Mr. Kroll is not factually or legally distinguishable from that between a U.S. patent attorney and a foreign patent or trademark attorney who refers work to the U.S. attorney on behalf of foreign clients, or between a patent attorney and a draftsman who prepares drawings for the attorney, or between a registered patent attorney and a general attorney within the same firm who is not registered before the USPTO but assists the patent attorney in his practice. However, the key distinction between this case and the examples cited by Respondent is that, unlike a foreign attorney, draftsman, general attorney, consultant, or other person who helps perform work before the Office under another practitioner's registration number, Mr. Kroll has been expressly suspended and excluded from practice before the Office. As discussed above, the USPTO rules provide that an excluded or suspended practitioner may act as a paralegal for another practitioner or assist him by performing services normally performed by laypersons, but only if the requirements of 37 C.F.R. § 11.58(e) are met. Respondent's arrangement with Mr. Kroll did not meet these requirements. In fact, the arrangement seemingly represented a conscious attempt to circumvent the limitations imposed by the USPTO on excluded and suspended practitioners.

12

For all the reasons discussed above, clear and convincing evidence establishes that Respondent assisted Mr. Kroll's unauthorized practice before the Office, in violation of 37 C.F.R. § 11.505.

The OED Director asserts that, by assisting in unauthorized practice, Respondent also engaged in conduct prejudicial to the administration of justice, in violation of 37 C.F.R. § 11.804(d) (2020). Generally, an attorney engages in conduct prejudicial to the administration of justice when his behavior negatively impacts the public's perception of the courts or legal profession or undermines public confidence in the efficacy of the legal system. Att'y Grievance Comm'n v. Rand, 981 A.2d 1234, 1242 (Md. 2009). Courts have found the unauthorized practice of law to represent a serious threat to the effective administration of justice. See, e.g., United States v. Johnson, 327 F.3d 554, 560 (7th Cir. 2003); Am. Exp. Co. v. Monfort Food Distrib. Co., 545 S.W.2d 49, 52 (Tex. Civ. App. 1976). In this case, as a member of the bar, when Respondent facilitated such unauthorized practice, his actions undermined public confidence in the integrity of the legal system and the ability of the bar to self-regulate. Thus, Respondent's conduct was prejudicial to the administration of justice and violated § 11.804(d). See In re Bang-er Shia, supra, at 35 (finding conduct prejudicial to the administration of justice where USPTO practitioner aided non-practitioner in unauthorized practice).

B. The OED Director has proven, by clear and convincing evidence, that Respondent's fee structure violated the USPTO Rules of Professional Conduct.

As Count II of the *Complaint*, the OED Director claims that Respondent's fee structure violated 37 C.F.R. § 11.105(b) and (e) because Respondent failed to communicate the basis or rate of his fee to his clients and improperly divided fees with Mr. Kroll without obtaining clients' informed consent. Respondent, citing ABA COMM. ON ETHICS & PROF'L RESPONSIBILITY, Formal Op. 08-451 (Aug. 5, 2008), argues that two attorneys are permitted to split a legal fee without notifying the client how the fee is divided, as long as the total amount is reasonable.

Contrary to Respondent's argument, the USPTO Rules of Professional Conduct expressly require practitioners to obtain a client's written consent to a fee-sharing arrangement if the practitioners are not in the same firm. See 37 C.F.R. § 11.105(e)(2) (2020). The applicable rule states that practitioners who are not in the same firm may divide a fee only if: (1) the division is in proportion to the services performed by each practitioner, or each practitioner assumes joint responsibility for the representation; (2) the "client agrees to the arrangement, including the share each practitioner will receive, and the agreement is confirmed in writing"; and (3) the total fee is reasonable. Id. § 11.105(e)(1)-(3). In addition, in general, the basis or rate of a client's legal fees and expenses must be "communicated to the client, preferably in writing, before or within a reasonable time after" the representation commences. Id. § 11.105(b).

In this case, Respondent clearly violated § 11.105(e)(2) because he and Mr. Kroll did not notify their clients of their fee division arrangement or obtain the clients' written consent to the arrangement. Respondent argues that his and Mr. Kroll's practice may meet the definition of a "law firm," which would render § 11.105(e) inapplicable. However, the record shows that Respondent and Mr. Kroll do not operate as a firm. They do not share office space or letterhead, nor is there evidence they share any other resources such as phone lines, computer access, a joint

13

Appx10167                                                    [A10026]

account, or a secretary. There is also no evidence they jointly advertise their services or otherwise present themselves to the public in any way as a firm. If they were working in the same firm, Mr. Kroll—to comply with the USPTO's rules for suspended and excluded practitioners at 37 C.F.R. § 11.58(e)—would need to be a salaried employee under Respondent's direct supervision. Instead, as Respondent described their business arrangement, Respondent essentially performs referral work for Mr. Kroll. They are not members of the same firm, and therefore must comply with the requirements of § 11.105(e), which they failed to do.

At hearing, Respondent testified that the joint clients cannot complain about his legal fees because the power of attorney signed by each client provides constructive notice that Respondent may perform work for the client and authorizes Respondent to collect a fee. But the power of attorney used by Respondent and Mr. Kroll does not disclose their fee division arrangement, including the share of the fee each attorney will receive, such that their clients can meaningfully consent to the arrangement under § 11.105(e)(2). In fact, most of the joint clients interviewed by OED in connection with this matter were not even aware that Respondent was performing work for them. Thus, clear and convincing evidence shows that Respondent and Mr. Kroll did not obtain informed consent to their fee division scheme as required under § 11.105(e)(2).

The evidence also shows that Respondent failed to communicate to his joint clients the basis or rate of the fees for which the clients would be responsible, as required under 37 C.F.R. § 11.105(b). Respondent admitted he rarely communicated with the joint clients at all. He also admitted he did not know the total amount Mr. Kroll charged each client, but merely assumed the clients had agreed to a reasonable fee, as they would not have paid it otherwise. Because the joint clients paid Mr. Kroll directly without being informed how he would divide the fee with Respondent, they could not have been aware of the basis or rate of Respondent's portion of the fee or the basis for the division. Accordingly, Respondent failed to comply with § 11.105(b).

C. The OED Director has proven, by clear and convincing evidence, that Respondent failed to adequately communicate with his clients.

In Count III of the *Complaint*, the OED Director argues that Respondent failed to adequately communicate his clients, in violation of 37 C.F.R. §§ 11.102(a), 11.104(a)(2) and (3), and 11.104(b). The OED Director further argues that, by the same conduct, Respondent also violated 37 C.F.R. § 11.804(c) and (d). Respondent counters he was not required to directly communicate with his clients and it was reasonable for him to entrust this duty to Mr. Kroll.

The USPTO Rules of Professional Conduct impose upon practitioners a duty to reasonably communicate with their clients. Section 11.102 requires a practitioner to abide by a client's decisions regarding the objectives of the representation and to consult with the client as to the means by which the objectives are to be pursued. 37 C.F.R. § 11.102(a) (2020). Similarly, Section 11.104 requires a practitioner to reasonably consult with his clients regarding the means by which the clients' objectives are to be accomplished. Id. § 11.104(a)(2). A practitioner also must keep a client reasonably informed about the status of the client's matters, id. § 11.104(a)(3), and explain matters to the extent reasonably necessary to permit the client to make informed decisions regarding the representation, id. § 11.104(b).

14

Appx10168                                                    [A10027]

Respondent admits that he rarely spoke to his and Mr. Kroll's joint clients and had no direct communications at all with many of them, such as Dr. Botero, Mr. Samad, Mr. Tawiah, Mr. El-Hennawy, or Dr. Frolova.  However, Respondent insists he is not required to communicate directly with clients and maintains that delegating this responsibility to another attorney is not unusual or inappropriate, as client communications are handled the same way both in law firms and in his foreign practice.  Respondent further asserts there is no evidence that Mr. Kroll did not regularly and in a reasonable and responsible manner inform Respondent's clients of pertinent communications from the USPTO.

While it is not per se unethical to communicate with clients through a third person, Respondent should not have delegated this responsibility to a suspended and excluded practitioner.  Because Respondent rarely had any personal contact with his clients, he relied on Mr. Kroll to ensure his compliance with the USPTO Rules of Professional Conduct governing client communication.  Respondent testified that he trusted Mr. Kroll based on their longstanding relationship and Mr. Kroll's status as a licensed attorney in the state of New York.  However, the fact that the USPTO suspended and excluded Mr. Kroll from practice shows that the USPTO did not find him trustworthy, and under the USPTO's rules, the suspension and exclusion disqualified Mr. Kroll from communicating directly with clients about matters pending before the Office.  See 37 C.F.R. § 11.58(e)(3)(i) (2020).

Respondent also should have made himself more accessible to his clients.  Although he claims all joint clients had the ability to contact him directly if desired, Respondent and Mr. Kroll did not make it easy for them to do so.  Respondent's name appeared only on the power of attorney and in a footnote in correspondence from Mr. Kroll.  Further, the clients were not given any contact information such as a mailing address, phone number, or email address for Respondent.  Most of the clients interviewed by OED did not know who Respondent was and were unaware he was helping prosecute their patents.

Finally, as the only registered patent practitioner representing the joint clients, Respondent also should have exercised better oversight to ensure that the USPTO Rules of Professional Conduct concerning client communications were satisfied.  At hearing, Respondent admitted to several instances when client communications should have been handled differently.[6] By serving as the registered practitioner for the representations, Respondent undertook the ultimate responsibility for these lapses and for communicating properly with the joint clients.

Although Respondent could have improved his client communications in the ways discussed above, the evidence does not establish a general failure to reasonably consult with clients regarding their objectives or to abide by their decisions regarding how to accomplish those objectives.  The record indicates that Respondent consulted with clients through Mr. Kroll, who relayed instructions to Respondent based on his discussions with the clients.

---

[6] Specifically, Respondent agreed that Dr. Botero should have been informed earlier of the June 28, 2017 Office action in the '134 application.  Respondent also seemed to agree that Mr. Kroll's January 12, 2017 email to Dr. Botero stating that the "response to the last office action is being processed, and we will advise as soon as we hear back from the Patent Office" was misleading.  Respondent testified he would have worded it differently, as the response to the most recent Office action actually had not yet been filed.

15

But the OED Director did present evidence that two of Respondent and Mr. Kroll's joint clients, Mr. Tawiah and Mr. Drammeh, told OED they had not been informed that their patent applications had gone abandoned. Respondent did not present any rebuttal evidence. Respondent's failure to ensure his clients were informed of the USPTO Notices of Abandonment constituted a failure to keep his clients reasonably informed of the status of their patent matters, and therefore violated 37 C.F.R. § 11.104(a)(3). His conduct also amounted to a failure to reasonably consult with his clients regarding their objectives and how they wished to accomplish those objectives in light of the Notices of Abandonment, in violation of §§ 11.102(a) and 11.104(a)(2).

The OED Director also presented evidence that another joint client, Mr. Cochran, was not timely informed that his utility patent applications had been converted to design patent applications, or of the difference between the two. After Mr. Cochran's two utility applications went abandoned, Respondent filed design applications for the same inventions in May 2018. However, in August 2018, Mr. Cochran told OED he had not been informed of the conversion or that the utility applications had gone abandoned. The following month, he told OED that Mr. Kroll still had not explained the difference between utility and design applications. Respondent himself did not communicate with Mr. Cochran at all until March 2019. At hearing, Respondent testified that Mr. Cochran was now happy because a patent had been issued. Nonetheless, Respondent failed to consult with Mr. Cochran regarding the client's objectives before filing the design applications, failed to keep Mr. Cochran reasonably informed about the status of his patent matters, and failed to explain the matters to him to the extent reasonably necessary to allow him to make informed decisions. Accordingly, Respondent violated 37 C.F.R. §§ 11.102(a) and 11.104(a)(2), (a)(3), and (b) in his representation of Mr. Cochran.

The OED Director argues that, by failing to inform his clients that Mr. Kroll was suspended, Respondent also violated 37 C.F.R. § 11.804(c) and (d) (2020). Section 11.804(c) proscribes "conduct involving dishonesty, fraud, deceit or misrepresentation," while Section 11.804(d) proscribes conduct prejudicial to the administration of justice. See In re Lane, Proceeding No. D2013-17, at 14 (USPTO Mar. 11, 2014) (discussing definitions of "deceit," "dishonesty," and "misrepresentation").

The Court agrees that Respondent violated these provisions. Respondent knew Mr. Kroll was suspended from practice before the Office, but allowed Mr. Kroll to continue counseling and directly communicating with their joint clients while exclusively using Respondent's name and customer number on USPTO filings. This conduct was deceptive, in violation of § 11.804(c), because it helped Mr. Kroll conceal his disciplinary history from his clients. See People v. McNamara, 311 P.3d 662, 669 (Colo. 2013) (finding violation of analogous rule where attorney led clients to falsely believe he was authorized to practice). Many joint clients told OED they had no idea Mr. Kroll had been suspended and excluded from practice. The use of Respondent's customer number allowed Mr. Kroll to hide from the USPTO, and the conduct at issue in Count III—Respondent and Mr. Kroll's method of communicating with joint clients—hid Respondent's involvement in the representations from the clients, allowing Mr. Kroll to continue to present himself to unwitting clients as an attorney authorized to practice before the USPTO. Respondent's participation in this deception was not only dishonest, but was also prejudicial to

16

the administration of justice, in violation of § 11.804(d), because it facilitated the unauthorized practice of law before the Office.

## V. Conclusion

After considering all the evidence in the record, the Court finds as follows:

Count I:     Respondent violated 37 C.F.R. § 11.505 and § 11.804(d) as charged.

Count II:    Respondent violated 37 C.F.R. § 11.105(b) and (e) as charged.

Count III:   Respondent violated 37 C.F.R. § 11.102(a), § 11.104(a)(2), (a)(3), and (b), and § 11.804(c) and (d) as charged.

## SANCTION

The OED Director asks the Court to sanction Respondent by suspending him from practice before the Office for at least three years.  Before sanctioning a practitioner, the Court must consider the following four factors:

> (1) Whether the practitioner has violated a duty owed to a client, to the public, to the legal system, or to the profession;
> (2) Whether the practitioner acted intentionally, knowingly, or negligently;
> (3) The amount of the actual or potential injury caused by the practitioner's misconduct; and
> (4) The existence of any aggravating or mitigating factors.

37 C.F.R. § 11.54(b) (2020).  The Court often looks to the American Bar Association's STANDARDS FOR IMPOSING LAWYER SANCTIONS (2005) ("ABA Standards") for guidance when determining the proper length and severity of a sanction, or when determining whether aggravating or mitigating factors exist.  See *In re* Chae, Proceeding No. D2013-01, at 4 (USPTO Oct. 21, 2013).

1. Violation of Duties Owed

As discussed above, the USPTO Rules of Professional Conduct impose upon practitioners certain duties to communicate with clients and keep them informed, including regarding the basis of the fees for which the clients will be responsible and the division of fees by attorneys not in the same firm.  Respondent violated these duties to his clients when he engaged in the conduct described in Counts II and III.

Respondent also violated duties owed to the public, the legal system, and the legal profession when he assisted in unauthorized practice before the Office.  An attorney is an officer of the Court who is expected to "assist in maintaining the integrity and competence of the legal profession and aid in the prevention of unauthorized practice of law." *In re* Piccone, Proceeding No. D2105-06, at 28 (USPTO May 25, 2017) (internal quotes omitted).  Respondent disregarded

Appx10171                                                          [A10030]

these duties when he facilitated Mr. Kroll's unauthorized practice. As discussed above, this conduct was prejudicial to the administration of justice because it undermined public confidence in the integrity of the legal system and profession and the ability of the bar to self-regulate. See United States v. Johnson, 327 F.3d 554, 560 (7th Cir. 2003) ("The unauthorized practice of law poses a serious threat to the integrity of the legal profession.").

2. Whether Respondent Acted Intentionally, Knowingly, or Negligently

It is undisputed that, at all times relevant to this matter, Respondent knew Mr. Kroll was not authorized to practice before the Office. As a registered patent practitioner since 1984, Respondent should have been familiar with the USPTO's Rules of Professional Conduct, and as the person who represented Mr. Kroll in disciplinary proceedings before the USPTO, he also should have been well aware of the language of the orders of suspension and exclusion explaining what Mr. Kroll was no longer permitted to do. Nonetheless, Respondent helped Mr. Kroll maintain his patent practice without much change after his suspension, operating in a manner that seemed calculated to deceive both the USPTO and their joint clients. As a whole, the record indicates Respondent knowingly assisted in Mr. Kroll's unauthorized practice.

Respondent also acted negligently in failing to ensure that his and Mr. Kroll's communications with their joint clients conformed to the Rules of Professional Conduct and that the joint clients were being properly informed about the basis for and division of legal fees.

3. Actual or Potential Injury

The OED Director claims Respondent's misconduct caused actual injury to at least some of his clients, citing instances where Respondent and Mr. Kroll took two months to notify Dr. Botero of an Office action, sent Dr. Botero a letter with misleading wording, and failed to notify Mr. Tawiah that his patent application had gone abandoned. The OED Director further asserts that Respondent caused actual injury to the justice system by failing to honor the USPTO Director's orders suspending and excluding Mr. Kroll.

Respondent argues that no clients were harmed and no clients' rights were unintentionally forfeited. He notes that, of the clients interviewed by OED and mentioned in the *Complaint*, several (Dr. Botero, Mr. Cochran, and Mr. El-Hennawy and Dr. Frolova) received patents, and no clients appeared at the hearing to testify against Respondent or undergo cross-examination. Respondent also points out that, even eighteen months after Mr. Tawiah learned from OED that his patent application had gone abandoned, he had not removed Respondent as attorney-of-record, contacted Respondent to inquire about his options, or sought in any way to revive the patent application, indicating he must no longer wish to prosecute it.

On review, the record does not support a finding of actual injury. Respondent's misconduct certainly had the potential to hurt his clients, and assisting in unauthorized practice is intrinsically detrimental to the justice system. But the OED Director has presented no evidence that Respondent caused actual harm to any client. Although Respondent and Mr. Kroll could have communicated better with Dr. Botero, there is no evidence any of Dr. Kroll's intellectual property rights were injured or forfeited. And although some clients' applications went

18

Appx10172                                                    [A10031]

abandoned, and at least two (Mr. Tawiah and Mr. Drammeh) told OED they were unaware of the Notices of Abandonment, the record does not reveal the context of the abandonments. As suggested by Respondent, a patent application may become abandoned if the inventor simply decides it is no longer worthwhile to continue pursuing a patent. The record contains no first-hand account from any of the clients, all of whom are identified as "non-grieving." The lack of evidence that any of Respondent's clients suffered actual harm, or even lodged a grievance against him, weighs in favor of a less severe sanction than that proposed by the OED Director.

4. Aggravating and Mitigating Factors

The ABA has promulgated a list of potential aggravating and mitigating factors to be considered when assessing disciplinary sanctions for attorneys. See ABA Standards §§ 9.22, 9.32. The OED Director argues that the following aggravating factors warrant a more severe sanction in this case: a dishonest or selfish motive; failure to acknowledge the wrongful nature of the misconduct; and substantial experience in the practice of law. See id. § 9.22(b), (g), (i).

The OED Director argues that Respondent committed misconduct with a dishonest or selfish motive because, although he collected a smaller fee than Mr. Kroll, he still was paid about $800 per Office action. However, collecting a fee does not, alone, support a finding that Respondent acted with a selfish motive. Respondent indicated he was charging less than he could have. He also testified only about 5 to 10% of his work came from Mr. Kroll. Respondent had a longstanding working relationship with Mr. Kroll, who "helped [Respondent] get started," and he believed that Mr. Kroll's clients may be "left high and dry if someone didn't handle their cases" after his suspension. Thus, the evidence suggests Respondent was motivated by a desire to help Mr. Kroll maintain his livelihood, not by a selfish motive. On the other hand, he acted with the dishonest motive of undermining the disciplinary system when he helped Mr. Kroll dodge the USPTO's regulations for suspended and excluded practitioners.

The OED Director also argues that Respondent has refused to acknowledge the wrongful nature of his conduct and that his deflections are an aggravating factor in this matter. It is true that Respondent has not admitted his conduct violated the USPTO disciplinary rules. However, because his misconduct did not injure any clients, this is not a case where he has refused to show remorse or accept responsibility for the harm he caused, as there is no tangible harm. The defenses Respondent raised against the OED Director's allegations were rejected by the Court, but were not frivolous or raised in bad faith. A practitioner should not be subjected to harsher discipline for attempting to defend himself against the disciplinary charges.

The OED Director contends that Respondent's substantial experience as a patent attorney is an aggravating factor. Respondent has engaged in practice before the Office for over thirty years. The Court agrees this is an aggravating factor warranting a meaningful sanction. Given his experience, Respondent should be familiar with the USPTO's disciplinary rules and should have known better than to undermine them by helping Mr. Kroll circumvent them. Although Respondent did not himself engage in unauthorized practice, he knowingly became an accomplice to Mr. Kroll's circumvention of the disciplinary sanction lawfully imposed on him by the USPTO Director.

19

Appx10173                                              [A10032]

The Court also finds that a mitigating factor exists in this case, the absence of a prior disciplinary record. There is no evidence Respondent has ever been subjected to discipline by the USPTO or by the New York State Bar, and he remains an attorney in good standing in New York.

5. Discussion and Conclusions

The OED Director argues that the appropriate sanction in this case is a suspension of at least three years. The Court agrees that a suspension is warranted. Respondent's conduct violated duties owed to his clients, the public, the legal system, and undermined the impact of disciplinary action in the legal profession. Facilitating unauthorized practice is a serious transgression. Respondent knowingly helped another practitioner commit this transgression, even though he certainly knew better given his years of experience. However, Respondent has a clean personal disciplinary record, and the evidence does not show that his misconduct caused actual harm or that he acted with a selfish motive. Accordingly, after considering the entire record and all the factors discussed above, the Court finds that a two-year suspension is appropriate.

**CONCLUSION AND ORDER**

For the reasons set forth above, Respondent shall be **SUSPENDED** from practice before the U.S. Patent and Trademark Office for a period of not less than two (2) years.[7]

So **ORDERED**,

J. Jeremiah Mahoney
United States Administrative Law Judge

**Notice of Appeal Rights**: Within fourteen (14) days after the date of this initial decision, either party may appeal to the USPTO Director. 37 C.F.R. § 11.55(a) (2021).

---

[7] Respondent is directed to 37 C.F.R. § 11.58 (2021), which sets forth his duties while suspended. Respondent shall remain suspended from practice before the Office unless and until he is reinstated by the OED Director pursuant to 37 C.F.R. § 11.60 (2021).

20

Appx10174                                                                                    [A10033]

**CERTIFICATE OF SERVICE**

I hereby certify that copies of the foregoing **INITIAL DECISION AND ORDER,** issued by J. Jeremiah Mahoney, Administrative Law Judge, in D2019-43, were sent to the following parties on this 24th day of September 2021, in the manner indicated:

*Cinthia Matos*

Cinthia Matos, Docket Clerk
HUD Office of Hearings and Appeals

**VIA EMAIL:**

Mr. Edwin Schindler                                      *Respondent*
4 High Oaks Ct.
Huntington, NY  11743
edschindler@optonline.net

Robin Crabb, Esq.                                        *Counsel for Government*
Associate Solicitors
Mail Stop 8
Office of the Solicitor
P.O. Box 1450
Alexandria, Virginia  22313-1450
PTO-HUDcases@uspto.gov
robin.crabb@uspto.gov

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2025-1557

**Short Case Caption:** Schindler v. Stewart

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✓] the filing has been prepared using a proportionally-spaced typeface and includes __13,999__ words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 05/19/2025          Signature: /s/ Edwin D. Schindler

Name: Edwin D. Schindler